[No. S045504. Mar. 14, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
HOOMAN ASHKAN PANAH, Defendant and Appellant.

400

404

**408**

## COUNSEL

Robert R. Bryan, under appointment by the Supreme Court, and Jill Culbert for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—A jury convicted defendant Hooman Ashkan Panah of the first degree murder of eight-year-old Nicole Parker (Pen. Code, § 187), among other offenses, and found true the special circumstance allegations that the murder was committed while defendant was engaged in the commission of the crimes of sodomy and lewd acts upon a child under the age of 14 (Pen.

Code, § 190.2, subd. (a)(17)(D), (E)). The same jury subsequently set the penalty at death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. *Procedural History*

Defendant was charged in a seven-count indictment with the murder of Nicole Parker (Pen. Code, § 187)[1] with the special circumstances that the murder occurred while defendant was engaged in the commission of the crimes of kidnapping, sodomy, lewd acts upon a child under 14, and oral copulation of a person under the age of 14 and more than 10 years younger than defendant. (§ 190.2, subd. (a)(17)(B), (D), (E), and (F).) He was further charged with kidnapping for child molesting (§ 207, subd. (b)); kidnapping a person under 14 years of age (§§ 207, subd. (a), 208, subd. (b)); sodomy by use of force (§ 286, subd. (c)); lewd acts upon a child under the age of 14 (§ 288, subd. (a)); penetration of genital or anal openings by a foreign object with a person under the age of 14 and more than 10 years younger than defendant (§ 289, subd. (j)); and oral copulation of a person under 14 years of age and more than 10 years younger than defendant (§ 288a, subd. (c).)

Defendant pled not guilty and denied the special circumstance allegations. Prior to commencement of the guilt phase of his trial, he also entered a plea of not guilty by reason of insanity. (§ 1016, subd. 6.)

After presentation of the prosecution's case, defendant moved for acquittal (§ 1118.1); his motion was granted as to the special circumstance allegation of kidnapping and as to the substantive counts alleging kidnapping and kidnapping for child molestation, but was otherwise denied. The jury convicted defendant of first degree murder and found true the special circumstance allegations that he committed the murder while engaged in the commission of the crimes of sodomy and lewd acts upon a child under the age of 14. The jury found not true the special circumstance allegation that the murder was committed while defendant was engaged in the commission of the crime of oral copulation. Defendant was also convicted of sodomy by force, lewd acts upon a child under the age of 14, penetration of genital or anal openings by a foreign object with a person under 14 years of age, and oral copulation of a person under 14 years of age.

Defendant withdrew his plea of not guilty by reason of insanity. Following the penalty phase, the jury returned a verdict of death. Defendant's motion

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

for a new trial (§ 1181) was denied and the trial court declined to modify the verdict of death (§ 190.4, subd. (e)). Defendant was sentenced to death on the murder count. On the remaining four counts, he was sentenced to eight years on each count, to run consecutively. These terms were stayed pursuant to section 654.

### B. *Guilt Phase Evidence*

#### 1. *Prosecution Evidence*

On the morning of Saturday, November 20, 1993, Lori Parker drove her eight-year-old daughter, Nicole, and her son, Casey, to the apartment of their father, Edward Parker, in Woodland Hills. Mr. Parker lived with the Parkers' other two children, Chad and Travis. Defendant, then 22, and his mother, Mehri Monfared, lived in the apartment across the courtyard from Mr. Parker's apartment. Defendant's mother was having a business meeting that morning with Ahmad Seihoon. When Mr. Seihoon arrived about 9:00 a.m., defendant was asleep in his bedroom upstairs.

Ms. Monfared left the apartment sometime before 11:00 a.m., as did Mr. Seihoon, but Seihoon had to return to the apartment for his keys and wallet. As Mr. Seihoon was leaving, he saw Nicole. She asked him if he lived in the apartment and if he was the father of the "boy with the long hair." He told her he was a friend of the family. Nicole stared at him and then ran across the courtyard into her father's apartment. Mr. Seihoon went back into defendant's apartment and called out to him in Farsi to lock the door.

Sometime after 11:00 a.m., Nicole asked her father for a glove and softball. As Mr. Parker walked back and forth between his apartment and the laundry room, he saw Nicole throwing the ball against the elevator. He told her to be inside the apartment by noon.

About 11:45 a.m., he came outside and called her. She did not respond, but he assumed she had heard him. Five minutes later, he went out again and called her. When she again failed to respond, he searched the apartment complex for her. About 12:30 p.m., he called Mrs. Parker and reported that Nicole was missing.

Afterwards, Mr. Parker began knocking on doors to see whether Nicole was playing inside a neighbor's apartment. He came to defendant's apartment. Defendant answered and stood in the doorway. Mr. Parker asked him whether he had seen Nicole and defendant answered "something like, oh, is she missing." Mr. Parker answered, "yeah. I can't find her," and went to the next door. Unable to locate her, he called the police.

While Mr. Parker waited for the police, defendant and other neighbors were standing around. They wanted to know if he had found Nicole. Defendant followed him down some stairs. He offered to drive down Ventura Boulevard with Mr. Parker looking for Nicole. Mr. Parker brushed him off, telling him the police were coming and would take care of it. Defendant was "very persistent," however, and kept "pushing," telling Mr. Parker, "let's go. Let's go." Mr. Parker told him, "no, no, no. Don't worry about it. Like just leave me alone." Eventually, he stopped paying attention to defendant, who left.

Los Angeles Police Department Officer Roger Mosset arrived about 1:15 p.m. He and Sergeant Melvin Patton set up a command post at the apartment complex. Officer Mosset obtained a description of Nicole from Mr. and Mrs. Parker and initiated a search of the apartment complex and the surrounding area. Officer Ruth Barnes and her partner, Officer Calderon, participated in a door-to-door search for Nicole. At defendant's apartment, Officer Barnes saw the television was on, but no one responded when she knocked, so she and Calderon left. Sometime later, Officer Barnes returned to the apartment and observed the television was off. A neighbor told her a young man lived there with his mother.

Defendant reported to work at Mervyn's department store about 3:00 p.m. Adele Bowen was the store manager. The day before, she and defendant had argued about his parking in an unauthorized area. Defendant had become loud and argumentative and called Ms. Bowen a "dictator." When defendant arrived for work, Bowen sought him out to resolve the argument. His responses were normal and he did not appear to be under the influence of drugs or alcohol.

Defendant's direct manager, Bruce Cousins, saw him about 3:15 p.m. According to Cousins, defendant was not as "up and cheery" as usual, but he did not appear to Cousins to be under the influence of alcohol or drugs. About 5:00 p.m., Rauni Campbell, a fellow employee who had dated defendant, saw him in the store. Sometime between 5:15 and 5:30 p.m., Mr. Cousins noticed that defendant was gone. Cousins searched for him, but he could not be found.

At the apartment complex, Sergeant Patton received information that Nicole had been seen talking with a man outside of defendant's apartment. Officer Barnes also told him that the television in defendant's apartment had been on and then turned off. After obtaining a key from the apartment manager, Patton and several other officers, including Barnes and Calderon, entered defendant's apartment to search for Nicole. After about 15 minutes, when they did not find her, Patton ended the search.

When Ms. Monfared returned to the apartment complex, she was stopped by police who showed her a picture of Nicole and asked her whether she knew the child. Ms. Monfared said she did not. An officer told her that defendant had been seen talking with Nicole, and asked her where he was. She said he was at work.

Officers Calderon and Barnes went to defendant's apartment and spoke to Ms. Monfared about talking to defendant. Ms. Monfared called him and gave the phone to Officer Barnes. Barnes asked defendant if he knew Nicole and he said, "vaguely," or "not really." Officer Barnes then asked him, "Do you know where she is?" Defendant answered, "No." Officer Barnes said, "Oh, because someone said that they had seen you with her earlier." Defendant replied, "No, I didn't see her."

Around 5:45 p.m., defendant called Bruce Cousins and told Cousins he was not in the store, would not be returning and loved everyone at Mervyn's. He said he could not come back "because some people that he knew [were] trying to get him in trouble and would I please inform his mother to get out of town." Cousins put him on hold to wait on customers. When he picked up the phone, defendant again asked Cousins to call his mother and "tell her that these people were after her and they were going to kill her, for her to get out of town." Cousins did not take defendant seriously.

Sometime after 5:00 p.m., defendant paged Rauni Campbell. He told her, "I need your help" and "I have done something very bad" and asked her to call his mother and his friends to tell them good-bye because he would not be seeing them again. When she asked him what he had done, he would tell her only that it was "so big" she would find out about it.

At 8:00 or 9:00 p.m., Mr. Seihoon called defendant's apartment and learned from Ms. Monfared that police were looking for a missing girl. He went to her apartment and told police about his earlier encounter with Nicole.

On Sunday, November 21, sometime around 9:00 a.m., Ms. Campbell was awakened by defendant, knocking at her window. His wrists were slashed and there was dried blood on his sweater and wrists. She let him into her apartment and he told her he wanted her to buy sleeping pills for him. She did not ask him why he needed them. They drove to a store, where defendant purchased the pills and then returned to her apartment.

After defendant took the pills, she asked him what he had done, and if it had anything to do with "the little girl that was missing from his apartment complex." He said, "Yes." When she asked him "if the little girl was still

alive," defendant said, "No." She asked him, "do you know she is not alive or are you assuming that because of what you have done that is so bad she is not alive." Defendant answered, "she is not alive." He told her she would find out about it because "they have a tape of me." Defendant appeared to understand her questions and was responsive to them.

Ms. Campbell told him she needed to go downstairs to the manager's apartment and call in sick. Instead, she called 911 and told the operator that a friend was in her apartment trying to commit suicide. When Officer Kong arrived, she told him defendant was taking sleeping pills and had something to do with the missing girl.

When defendant saw Officer Kong, he ran. Officer Kong went in pursuit, but lost defendant. He broadcast a radio call describing defendant as the victim of a suicide attempt. When he learned from Ms. Campbell what defendant had told her about Nicole, he relayed this information to Sergeant Mascola.

Sergeant Mascola arrived at Ms. Campbell's apartment about 10:00 a.m. After talking to Officer Kong, he began a search. He came upon defendant's black BMW. Through the windows he saw a couple of bloodstained knives and bloodstains in the interior of the car. He also observed a cord sticking out from the trunk that he believed could have been a ligature. Mascola believed Nicole might be inside the trunk so he had his officers force it open. She was not there.

Detective David Navarro also went to Ms. Campbell's apartment that morning. From there, he went to defendant's apartment. Detective Navarro and other officers searched defendant's apartment for Nicole but did not find her. In defendant's bedroom, Detective Navarro observed a video camera set up with a video machine. The video camera was pointing toward the bed. Detective Navarro ended the search and secured the location so he could obtain a search warrant.

Defendant was eventually detained by police at Ms. Campbell's apartment complex. His wrists were cut and he appeared to one of the officers, Officer Joe, to be under the influence of drugs or alcohol. Officer Joe asked defendant where the little girl was. Defendant replied she "could be at Topanga Canyon and Parenthia" at a motel. He also said she could be at the Fallbrook Mall or at a park located at Topanga Canyon and Roscoe Boulevard. He told the officer he "liked her very much, even carry her skeleton remains around." The statement did not make sense to Officer Joe. At times defendant spoke clearly, at other times he was incoherent as if he were falling asleep. He appeared to Joe to be under the influence of "something," and because of the cuts to his

wrists, the paramedics were called. Defendant was transported to West Valley Hospital for medical treatment.

At 10:00 or 11:00 p.m., Detective Burris and other police officers arrived at defendant's apartment and conducted a search pursuant to a search warrant. In defendant's bedroom closet, Burris found three suitcases, one atop the other beneath a pile of clothes. Inside the third suitcase, Burris found Nicole's naked body wrapped in a bed sheet tied with a knot.

Various items were removed or collected from defendant's bedroom by police criminalist, Robert Monson, including the bedding, all the items on the bed, and defendant's blue robe. The sheet Nicole was wrapped in was preserved for later analysis. Monson also found and collected bloodstains from the bathroom and a tissue paper from the bathroom wastebasket that had a beige-colored stain on it. A preliminary acid phosphatase test of the stain indicated the possible presence of semen. Later, Monson went to West Valley Hospital where he obtained a blood sample from defendant. A police detective also gave Monson a ring, a pendant, and a necklace belonging to defendant.

About midnight, a coroner's criminalist, Lloyd Mahany, arrived at the crime scene. He lifted Nicole's body out of the suitcase, placed it on the bed, and unwrapped it. Mahany examined the body and collected sexual assault evidence, including swabs of the mouth, vaginal and anal areas, and breasts.

The evidence collected by Monson and Mahany was analyzed by a third criminalist, William Moore, a forensic serologist. Preliminarily, Moore determined that defendant's blood type was ABO type B while Nicole's blood type was ABO type A. The sheet in which Nicole was wrapped was found to have bloodstains of ABO type AB, semen, and amylase, a constituent of saliva and other bodily fluids.

Moore testified the blood on the sheet could have come from a person who had type AB blood or could have been a mixture of A antigens and B antigens. The bloodstain on the sheet was "consistent" with Nicole. Additionally, there were a small number of stains on the sheet exhibiting positive acid phosphatase activity consistent with semen. Some of these stains revealed the presence of spermatozoa fragments, indicating "that a male had ejaculated and deposited semen directly on the sheet or it was deposited by some other means." Moore opined that the pattern of stains was consistent with the spewing of semen across the sheet and inconsistent with masturbation. The stains also showed amylase activity that was consistent with saliva. The saliva could have come from Nicole and the semen could have originated from defendant. Moore also analyzed the oral swab taken from Nicole as part

of the sexual assault kit. The oral swab produced a positive acid phosphatase result indicative of the presence of semen, but was inconclusive.

Moore also analyzed defendant's blue robe. The robe, like the sheet, bore bloodstains of ABO type AB. These stains also contained high amylase activity, indicative of saliva. The bloodstain was consistent with Nicole. The saliva could have originated from defendant.

Moore's analysis of the tissue paper found in the wastebasket in defendant's bathroom revealed that the paper contained semen stains consistent with defendant and high amylase activity consistent with Nicole. The stains were consistent with the product of oral copulation.

Moore also examined the anal swab. The swab produced a positive acid phosphatase result indicative of the presence of semen, but was inconclusive.

The autopsy of Nicole's body was performed by Dr. Eva Heuser of the Los Angeles County Coroner's Office. Dr. Heuser testified that there were petechial hemorrhages around Nicole's eyes indicative of pressure to the neck. This was confirmed by evidence of neck injuries, including deep bruising to the tissue around the carotid artery and jugular vein. The bruising was consistent with application of pressure by a thumb. The injury to the carotid artery could have caused death. There was an injury to the larynx indicative of manual strangulation. The injuries to her neck were sufficient to cause death. An examination of her lungs indicated she had aspirated her own vomit.

Dr. Heuser also observed other bruises and abrasions to Nicole's face. A bruise on her forehead was consistent with impact with a wall or the floor or being struck with a fist. Other bruises were caused by finger pressure. Scratches on the inside of her thighs were consistent with having been made by defendant's ring.

The vaginal opening was "very widely" open and bruised, suggesting penetration with a finger or attempted penetration by a penis. The anal opening was very relaxed and the circumference of the anus had a bruised appearance; there was also tearing of the anus toward the vagina and indications of bleeding. These injuries were consistent with the insertion of a male penis, or a similar object, into the rectum. All these injuries were premortem. Dr. Heuser opined that the injury to the rectum could have caused death.

Dr. Heuser concluded that the cause of Nicole's death could have been the injuries to her neck or the result of sodomy. She was unable to state a time of death but did opine that death would have taken at least a half-hour.

## 2. Defense Evidence

Defendant called Dr. John Palmer, who had treated him following his arrest. Dr. Palmer was not a psychiatrist but had treated many people with psychiatric problems in the emergency room. Dr. Palmer thought defendant was "psychotic," and described him as being "agitated" and "delusional." He was having auditory hallucinations, acting inappropriately, and had slashes on his wrists that appeared to have been self-inflicted. The cuts to his wrists were not life threatening. Defendant said that people in black hoods had told him to slash his wrists. A toxicological screen revealed the presence of tetrahydrocannabinol, the active ingredient in marijuana, and benzodiazepine, which belongs to a class of drugs used as a mild tranquilizer.

Dr. Palmer concluded that defendant was "acutely psychotic," suicidal and hearing "command hallucinations, meaning the black robed and hooded figures were telling him to kill himself." Defendant was also under the influence of drugs. Dr. Palmer could not tell whether his psychosis was brought on by the drugs, or was long-standing and relatively quiescent but had been exacerbated. He also acknowledged "environmental factors," like "acute stress" or "acute grief," can produce an acute psychotic break.

Defendant also presented character witnesses who testified to his peaceful disposition, sensitive nature and lack of any unnatural interest in children.

Two former girlfriends also testified that defendant was never violent during sex. One of them, Victoria Eckstone, whom defendant dated for six months to a year, also testified that she believed defendant was the father of her 19-month-old daughter. She testified that defendant loved the child.

Michael Mier, who lived about five miles from defendant, testified that on the evening of November 20, he heard a young girl and a man screaming for help in a creek next to his home. He called 911.

## C. Penalty Phase Evidence

### 1. Prosecution Evidence

The prosecution presented victim impact evidence in the form of testimony from Mr. and Mrs. Parker and their sons, Travis, Chad and Casey. Each family member testified about Nicole's character and the effect that her death had had on that family member and other members of the family.[2]

---

[2] This evidence is discussed in greater detail in connection with defendant's argument that it was cumulative, unsubstantiated and prejudicial.

## 2. *Defense Evidence*

Victoria Eckstone testified that she believed defendant was the father of her child, Amanda, and that defendant was good with the child. She acknowledged that she had never had Amanda's paternity medically determined but believed she bore an uncanny resemblance to defendant. She wanted defendant to continue to have a relationship with Amanda because even an imprisoned father was better than no father at all. If defendant were given the death penalty, Amanda would not have a father.

Five friends of defendant testified to his good character, describing him as "nice," "polite," "kind," "sensitive," "sweet," and "gentle," and described how they would be affected should he receive the death penalty—"shocked," "devastat[ed]," "hurt," "very sorry," and "very upset." Daryoosh Adib, who befriended defendant after his arrest, believed defendant was a "very calm" person who could not have "bothered anyone." If defendant received the death penalty, he would feel as if he had lost a brother. William Glaser, defendant's history teacher, testified he had encouraged defendant to seek psychological counseling for stress after defendant expressed his pessimism about his future.

Farrah Farzaneh was a friend of defendant's mother, and had known defendant for approximately six years. Ms. Farzaneh believed that defendant's mother loved him very much but that her parenting methods had "failed miserably." She described defendant as a "sensitive" and "caring" young man who had had a very difficult life. She testified that it would be horrible for her if defendant received the death penalty.

Defendant's mother, Ms. Monfared, testified at length. She was born in Tehran in 1947 and married defendant's father when she was 21 and he was 25. She testified that she and defendant's father argued constantly and that he beat her. While she was pregnant with defendant, her husband physically abused her, more than once pushing her and causing her to fall to the floor. The abuse continued after defendant was born in 1971. When defendant was three months old, defendant's father pushed her and she dropped the baby carrier containing him. He required medical attention. When defendant was about three and a half years old, Ms. Monfared divorced her husband and was granted custody of defendant.

Defendant and his mother went to live with her family. Defendant was upset at his parents' separation. When he was four years old, he intentionally cut his finger severely enough to require stitches. When his mother asked him why, he said did not want to live anymore. Defendant did eventually reestablish a good relationship with his father.

When defendant was 10, he told his mother that his grandfather was sexually molesting him and an older cousin by having anal sex with them. Ms. Monfared did not believe defendant. She slapped him and called him a liar and a "kuni," a pejorative term in Farsi for a homosexual. A few months later, the principal at his school told her some students were saying defendant was "acting like a gay." Defendant denied it, but she did not believe him. She slapped him and punished him and frequently called him a "kuni."

In 1984, after the death of her parents, Ms. Monfared decided to leave Iran with defendant. She had been fired from her job because of her disagreement with the government over its treatment of women. At one point, Ms. Monfared was put in jail by the government. Also, while they were in Iran, the country was at war with Iraq. Defendant was so frightened by the bombing of Tehran that he wet himself at night. Ms. Monfared was afraid that defendant might be taken to war. She also wanted more opportunity for him. For all these reasons, she wanted to take him out of the country. Defendant, however, wanted to stay in Iran where he could have a relationship with his father.

They first went to Turkey where they lived for two years while Ms. Monfared attempted to gain entry into the United States. For the first two weeks they were in Turkey they had to share a bed; during this period, defendant, then 13, tried to "touch" his mother. At one point, during their sojourn in Turkey, they went to Cyprus where Ms. Monfared attempted unsuccessfully to obtain visas to the United States. While they were in Cyprus, a man tried to rape her in the hotel room she was sharing with defendant. Her yelling woke defendant, who was very frightened. The man struck them and left.

In 1986, Ms. Monfared obtained visas to Germany and to Mexico. Defendant did not require a visa to go to Germany, so they went there. Ms. Monfared remained in Germany for 10 days, then left for Mexico before her visa expired. Defendant, then 15, stayed behind in Germany, which had granted him political asylum. He lived at a dormitory for teenagers from foreign countries or without parents. Eventually, Ms. Monfared obtained green cards for herself and defendant to allow them to travel to the United States. In 1988 she returned to Germany for defendant.

Defendant was happy in Germany where he had a girlfriend whom he wanted to marry. Ms. Monfared threatened to commit suicide unless he came with her to the United States. In September 1988, a month after they arrived, defendant took some pills in a suicide attempt. When Ms. Monfared asked him why he had attempted suicide, he told her it was because he had wanted to stay in Germany with his girlfriend.

In 1989, defendant began dating a girl named Laura. Laura lived with defendant and his mother briefly, but Ms. Monfared asked Laura to leave because she suspected Laura was stealing from her. Defendant continued to see Laura. Ms. Monfared threatened to kill herself unless defendant stopped seeing Laura. They argued and she hit him and threw him out of the apartment. On one other occasion, Ms. Monfared threw a knife at defendant and threatened to kick him out of the house.

Ms. Monfared testified that she physically abused defendant when he was a child. She beat him with her hands and shoes, slapped him when he misbehaved and pulled his hair. She also put pens and pencils in the middle of his fingers and squeezed his hand to make him cry. Defendant's uncles and aunts also struck him when he misbehaved. She also testified that when defendant was eight or nine, she took more than 50 showers with him. She testified further that over the years, she would threaten to commit suicide to get defendant to do as she said. She threatened to commit suicide when defendant was offered a plea bargain in this case.

Dr. Palmer testified that it was "possible" the symptoms he observed defendant exhibit the night he treated him could have been the result of long-standing psychosis. He also examined the hospital records of defendant's 1988 suicide attempt. The records indicated defendant had taken a relatively small overdose of antihistamines, an over-the-counter medication. Dr. Palmer characterized the incident as a "suicide gesture, not a suicide attempt." The hospital records showed evidence of major depression, not psychosis. On cross-examination, Dr. Palmer stated it had "always been [his] opinion" that defendant's psychotic episode on the night of his arrest was more likely a stress-induced or drug-induced reaction, rather than a long-standing psychological problem.

Dr. William Vicary, defendant's court-appointed psychiatrist, testified that, prior to the crime, defendant's mental condition was "decompensating." He explained that, from childhood, defendant had been through "an ongoing series of traumatic experiences," and "was getting worse." He testified that "the best single diagnostic label" to apply to defendant would be "depression." He also described defendant as a passive personality, and explained that people who are excessively passive "tend to accumulate painful experiences, frustration, resentments [and] anger . . . until one day like a pressure cooker the top blows off." Nonetheless, Dr. Vicary concluded that defendant was sane at the time he committed the crimes.

### 3. *Rebuttal Evidence*

A police detective, Kevin Krafft, testified that Victoria Eckstone had told him William Boorstin, not defendant, was the father of her child. Eckstone

described Boorstin as her "common law husband" of 10 years. Krafft obtained a certified birth certificate for Amanda that listed Boorstin as her father. Another police witness, Brent Rollins, testified that he had had a conversation with Eckstone just after she testified at defendant's trial. She told him that the child would never see defendant. She also told him that the father's name was not on the birth certificate.

Dr. Kaushal Sharma, a forensic psychiatrist, testified that defendant was not suffering from a mental illness that would have caused him to be legally insane at the time of the crime. He agreed that defendant was passive in relation to his mother, but not in other relationships. He characterized defendant's 1988 suicide attempt as an impulsive act designed to gain attention and express his unhappiness. He agreed that defendant may have been suffering from depression. In Dr. Sharma's interview with defendant, defendant denied having been sexually molested by anyone. He also characterized defendant as manipulative during the interview. His conclusion that defendant was not suffering from a mental illness was not altered by the testimony presented regarding defendant's early life, his physical and sexual abuse, and the events that followed his departure with his mother from Iran.

## II. DISCUSSION: GUILT PHASE ISSUES

### A. Claims Relating to Removal and Replacement of Second Counsel

#### 1. Background

On December 14, 1993, Attorney Syamak Shafi-Nia, who had been privately retained, appeared on defendant's behalf at his arraignment. Defendant was also represented at that point by Milton Kerlan. After Kerlan withdrew from the case, Robert Sheahen was substituted in to conduct the preliminary hearing. Shafi-Nia had limited experience in criminal law and described his role as being there to "help" defendant. Sheahen, by contrast, was a veteran criminal lawyer with death penalty experience.[3]

On February 25, 1994, Shafi-Nia and Sheahen were appointed by Judge Ito to represent defendant to settle the case. Shafi-Nia was appointed pursuant to *Harris v. Superior Court* (1977) 19 Cal.3d 786 [140 Cal.Rptr. 318, 567 P.2d 750], notwithstanding his lack of criminal law experience, because of his personal relationship with defendant. Judge Ito made it clear that Shafi-Nia was being appointed "as second counsel" because of his "lesser qualifications" as a criminal lawyer.

---

[3] No preliminary examination was held because the prosecution elected to proceed by way of grand jury indictment.

On June 1, 1994, Judge Ito reappointed Shafi-Nia and Sheahen for all purposes. The case was transferred to Van Nuys where it was ultimately tried by Judge Kriegler.

On November 21, 1994, defendant made a *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]) primarily directed at removing Shafi-Nia. He objected to Shafi-Nia's "inexperience in not being a criminal attorney and definitely not qualifying for first degree death penalty cases," and also faulted Shafi-Nia for his "inadequate translation" of a magazine article from Farsi to English. Defendant requested a "second outstanding criminal attorney with appropriate experience and expertise in death penalty cases." The trial court denied the motion, remarking, "I don't think there's any need for a second attorney in this case. I think it's nice that Mr. Shafi-Nia has been here to serve the function that he was appointed to serve, but it's more than the defendant necessarily would have received."

On November 29, Sheahen informed the court that Shafi-Nia had been in a traffic accident the previous day for which he was being treated, but did not request a continuance.

The following day, jury selection began. Sheahen waived Shafi-Nia's presence. The court expressed its understanding that Sheahen would be handling "all the jury selection." Sheahen agreed that he would be "making the calls here." At the afternoon session, however, he said Shafi-Nia was his "communication link" to defendant and that it was "very important that he be here." He acknowledged he was not unable to proceed in Shafi-Nia's absence and asked that, if Shafi-Nia could not be present, another lawyer be appointed. He conceded he had not asked the case to be put over and was prepared to "go the distance" on jury selection. He also acknowledged that "97 percent of the decisions in this case have been made by me," and that Shafi-Nia's "learning curve" had been like a "fifty-pound weight that we are dragging around." Nonetheless, he said, Shafi-Nia had assisted him on the juror questionnaires. The prosecutor suggested a recess to allow Sheahen to read the questionnaires. Sheahen requested that the proceedings be "adjourn[ed]" until Shafi-Nia could return or, if the court declined to do so, he requested that the court "appoint a new and different second counsel for Mr. Panah." The court did not rule on the request, nor did Sheahen press for a ruling.

At some point, the court received a fax from Southern California Orthopedic and Medical Associates, dated November 29. It stated Shafi-Nia required bed rest for five days because of back pain due to the traffic accident.

On December 1, both Sheahen and Shafi-Nia appeared. Shafi-Nia wanted more time to discuss possible settlement and asked for a 10-day continuance or, alternatively, that another lawyer be appointed for defendant. The prosecutor said he would not object to the five-day continuance requested for Shafi-Nia to recover, but would object if the continuance was sought to give the defense more time to talk defendant into taking a plea.

That afternoon, Shafi-Nia's representation of defendant was again discussed. The trial court had reviewed the transcript of Shafi-Nia's appointment and observed that he had been appointed to facilitate a settlement and because of his long-standing relationship with defendant. The court remarked that the latter ground "has nothing to do with this case. And I think in retrospect it has created nothing but problems for the court and the orderly processing of this case." The court also reiterated its belief that the case did not require two lawyers. It denied the request for a 10-day continuance, noting that it was giving Shafi-Nia until Monday, December 5—the five days requested in the November 29 fax.

On December 5, the court received a fax from Dr. Solomon Hakimi saying Shafi-Nia continued to have severe lower back pain and required bed rest until December 10, at which point he would be evaluated again. The defense requested a continuance. It was denied.

The next day, defendant requested that the case be continued until Shafi-Nia could return or alternatively, for appointment of new counsel. Sheahen told the court he had spoken with a possible replacement, Marcia Morrissey. The court indicated it was willing to entertain this request but denied the continuance. Later that day, when the court was informed Ms. Morrissey was not available, the court said it would consider another attorney if Sheahen proposed one.

At the end of the court day, the trial court noted Shafi-Nia had not appeared. It terminated Shafi-Nia's appointment and appointed William Chais in his place as second chair. Defendant thanked the court, but Sheahen objected that replacing Shafi-Nia deprived defendant of Shafi-Nia's preparation and communication skills. He also complained that Shafi-Nia remained in possession of some files. The trial court responded that it would order him to return the files.

The following day, the court made the following statement to Mr. Sheahen to clarify the record: "You had, in fact, requested that a new second attorney be appointed and . . . your client last week had made that request. [¶] And I denied that request from [sic] the grounds Mr. Shafi-Nia was fulfilling the

limited function he had been appointed to fulfill. [¶] You repeated your request for a new second lawyer yesterday, and I took action to ensure that an experienced criminal lawyer was brought in as second chair in an exercise of my discretion. [¶] That was not done because I felt that defendant was receiving inadequate representation or that the absence of Mr. Shafi-Nia had any impact whatever on how the trial had progressed to that point. [¶] It was done because the case started with two lawyers, and I thought really just to continue having two lawyers would be in the defendant's best interest." Sheahen responded that the defense would have preferred a continuance and complained again that Shafi-Nia was in possession of files in the case. At the end of the day, the defense investigator informed the court that he had spoken to Shafi-Nia and arranged for the missing files to be brought to court.

At the end of the guilt phase, the trial court observed that Chais had done an "outstanding job," and that what he "added to the trial in terms of good lawyering, coordination, and communication is far beyond what Mr. Shafi-Nia could have ever hoped to have added in this case because of his complete lack of criminal experience." Sheahen argued that Chais, who was 32 years old, lacked trial experience in murder cases and should have been given time to prepare. The court pointed out that the defense had not requested a continuance for that purpose nor had Chais ever indicated he was unprepared.

### 2. *Analysis*

Defendant contends the trial court erred by: (1) denying his request for a continuance to permit Shafi-Nia to recover from his back injury; (2) removing Shafi-Nia over his objection; (3) appointing Chais; and (4) failing to give Chais adequate time to prepare. He asserts the errors were of federal constitutional magnitude. As we explain, we reject his claims.

" ' "The granting or denial of a motion for continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion." ' [Citation.] In the absence of a showing of an abuse of discretion and prejudice to the defendant, a denial of a motion for a continuance does not require reversal of a conviction. [Citation.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1125–1126 [74 Cal.Rptr.2d 121, 954 P.2d 384], quoting *People v. Zapien* (1993) 4 Cal.4th 929, 972 [17 Cal.Rptr.2d 122, 846 P.2d 704]; § 1050, subd. (e).) Defendant bears the burden of establishing that denial of a continuance request was an abuse of discretion. (*People v. Beeler* (1995) 9 Cal.4th 953, 1003 [39 Cal.Rptr.2d 607, 891 P.2d 153].)

There was no such abuse of discretion here, but even if there was, defendant was not prejudiced. The trial had already commenced and the respective roles of defendant's two lawyers, Sheahen and Shafi-Nia, were clearly delineated. It was understood that Sheahen would be conducting the defense at trial because, by his own admission, Shafi-Nia was not qualified to try the case. Sheahen had, at least initially, waived Shafi-Nia's presence for purposes of jury selection and even after Sheahen argued that Shafi-Nia should be present, he acknowledged that he, not Shafi-Nia, was making "97 percent of the decisions in the case." Sheahen also conceded he was able to proceed in Shafi-Nia's absence.

Additionally, the continuance requests escalated from an initial request of five days, which, in effect, the court granted, to 10 days, and then, ultimately, to an open-ended request.[4] Furthermore, the trial court had reason to believe that the underlying reason for the request was not to allow Shafi-Nia to recover, but to obtain more time for defense counsel to persuade defendant to plead guilty after many months of fruitless plea negotiations.

Thus, the trial court was being asked to continue a trial that had already begun to some unknown point in the future to accommodate defendant's secondary lawyer whose role in the trial, it was understood by all participants, was to have been, at best, limited. Given these circumstances, the trial court did not abuse its discretion when it denied the request.

Defendant argues that Shafi-Nia's status as "*Harris* counsel," because of his "long-standing and unique relationship" with defendant, rendered his participation in the trial essential. We disagree. In *Harris*, while affirming the general principle that an indigent defendant's choice of counsel is not a dispositive factor in the appointment of counsel, we concluded that the trial court abused its discretion when it rejected the defendants' request to appoint as counsel attorneys who had represented them in prior related criminal proceedings and with whom the defendants had developed a relationship of trust and confidence over a substantial period of time. (*Harris v. Superior Court, supra,* 19 Cal.3d at p. 799.) We laid particular stress on the prior representation factor because it "served to provide those attorneys with an extensive background in various factual and legal matters which may well become relevant in the instant proceeding—a background which any other attorney appointed to the case would necessarily be called upon to acquire." (*Id.* at p. 798.)

---

[4] In his reply brief, defendant suggests that even a 30-day continuance would not have been unreasonable but this number appears nowhere in the record, nor was a 30-day request made to the trial court.

In this case, there was no prior history of representation like that present in *Harris* and, unlike the attorneys in *Harris,* Shafi-Nia was so wholly inexperienced in criminal matters that, even in appointing him, Judge Ito made it clear he was to function as "second counsel," behind Sheahen. The only basis supporting Shafi-Nia's appointment was his prior personal relationship with defendant. Fully aware of the circumstances of Shafi-Nia's appointment, the trial court concluded that he was not essential to the defense, but was, at most, a "special benefit bestowed" on defendant by Judge Ito.

The record bears this out. Just one week before trial began, defendant specifically sought to remove Shafi-Nia because of Shafi-Nia's lack of criminal law experience and his deficiencies as a translator.[5] Additionally, the various defense requests for a continuance also alternatively requested appointment of new counsel. Moreover, lead counsel Sheahen acknowledged that Shafi-Nia's lack of criminal experience was, in essence, a dead weight on the defense. Plainly, by the time this case reached the trial stage, any value Shafi-Nia may have had to the defense was exhausted.

Defendant also contends that the denial of his request for a continuance was detrimental because Shafi-Nia had been in contact with a number of potential witnesses in Iran and with defendant's German girlfriend, all of whom may have testified at the penalty phase but, ultimately, did not. This argument was not made to the trial judge at the time defendant requested the continuance and to the extent he bases his claim of error on this point, his claim is forfeited. (Cf. *People v. Crovedi* (1966) 65 Cal.2d 199, 207 [53 Cal.Rptr. 284, 417 P.2d 868] [whether denial of a continuance constitutes a due process violation " 'must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied' "].) In any event, defendant fails to establish either that the testimony of these witnesses—all of them unidentified except defendant's German girlfriend—would have been anything other than cumulative to his mother's penalty phase testimony.[6]

Accordingly, Shafi-Nia's asserted status as "*Harris* counsel" did not render the denial of defendant's request for a continuance an abuse of discretion. Since there was no abuse of discretion "there is thus no predicate error on which to base the [defendant's] constitutional claims." (*People v. Roybal*

[5] Defendant contends that he was not requesting that Shafi-Nia be relieved, but for a third lawyer to be appointed, one with criminal law experience. This is a misreading of the record; defendant was clearly requesting removal of Shafi-Nia.

[6] Defendant does not explain why Shafi-Nia's removal prevented his German girlfriend from traveling to the United States to testify since she, presumably, would not have had the same fear of traveling to this country and participating in his trial that, he asserts, his potential Iranian witnesses experienced.

(1998) 19 Cal.4th 481, 506, fn. 2 [79 Cal.Rptr.2d 487, 966 P.2d 521].) Accordingly, we reject them as well.

Defendant next contends that the trial court abused its discretion and violated his constitutional rights when it removed Shafi-Nia from the case.

■ "On appeal, a trial court's removal of counsel for an indigent criminal defendant is reviewed for abuse of discretion." (*People v. Cole* (2004) 33 Cal.4th 1158, 1187 [17 Cal.Rptr.3d 532, 95 P.3d 811]; see *People v. McKenzie* (1983) 34 Cal.3d 616, 629 [194 Cal.Rptr. 462, 668 P.2d 769] [a trial court may remove defense counsel, even over a defendant's objections, "in order to eliminate potential conflicts, ensure adequate representation, or prevent substantial impairment of court proceedings . . ."].) Whether the trial court acted within its discretion in removing counsel to prevent "disruption of the orderly processes of justice" is to be determined "under the circumstances of the particular case." (*People v. Crovedi, supra*, 65 Cal.2d at p. 208; *People v. Strozier* (1993) 20 Cal.App.4th 55, 62 [24 Cal.Rptr.2d 362].) "A court abuses its discretion when it acts unreasonably under the circumstances of the particular case." (*People v. Cole, supra*, 33 Cal.4th at p. 1185.)

In this case, given Shafi-Nia's indeterminate unavailability coupled with defendant's insistence that he was entitled to two attorneys, the trial court acted within its discretion in relieving Shafi-Nia and replacing him.

Defendant advances the same arguments he raised in connection with his claim that the trial court abused its discretion in denying his request for a continuance. We find them no more persuasive in this context than in the continuance context and for the same reason we reject them. Further, the cases upon which he relies are inapposite because they involve the removal of lead counsel (e.g., *People v. Crovedi, supra*, 65 Cal.2d 199) or removal for reasons not present here (e.g., *Smith v. Superior Court* (1968) 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65] [trial court exceeded its authority by removing counsel for incompetence].)

■ Even if the trial court abused its discretion either by denying defendant's requests for a continuance or by removing Shafi-Nia, we would find any error harmless. Preliminarily, we reject defendant's assertion that the removal of Shafi-Nia, if error, is reversible per se. For this proposition, defendant relies on *People v. Crovedi, supra*, 65 Cal.2d 199.

In *Crovedi*, we found that the trial court denied defendant his federal and state constitutional right to counsel when it denied his request for a seven-week continuance of trial to permit his attorney to recover from a heart attack, and removed counsel and replaced him with the attorney's law partner

over the latter's protest. (*People v. Crovedi, supra,* 65 Cal.2d at pp. 201–203, 208–209.) In this situation, we concluded the constitutional violation required reversal "*regardless* of whether a fair trial resulted." (*Id.* at p. 205; accord, *People v. Gzikowski* (1982) 32 Cal.3d 580, 589 [186 Cal.Rptr. 339, 651 P.2d 1145] [denial of continuance to permit counsel to associate more experienced cocounsel, after withdrawal of original, experienced cocounsel, reversible regardless of whether a fair trial resulted].) Here, Shafi-Nia was secondary counsel who had, from the beginning of his representation of defendant, disavowed any intention of trying the case, leaving that duty to Sheahen. Under these circumstances, a reversible per se standard is not required. (See *People v. Weaver* (2001) 26 Cal.4th 876, 952 [111 Cal.Rptr.2d 2, 29 P.3d 103] [after one cocounsel withdrew, the defendant agreed to proceed with remaining counsel and "nothing in the record suggests [remaining counsel] was an inexperienced attorney or was otherwise unable to assume lead counsel status"; distinguishing *Gzikowski*].)

Defendant was represented by two competent lawyers, and nothing in the record shows he was prejudiced by Shafi-Nia's removal. Accordingly, any error, if there was error, was harmless under any standard of review.

Defendant makes two additional, related claims. He asserts that the trial court erred by appointing Chais because he was unqualified to try a death penalty case and that the court erred by failing to give Chais sufficient time to prepare. These claims are forfeited because defendant did not object to the appointment of Chais on grounds he was unqualified, or did Chais request a continuance to prepare. In any event, defendant does not demonstrate Chais rendered ineffective assistance of counsel. Therefore, he fails to show any prejudice arising from his claims of error.

## B. *Denial of* Marsden *Motions*

Defendant contends the trial court erred in denying his three motions for substitution of counsel. (*People v. Marsden, supra,* 2 Cal.3d 118 (*Marsden*).) He asserts that the trial court did not give him an adequate opportunity to explain his dissatisfaction with counsel, as mandated by *Marsden,* and that, as a result, his right to effective assistance of counsel and other constitutional rights were denied. We disagree.

### 1. *The November 21, 1994 Hearing*

On November 21, 1994, defendant filed a letter with the court in which he lodged 15 complaints against his lawyers.[7] Upon being informed by Shafi-Nia

---

[7] Those complaints included: "1.) D.N.A expert(s) [¶] 2.) Investigator [¶] 3.) Forensic criminalist(s) [¶] 4.) Writs on Judge's rulings 'writing writs' [*sic*]; 5.) A separate suppression

of the existence of the letter and some of its contents, the trial court excused the prosecutor and conducted a *Marsden* hearing. Responding to the letter, Sheahen told the court that, based on the evidence, and his discussions with other criminal defense lawyers who had tried death penalty cases, he had tried to persuade defendant to move away from a claim of "factual innocence" and either plead guilty to avoid the death penalty or enter a plea of not guilty by reason of insanity. With respect to defendant's desire for a DNA expert, Sheahen said he had explained to defendant that a DNA expert would only confirm the prosecution's serology results. He said he had told defendant the case was "moving toward the death penalty," and urged defendant to plead and avoid the death penalty. "And rather than do that, Mr. Panah has said, 'Well, let's get a new lawyer on the case. Let's do whatever.' [¶] And that's essentially where we are."

Defendant read a statement in which he claimed a conflict of interest with counsel existed because they had failed to pursue "certain matters" he asserted were important to his defense. He also read the complaints he had put in his letter.

---

motion specifically for any items or evidence(s) not listed in the affidavit search warrant. [¶ 6.] Interviewing certain witness(es) [¶ 7.] Mr. Panah's complaint of counsel Mr. Shafinia inexperience and not being a criminal attorney and definitely not qualifying for first degree death penalty cases. 'Note*,' I feel that I do need two criminal attorneys, one for guilt, and one for penalty if the need arises. 8.) There for [*sic*] my request for a second outstanding criminal attorney with appropriate experience and experti[se] in death penalty cases. [¶] My counsel, Mr. Shafina's inadequate translation. For example his incomplete translation of 'Exhibit C the Iranian magazine's article relating to my case that important parts of it were missing, and misinterpreted by him on 11-17-94. [¶ 10.) Therefore my request for a farsi translat[o]r to interp[r]et[], and articulate the law, and matters concerning to my case. [¶ 11.] The full access to all my paper work and whole case file. [¶ 12.) The request from prosecution and motion to return the original of every and any items seized from property case, or apartment that has not relate [*sic*] or value to this case and of those items that prosecution has no use for and has decided not to use against me, such as: pictures, audio tapes, videotapes, books, notebooks, posters, video camera, any clothing. [¶ 13.) My complaints about this harassment of a jailhouse informant have gone unnoticed, plus my complaints about this vicious criminal with a rap sheet as long as my sleeves, which I knew was an informant and he kept threatening me with my life constantly and tried to involve my mother with his lies and tricks, went unnoticed. As a matter of fact I was back and forth in contact with both my counsels Mr. Shafina and Mr. Sheahan [*sic*] and asking them to contact a judge or police or investigator about this guy and his friends were Mr. Peter Berman and detective Joel Price. I was denied of any assistance for both my counsel's [*sic*] to get an investigator for investigating my matter to the police, and the judge. [¶ 14.) Request for discovery hearing. [¶ 15.) Request for a specific hearing. '*Franks v. Delaware*' I'm respectfully bringing this to your attention, I feel strongly about these issues, and need the court to acknowledge this problem before proceeding any further. *P. v. Ebert* (1988) 199 Cal.App.3d 40, 44 [244 Cal.Rptr. 447] . . . . Counsel whether advisory or otherwise is constitutionally required to act competently."

In reply, Sheahen again said he had assessed the DNA question and determined that the downside of a defense examination was greater than the upside. He also stated that every important witness had been interviewed. He said he was working on a petition for writ of mandate to review denial of a disqualification motion under Code of Civil Procedure section 170.1. (See *post*, at pp. 444–447.) He explained he had not moved to suppress certain items, including the victim's body, as defendant urged, because, as he had explained to defendant, there was no legitimate basis to suppress them. He pointed out that the defense had filed an exhaustive discovery motion and that were no grounds for a hearing because the prosecution had complied with every request made by the defense. As to defendant's request for a *Franks* hearing (*Franks v. Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 98 S.Ct. 2674] [evidence obtained pursuant to a search warrant based on an affidavit including false statements, or statements made in reckless disregard of the truth, must be suppressed]), Sheahen pointed out that such a hearing had been conducted a month earlier. Regarding the jailhouse informant to whom defendant referred, Sheahen said the district attorney had informed the defense that a cellmate of defendant's had been used to attempt to elicit incriminating statements from defendant about eliminating a witness. (See *post*, at pp. 454–455.) Their conversations had been taped and reviewed by Sheahen. He said nothing on them was admissible in the guilt phase and if the prosecution tried to use them at the penalty phase their probative value was minimal because defendant "doesn't say much of anything on these tapes."

The trial court found that "Mr. Sheahen has done a very, very thorough and comprehensive job in presenting the 1538.5 issues, the 402 issues, the change of venue motion, the challenge to the entire courthouse, including myself, as well as the renewed motion for change of venue or transfer of district." It found Sheahen's decision not to call a DNA expert was a "sound" tactical decision. When the trial court asked defendant if there were specific names of witnesses whom he believed counsel had not interviewed, defendant was unable to provide them. Sheahen stated if the case went to trial he would seek appointment of an investigator to interview any remaining witnesses. Concluding there had been no irreconcilable breakdown of the attorney-client relationship, the trial court denied the motion.

### 2. *The December 5–6, 1994 Hearing*

On December 5, defendant requested another *Marsden* hearing. The trial court excused the prosecutor. Pressed by the trial court to state his specific complaints against Mr. Sheahen, defendant complained that Sheahen had failed to adequately communicate with him, leaving most of the communication to Shafi-Nia and that Shafi-Nia's absence was having a "negative effect"

on Sheahen's representation of him. He also complained Sheahen had failed to adequately investigate and prepare an "alibi defense." Specifically, he stated that Sheahen had not talked to a professor of his who knew he had been suicidal. He also said Sheahen had failed to interview other witnesses, including Ronald Hicks, Victoria Eckstone, Adele Bowen and Bruce Cousins. He complained, moreover, that Sheahen had not investigated mental defenses or sought to suppress evidence. Defendant said Sheahen had told him he would be "found guilty regardless . . . ." The court interrupted and observed that Sheahen had visited defendant countless times in lockup and arranged meetings with defendant at county jail. Defendant complained, however, that Sheahen had only talked to him about "taking a deal."

In response, Sheahen agreed with defendant that a substantial amount of communication with him had been done through Shafi-Nia, but said he also had met repeatedly with defendant. As to defendant's complaint about suppression of evidence, Sheahen pointed out that "we had a month long hearing where we moved to suppress." With respect to defendant's claim about alibi witnesses, Sheahen said defendant "doesn't have an alibi witness because he was there at the scene of the crime." As to the professor defendant mentioned, Sheahen stated there were other witnesses to defendant's mental state but he might use the professor. Regarding defendant's claim about Sheahen's assessment of the case, Sheahen said the record showed the evidence against defendant was substantial. "He wanted me to use a two bearded strangers defense. That is absolutely absurd and I will not use it."[8] The trial court denied the motion. It pointed out that Sheahen "cannot make up defenses where no defenses exist. [¶] His duty is to give the defendant solid advice and do the best he can under the circumstances. [¶] There is no doubt in my mind Mr. Sheahen has done exactly that . . . . [¶] I find there's no conflict. No irreparable breakdown in the attorney-client relationship."

The following day, defendant appeared in court with a two- or three-page handwritten note and complained the trial court had cut him off before he could make his record on the "*Marsden Bonin* hearing." The court declined to excuse the prosecutors because it said it had heard all of defendant's claims. Nonetheless, with Sheahen's assistance, defendant was allowed to state his complaints. Defendant complained about Sheahen's failure to prepare for the penalty phase. He said he wanted his father to come from Iran for the penalty phase. Sheahen told the court he had "looked into" having defendant's father come but "he is presently in an immigration status that precludes him from leaving Iran to come to this country." The trial court stated it was "going to stand by my rulings regarding the representation given the defendant in this case."

---

[8] By "two bearded strangers defense," it seems Sheahen was referring to a defense that blamed others for the crime.

### 3. *The January 3, 1995 Hearing*

On January 3, after the guilt phase but before the penalty phase, defendant made a third *Marsden* motion. The trial court declined to excuse the prosecutors because defendant's complaints related to tactical decisions made during the guilt phrase.[9]

Defendant complained that counsel had not argued his ring could not have made the scratches on Nicole's thigh and had not called a forensic expert to establish this point. He said counsel should have contended he had not worn the ring for a long time. Defendant also complained about counsel's failure to impeach the victim's mother and Rauni Campbell.

The trial court stated that, with respect to the ring, counsel had objected to its admission and conducted cross-examination on whether it caused the scratches on the victim's body but that, in any event, it was an "insignificant factor" on identity, the only possible issue to which it could have been relevant. With respect to attacking Mrs. Parker's credibility, the trial court stated this was a disagreement over tactics. Regarding the cross-examination of Rauni Campbell, the trial court found defendant's complaints were conclusory and that, in any event, a tactical decision was involved. The trial court denied the motion.

### 4. *Analysis*

■ "A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." (*People v. Jones* (2003) 29 Cal.4th 1229, 1244–1245 [131 Cal.Rptr.2d 468, 64 P.3d 762].) When the defendant seeks to remove appointed counsel "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of counsel's inadequacy." (*People v. Cole, supra*, 33 Cal.4th at p. 1190.) The trial court's ruling is reviewed for abuse of discretion. (*Ibid.*)

■ Defendant asserts he was not given a sufficient opportunity to justify his request for new appointed counsel, that his attorney argued against him, and that the trial court improperly defended counsel. These claims are meritless. The record demonstrates that defendant was afforded the opportunity to explain the basis of his *Marsden* requests and to cite specific instances of counsel's inadequate performance. His complaints, however, amounted to

---

[9] Defense counsel, Mr. Sheahen, objected to the trial court's failure to conduct this hearing in camera. The trial court overruled his objection. Defendant does not contest the propriety of this ruling.

nothing more than tactical disagreements between defendant and counsel. Given the overwhelming evidence of defendant's guilt, defense counsel was not obliged to pursue futile lines of defense simply because defendant demanded them, and his refusal to do so did not justify his removal as counsel. (*People v. Welch* (1999) 20 Cal.4th 701, 728–729 [85 Cal.Rptr.2d 203, 976 P.2d 754] ["Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict' "].)

■ Furthermore, the trial court did not err in soliciting a response from defense counsel to defendant's complaints, nor was counsel "arguing" against him when he did so. Inquiring of counsel is necessary for the trial court to evaluate the defendant's request and for appellate review. (See, e.g., *People v. Fierro* (1991) 1 Cal.4th 173, 205 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People v. Memro* (1995) 11 Cal.4th 786, 854–855 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) Nor did the court improperly defend counsel against defendant's complaints when it disagreed with certain of defendant's assertions. ■ The trial court is not required to sit mute while a defendant advances patently erroneous grounds for substitution of counsel. (See, e.g., *People v. Valdez* (2004) 32 Cal.4th 73, 95 [8 Cal.Rptr.3d 271, 82 P.3d 296].) We conclude defendant failed to show the trial court abused its discretion in denying his *Marsden* motions and, of necessity, reject his claims of constitutional violation as well.

### C. *Mental State Issues*

#### 1. *Failure to Order Competency Hearing*

Defendant contends the trial court erred by declining to order a competency hearing pursuant to section 1368.

■ "When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citation.] 'Evidence is "substantial" if it raises a reasonable doubt about the defendant's competence to stand trial.' " (*People v. Lawley* (2002) 27 Cal.4th 102, 131 [115 Cal.Rptr.2d 614, 38 P.3d 461], quoting *People v. Danielson* (1992) 3 Cal.4th 691, 726 [13 Cal.Rptr.2d 1, 838 P.2d 729].) Absent substantial evidence of a defendant's incompetence, "the decision to order such a hearing [is] left to the court's discretion." (*People v. Gallego* (1990) 52 Cal.3d 115, 162 [276 Cal.Rptr. 679, 802 P.2d 169].)

On November 28, 1994, just before trial began, the trial court learned that Dr. Coburn, defendant's court-appointed psychiatrist, had written defense counsel expressing his doubt that defendant was competent to stand trial. According to the trial court, the letter indicated that defendant was fully

aware of the charges against him but "he has little understanding of the nature of the plea change and has significant impairment in his ability to rationally cooperate with counsel . . . ." The court found that the letter was too vague to raise a doubt about defendant's competence. It asked Dr. Vicary, the defense psychiatric expert, and Dr. Coburn to interview defendant and assess his competence to stand trial. As part of their assessment, the court asked them to examine the November 21 *Marsden* proceeding transcript, calling it "highly probative of whether or not the defendant understands the nature of the proceedings and can assist counsel."

Defense Counsel Sheahen stated that, although working with defendant had been "extremely difficult" and at times defendant "lack[ed] [a] . . . grasp of what [was] going on," he was "surprised that Dr. Coburn felt there was a 1368 issue" and was uncertain whether defendant's behavior amounted to incompetence. The court also observed that defendant had "repeatedly assisted counsel." Shafi-Nia disagreed with Sheahen and the court, stating that he believed defendant was incompetent.

After reviewing the transcript and interviewing defendant, both Coburn and Vicary opined that defendant was competent to stand trial. The trial court declined to conduct a competency hearing.

Defendant contends that Dr. Coburn's somewhat equivocal statements about his competence and statements by defense counsel constituted substantial evidence of incompetence. They do not. While Coburn testified that defendant was "fragile" and "disturbed," he also repeatedly acknowledged that defendant was not incompetent to stand trial. Moreover, defendant ignores the opinion of the other defense psychiatric expert, Dr. Vicary, who testified without reservation that defendant was competent.

Nor did comments by defense counsel constitute substantial evidence of incompetence. First, defense counsel were not in agreement on the issue of defendant's competence. While Shafi-Nia claimed that defendant was incompetent, Sheahen, the more experienced criminal defense attorney, did not share this belief. Second, even if both counsel had agreed that defendant was incompetent, such opinion, standing alone, would not have been dispositive of the issue but only one factor for the trial court to consider in determining whether substantial evidence existed. (*People v. Howard* (1992) 1 Cal.4th 1132, 1164 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) Balanced against the conflicting statements of counsel were the opinions of the experts that defendant was competent and the trial court's own observation that defendant had repeatedly assisted in his defense, including bringing and arguing his first *Marsden* motion. (See *People v. Hayes* (1999) 21 Cal.4th 1211, 1282 [91

Cal.Rptr.2d 211, 989 P.2d 645] [a defendant's participation in his trial "demonstrate[s] beyond any doubt that he was fully aware of the nature of the proceedings and able to assist counsel"].) We conclude therefore that the trial court did not abuse its discretion in declining to conduct a competency hearing.[10]

### 2. *Informing Jury of NGI Plea*

■ Defendant entered dual pleas of guilty and not guilty by reason of insanity (NGI). Where such dual pleas are entered, section 1026, subdivision (a) provides for a bifurcated trial.[11] The trial court told counsel it would inform prospective jurors that defendant had entered an NGI plea. Defense counsel objected that it would be prejudicial to do so. The trial court responded: "I think the jury needs to be advised of the plea and just what they're facing in this case." In the voir dire proceedings that followed, two prospective jurors were excused for cause, one because he told the court that, if the prosecution proved defendant guilty, he could not accept an insanity defense, and the other because she did not understand the burden of proof would shift during a sanity phase.

Defendant contends that informing prospective jurors about his NGI plea violated the spirit of section 1026, and various constitutional protections including the privilege against self-incrimination and the presumption of innocence.

■ Nothing in the statute, either expressly or by implication, bars the trial court from informing prospective jurors about a defendant's NGI plea,

---

[10] To support his claim that substantial evidence of incompetence existed, defendant also cites the preliminary hearing testimony of Dr. Palmer—the physician who treated him after his arrest—that, at that time, defendant appeared to be psychotic, and a letter written in February 1994 by Defense Counsel Sheahen to the presiding judge of the superior court, in which counsel alluded to defendant's history of mental instability and hospitalization. We do not review the propriety of the trial court's competency ruling based on evidence that was not presented to it at the time it made that ruling. (Cf. *People v. Welch, supra,* 20 Cal.4th at p. 739 ["We review the correctness of the trial court's ruling at the time it was made, however, and not by reference to evidence produced at a later date"].) In any event, "[e]vidence regarding past events that does no more than form the basis for speculation regarding possible current incompetence is not sufficient." (*People v. Hayes, supra,* 21 Cal.4th at p. 1281.) Both Dr. Palmer's testimony and counsel's letter fall into this category.

[11] "When a defendant pleads not guilty by reason by insanity, and also joins with it another plea or pleas, the defendant shall first be tried as if only such other plea or pleas had been entered, and in that trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. If the jury shall find the defendant guilty, or if the defendant pleads only not guilty by reason of insanity, then the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court." (§ 1026, subd. (a).)

and defendant fails to articulate a basis for his claim of statutory violation. His constitutional claims are based on the premise that the jury would have been so prejudiced by having learned of his NGI plea it would have been unable to impartially determine his guilt. A similar claim was made and rejected in *People v. Guillebeau* (1980) 107 Cal.App.3d 531 [166 Cal.Rptr. 45]. There, the court remarked: "As to the contention that once the jury learns of the double plea it cannot approach the question of guilt in an impartial way, it is sufficient to cite the following passage from *People v. Leong Fook* [(1928)] 206 Cal. 64 at page 78 [273 P. 779]: 'We must assume that a fair and impartial jury of intelligent men and women would obey . . . instructions and would therefore hold in reserve their ultimate finding upon the issue of the defendant's sanity until that separate issue and the evidence supporting it had, in the prescribed order of the trial, been committed to it for determination. We are not to assume that such a jury will cease to be fair and impartial as the cause progresses upon its successive issues, but, on the contrary, we must assume, in the absence of any other showing, that the jury has retained its attitude of fairness and impartiality under the changed procedure as before until the whole cause . . . has been determined.' " (*Id.* at p. 543.)

We agree with this analysis. Defendant's claim that the jury was prejudiced by learning about his double plea at the outset of trial is wholly speculative. There was no error and, necessarily, no constitutional violation.

### 3. *Denial of Request to Appoint a Third Mental Health Expert*

After defendant entered his NGI plea, the trial court, pursuant to section 1027, appointed two psychiatrists to examine him, Dr. Vicary for the defense and Dr. Sharma for the prosecution. At the conclusion of the guilt phase, defense counsel informed the court that defendant was requesting appointment of a psychologist to examine him for the sanity phase. Counsel told the court defendant had "declined to cooperate" with Vicary or Sharma. The trial court refused to appoint a psychologist but without prejudice to renewal of the request.[12] Defendant did not renew his request. Ultimately he withdrew his NGI plea.

Defendant contends the trial court's refusal to appoint a third mental health expert violated his federal and state constitutional rights, including the right to ancillary defense services as part of the right to effective assistance to counsel. (*Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 319–320 [204 Cal.Rptr. 165, 682 P.2d 360].) His claim is without merit.

---

[12] When a defendant enters an NGI plea, section 1027 requires the trial court to appoint two psychiatrists or qualified psychologists to examine the defendant and vests the trial court with discretion to appoint a third.

As a procedural matter, defendant failed to argue in the trial court that the denial of a third mental health expert amounted to a violation of his federal constitutional rights. His constitutional claim is, therefore, forfeited. (*People v. Saunders* (1993) 5 Cal.4th 580, 590 [20 Cal.Rptr.2d 638, 853 P.2d 1093].)

■ His claim is also substantively without merit. Defendant contends that under California law, he has a federal constitutional right to effective assistance of a mental health expert. Not so. "Neither *Ake* [*v. Oklahoma* (1985) 470 U.S. 68 [84 L.Ed.2d 53, 105 S.Ct. 1087]] . . . nor the broader rule guaranteeing court-appointed experts necessary for the preparation of a defense [citation], gives rise to a federal constitutional right to the effective assistance of a mental health expert." (*People v. Samayoa* (1997) 15 Cal.4th 795, 838 [64 Cal.Rptr.2d 400, 938 P.2d 2].) In any event, defendant received reasonable ancillary services, and there was no showing that the appointed psychiatrists were unqualified or incapable of administering the psychologist tests defendant now argues were crucial to his defense. ■ The issue, rather, is whether a defendant's unjustified refusal to cooperate with qualified, court-appointed mental health experts required the trial court to appoint another expert. We think not. (See, e.g., *People v. Messerly* (1941) 46 Cal.App.2d 718, 722 [116 P.2d 781] [trial court did not abuse its discretion in refusing to appoint a third mental health expert where two experts had been appointed pursuant to section 1027, had examined the defendant, were cross-examined and "(n)o objections were made at the trial as to their qualifications"].)

### 4. *Withdrawal of NGI Plea*

Prior to the commencement of the sanity phase, defendant sought an advance ruling from the trial court to limit the scope of cross-examination if he testified. He wanted to testify only to matters regarding his childhood and his upbringing and to preclude the prosecution from cross-examining him about the murder. The trial court declined to issue an "advisory opinion" regarding the scope of cross-examination in advance of hearing defendant's direct testimony.

Defendant claimed the court left him "no choice" but to withdraw his plea, but the court refused to accept the withdrawal. Defendant began to withdraw his plea a second time, but then again equivocated, and the trial court again declined to proceed unless defendant's withdrawal was unequivocal.

The prosecutor, citing *People v. Bloom* (1989) 48 Cal.3d 1194 [259 Cal.Rptr. 669, 774 P.2d 698], argued that defendant should be allowed to withdraw his NGI plea if there was no doubt as to his sanity and the

examining psychiatrists unanimously agreed he was sane. Without objection, the trial court unsealed the reports of Drs. Vicary and Sharma, and read portions of the reports into the record. The court noted that both Vicary and Sharma concluded that defendant was legally sane at the time of the commission of the offenses. Defendant was then allowed to withdraw his NGI plea. The court stated it was "satisfied that defendant understood the nature of his plea and that he furthermore understood his right to a sanity phase trial, and that he has effectively and knowingly and intelligently given up that right and personally withdrawn his plea of not guilty by reason of insanity."

Defendant argues that the trial court's refusal to give him an advance ruling on the scope of cross-examination coerced him into withdrawing his NGI plea. He also suggests the withdrawal was involuntary because there were doubts as to his sanity. Neither claim has merit.

■■■ Defendant's withdrawal of his plea was not coerced by the trial court's adverse ruling on his motion to limit the scope of cross-examination because there was no such ruling. Rather, the trial court properly declined to provide a ruling in advance of defendant's testimony. "Defendant had no inherent right to a binding advance ruling which would spare him the necessity of raising specific objections before the jury." (*People v. Keenan* (1988) 46 Cal.3d 478, 513 [250 Cal.Rptr. 550, 758 P.2d 1081]; see *People v. Sandoval* (1992) 4 Cal.4th 155, 178–179 [14 Cal.Rptr.2d 342, 841 P.2d 862].)

Regarding his second claim, unlike *People v. Merkouris* (1956) 46 Cal.2d 540, 553 [297 P.2d 999], upon which defendant relies, there was no conflict among the experts regarding defendant's sanity at the time of the offense. (See *People v. Bloom, supra,* 48 Cal.3d at p. 1214 [where there is no doubt in the trial court's mind of the defendant's sanity, and the reports of the examining psychiatrists agree he was sane, the defendant should be allowed to withdraw his NGI plea].) Accordingly, the withdrawal of his NGI plea was not involuntary.

### D. *Juror Issues*

#### 1. *Failure to Remove Two Jurors for Cause*

Defendant contends the trial court erred by failing to remove two prospective jurors for cause. Assuming, without deciding, there was error, defendant was not prejudiced in either case. One of the prospective jurors, G.B., did not sit on the jury because she was excused by the prosecution. (*People v. Boyette* (2002) 29 Cal.4th 381, 419 [127 Cal.Rptr.2d 544, 58 P.3d 391].) The other, L.W., was excused by the defense via a peremptory challenge, but because

the defense did not exhaust its peremptory challenges, the claim of error is waived. (*People v. Seaton* (2001) 26 Cal.4th 598, 637 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

Defendant nonetheless argues he was prejudiced because the prospective jurors were not removed until toward the end of jury selection and were thus able to "intermingle and influence the objectivity of those potential jurors who ultimately become members of [defendant's] panel." This is sheer speculation.

## 2. Wheeler *Claim*

Defendant contends the trial court erred in denying his *Wheeler* motion (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]) based on the prosecutor's use of peremptory challenges to remove women from the jury.[13]

" 'In [*Wheeler*] . . . we held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. Subsequently, in *Batson* v. *Kentucky* (1986) 476 U.S. 79, 84–89 . . . the United States Supreme Court held that such a practice violates, inter alia, the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution. . . .' " (*People v. Catlin* (2001) 26 Cal.4th 81, 116 [109 Cal.Rptr.2d 31, 26 P.3d 357].) Women constitute a cognizable group for purposes of *Wheeler*. (*People v. Crittenden* (1994) 9 Cal.4th 83, 115 [36 Cal.Rptr.2d 474, 885 P.2d 887].) "The United States Supreme Court has given this explanation of the process required when a party claims that an opponent has improperly discriminated in the exercise of peremptory challenges: '[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial [or gender] discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral [or gender-neutral] explanation (step two). If a race-neutral [or gender-neutral] explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial [or gender] discrimination.' (*Purkett v. Elem* (1995) 514 U.S. 765, 767 [131 L.Ed.2d 834, 115 S.Ct.

---

[13] Defendant also asserts this claim under *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712], even though he apparently did not explicitly raise the federal claim below. Nonetheless, we may properly consider the *Batson* claim on its merits (see *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118 [2 Cal.Rptr.3d 186, 72 P.3d 1166] [a claim is not waived on appeal when the state and federal standards and the factual inquiry are essentially the same].) Accordingly, defendant's *Batson* claim lacks merit for the same reason as his *Wheeler* claim.

1769, 1770–1771].)" (*People v. Silva* (2001) 25 Cal.4th 345, 384 [106 Cal.Rptr.2d 93, 21 P.3d 769].)

 Defendant brought four gender-based *Wheeler* motions. On each occasion, the trial court concluded that a prima facie case had not been made. Only once did the prosecutor offer a comment to justify his use of a peremptory challenge.[14] When, as here, "a trial court denied a *Wheeler* motion because it finds no prima facie case of group bias was established, the reviewing court considers the entire record of voir dire. [Citation.] 'If the record "suggests grounds upon which the prosecutor might reasonably have challenged" the jurors in question, we affirm.' " (*People v. Davenport* (1995) 11 Cal.4th 1171, 1200 [47 Cal.Rptr.2d 800, 906 P.2d 1068], quoting *People v. Howard* (1992) 1 Cal.4th 1132, 1155 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)

Defendant concedes that the prosecution may have been justified in excusing two of the 10 women on whom it used peremptory challenges, J.R. and M.C. We therefore consider only the remaining eight.

*Prospective Juror M.A.* Prospective Juror M.A. stated on her questionnaire that she strongly agreed with the statement that "[r]egardless of the evidence, anyone who intentionally kills another person should <u>never</u> get the death penalty." She also indicated her belief that life without possibility of parole might be worse for a defendant than death. Nonetheless, she stated she would be able to return a death sentence. She indicated further that she had had a negative experience with a police officer who gave her a "traffic ticket without cause," that she or someone close to her had been the victim of a robbery and her niece had been arrested or charged with a crime.

*Prospective Juror G.B.* Prospective Juror G.B. disclosed in camera that her daughter had been raped by a psychiatrist and the case was pending. When asked whether she could fairly listen to psychiatrists and not be upset about what had happened to her daughter, she replied, "I would have to check it in his record and the credibility and see if they had any previous problems or any incidents, but it's a very heavy situation." When asked if she would rather not sit on the case because of the NGI plea, she replied, "Probably so."[15]

*Prospective Juror J.W.* Prospective Juror J.W. responded to the question about her general feelings regarding the death penalty that "only God gives and takes away, but honestly, if someone close to me [was] involved, I don't

---

[14] Defendant made a fifth, race-based *Wheeler* motion, but he does not argue the trial court improperly denied it.

[15] This is the same juror who defendant claimed should have been excused for cause because her daughter was raped by a psychiatrist.

know the [depth] of my [compassion.]" On the statement, "[r]egardless of the evidence, anyone who intentionally kills another person should <u>never</u> get the death penalty," she responded, "[t]here is so much involved I don't know what to answer." On the other hand, when asked about a spiritual or religious belief pertaining to the death penalty, she wrote, "Eye for an eye [¶] Do not befriend a bad person." However, she agreed that life without possibility of parole might be a worse punishment than death.

*Prospective Juror R.M.* Prospective Juror R.M. indicated it might be difficult for her to sit on the case because she had children of her own. She also responded, to a question regarding any religious or moral beliefs that would make it difficult for her to sit as a juror, with "the Ten Commandments." She again referred to the Ten Commandments and "Thou Shalt Not Kill," in response to the question whether she had any spiritual or religious beliefs that would have a bearing on the death penalty. Nonetheless, she also stated she had voted for the death penalty. In court, when asked to explain her reference to the Ten Commandments, she replied, "One of the commandments obviously is thou shalt not kill. And there's a contradiction in my answer. I don't believe anybody should kill anyone. However, if someone is guilty of murder, it's my belief that they get what they deserve, be it life in prison or the death penalty, depending on how the jury decides to go."

*Prospective Juror M.S.* Prospective Juror M.S. also indicated on her questionnaire that she had religious scruples that might make it difficult to pass judgment on another, also citing the Ten Commandments. She agreed somewhat with the statement that "[r]egardless of the evidence, anyone who intentionally kills another person should <u>never</u> get the death penalty," explaining "selfdefence [*sic*]." Nonetheless, she also felt that life without possibility of parole was not a severe punishment. She responded to the question about why she might or might not want to sit on the case by writing, "[d]ue to my religious background and having children of my own and grandchildren I feel that it would be impossible." She also indicated she was under a doctor's care for stress. She indicated further that her ex-husband had been molested as a child, that she could not evaluate the credibility of police the same as other witnesses, believed that criminals were favored by the legal system, and would have a difficult time keeping an open mind. In court, she continued to express religious reservations about her ability to sit as a juror.

*Prospective Juror B.B.* Prospective Juror B.B. expressed skepticism regarding the validity of psychiatric opinions and, citing her job, answered yes to the question whether she had pressing business that might cause her to wish to "hurry along" the decisionmaking process. She expressed dislike of the death penalty although she also felt it was necessary to deter crime and

recognized that one of the commandments was "[t]hou shalt not kill." She also stated she would "try hard to be an impartial juror, but a child is very precious."

*Prospective Juror B.D.* Prospective Alternate Juror B.D. indicated that she agreed somewhat with the statement that "[r]egardless of the evidence, anyone who intentionally kills another person should <u>never</u> get the death penalty" and expressed the view that life without possibility of parole would be a "living Hell." She had taken college-level courses in psychology and stated that "psychological tests should give insight" into the defendant in deciding upon a penalty.

*Prospective Juror A.R.* Prospective Alternate Juror A.R. had a bachelor of arts degree in psychology and sociology and was undergoing therapy for obsessive-compulsive disorder. She expressed the view that life without possibility of parole was "better than being put to death—at least they still have the gift of life," and that she would need to be "absolutely sure" before she could impose the death penalty. However, she also believed the death penalty should be enforced "more than it generally is" and that it is a "positive." She also stated that one brother had been murdered and another had been arrested or charged with drunk driving and theft.

Defendant focuses on the attitudes expressed by these jurors regarding the death penalty because this was a factor cited by the prosecutor when he explained why he excused Prospective Juror B.D. Defendant argues that while this may have been sufficient reason to excuse her, it did not provide support for the bulk of the prosecutor's peremptory challenges. We disagree. In the first place, each of these prospective jurors expressed some reservations or religious scruples about the death penalty and, while some of them nonetheless stated they could impose the death penalty, "neither the prosecutor nor the trial court was required to take the jurors' answers at face value." (*People v. Boyette, supra,* 29 Cal.4th at p. 422.)

 Even if these reservations or scruples were insufficient to challenge a prospective juror for cause, such skepticism nonetheless constitutes a gender-neutral reason for a peremptory challenge. (*People v. Turner* (1994) 8 Cal.4th 137, 171 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People v. Ochoa* (2001) 26 Cal.4th 398, 432–433 [110 Cal.Rptr.2d 324, 28 P.3d 78].) This provided a nondiscriminatory reason for the prosecutor to have excused J.W., M.A., R.M., M.S., and A.R.

 Moreover, the prospective jurors' views on the death penalty were not the only nondiscriminatory basis for exclusion. Juror M.A., for example, also revealed a negative experience with a police officer and that a niece had

been arrested or charged with a crime. Prospective Juror A.R. also had a relative who had been arrested or charged with a crime. A negative experience with police or the arrest of a prospective juror or a close relative is a gender-neutral reason for exclusion. (*People v. Wheeler, supra,* 22 Cal.3d at p. 277, fn. 18; *People v. Turner, supra,* 8 Cal.4th at p. 171.)

Four other prospective jurors, G.B., R.M., M.S., and B.B., expressed their reluctance to sit on the jury for various reasons: G.B., because the rape of her daughter by a psychiatrist might have made it difficult to evaluate testimony by psychiatrists; R.M., because she had children of her own; M.S. stated that because of her religious background and because she had children and grandchildren it would be "impossible" for her to sit on the jury; and B.B. stated that concern about her job might cause her to wish to "hurry along" the decisionmaking process. M.S. was also under a doctor's care for stress. Because their reluctance to serve, and the reasons for it, might have impaired their impartiality or their ability to deliberate, these also constituted gender-neutral reasons for the exercise of a peremptory challenge.

We conclude, therefore, that the record suggests gender-neutral reasons for the use of peremptory challenges as to each juror excused and, therefore, affirm the trial court's ruling that no prima facie case was established. (*People v. Davenport, supra,* 11 Cal.4th at p. 1200.) We note, in this connection, that the *Wheeler* claim was particularly weak as it consisted of little more than an assertion that a number of prospective jurors from a cognizable group had been excused. Such a bare claim falls far short of "rais[ing] a reasonable inference that the opposing party has challenged the jurors because of their race or other group association." (*People v. McDermott* (2002) 28 Cal.4th 946, 970 [123 Cal.Rptr.2d 654, 51 P.3d 874].)

In this light, we consider defendant's further claim that the trial court's consideration of his motion was perfunctory because it only reviewed two of the 10 juror questionnaires when the motions were made. He also contends that the trial court acted as an advocate for the prosecutor. The record is clear that the trial court read the juror questionnaires in preparation for voir dire and asked pertinent follow-up questions of some of the jurors based on its evaluation of the questionnaires. Thus, the trial court was not unprepared to rule on defendant's motions. Second, given the weakness of defendant's prima facie showing, the trial court's response was appropriate. Finally, the trial court did not act as the prosecutor's advocate either because it found, based on defendant's bare-bones allegations, that a prima facie case was not made or because it did not further inquire of the prosecutor. Absent a prima facie showing, the prosecutor was not required to offer such explanation nor was the court required to ask it of him.

### 3. *Defendant's Exclusion from Jury Selection Hearing*

 "A criminal defendant's federal constitutional right to be present at trial, largely rooted in the confrontation clause of the Sixth Amendment, also enjoys protection through the due process clause of the Fifth and Fourteenth Amendments [citation] ' "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defendant against the charge," ' but not ' "when presence would be useless, or the benefit but a shadow." ' (*Kentucky v. Stincer* (1987) 482 U.S. 730, 745 [96 L.Ed.2d 631, 107 S.Ct. 2658, 2667], quoting *Snyder v. Massachusetts* (1934) 291 U.S. 97, 105–107 [78 L.Ed. 674, 54 S.Ct. 330, 332–333, 90 A.L.R. 575].) Article I, section 15 of the California Constitution applies the same standard. [Citation]." (*People v. Ochoa, supra,* 26 Cal.4th at p. 433.)

Defendant contends these rights were violated by his exclusion from an in camera proceeding during voir dire at which the prosecutor and defense counsel passed for cause and each exercised three peremptory challenges. Even if his exclusion was error, he fails to show prejudice. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1357 [65 Cal.Rptr.2d 145, 939 P.2d 259] ["Defendant has the burden of demonstrating that his absence prejudiced his case or denied him a fair trial"].)

Defendant cites nothing in the record to support his generalized claim that, during this session, his attorney excused any juror whom defendant would have wanted to retain; thus his argument is speculative. Defendant's further claim that he was unable to review the prosecutor's choices is similarly unconvincing. The only ground on which the defense could have objected to the prosecutor's exercise of peremptory challenges would have been for the discriminatory use of such challenges under *Wheeler/Batson* but defendant fails to show that any such issue arose during the in camera session. His remaining claim, that defense counsel failed to excuse a juror who had connections to the victim and her family, also fails. The defense did not exhaust its peremptory challenges at the in camera session and could have excused the juror subsequently. That the juror was not excused cannot be attributed to defendant's absence from the in camera session.

### 4. *Trial Court's Voir Dire Reference to "Murder"*

During voir dire, in the course of questioning a prospective juror, the trial court said, "You know, to be quite blunt about it, there's one thing that's not in dispute in this case. That's that an eight-year-old girl was murdered." Defense counsel moved for a mistrial, arguing that the trial court had prejudged the evidence by referring to the killing as a murder. The trial court denied the motion, observing, "I think the point you're making is a point that,

when the case is finally submitted to the jury, no juror will even remember." Nonetheless, at the prosecutor's prompting, the trial court later repeatedly told prospective jurors that it had not intended to imply a murder had occurred, but that this was a determination for the jury.

■ Defendant contends the trial court erred when it denied his motion for a mistrial because its reference to murder lowered the prosecution's burden of proof. Not so. Denial of a motion for a mistrial is reviewed for abuse of discretion and should be granted "only when ' "a party's chances of receiving a fair trial have been irreparably damaged." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 282 [96 Cal.Rptr.2d 682, 1 P.3d 3], quoting *People v. Welch* (1999) 20 Cal.4th 701, 749 [85 Cal.Rptr.2d 203, 976 P.2d 754].) The motion should be granted only if the trial court is informed of the prejudice and it judges the prejudice to be insusceptible of being cured by admonition or instruction. (*People v. Lucero* (2000) 23 Cal.4th 692, 713–714 [97 Cal.Rptr.2d 871, 3 P.3d 248].)

The trial court's brief reference to "murder" in the particular context in which it occurred was not prejudicial but, in any event, any prejudice was cured by the court's subsequent clarifications.

E. *Disqualification Motion*

Defendant contends that the trial court committed statutory and constitutional error when it struck his motion to disqualify the court and all judges at the Van Nuys courthouse. (Code Civ. Proc., § 170.1, subd. (a)(6)(C).) We find no error.

■ Preliminarily, his claim is not cognizable on appeal. As set forth in Code of Civil Procedure section 170.3, subdivision (d): "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought within 10 days of notice to the parties of the decision and only by the parties to the proceeding." As we have repeatedly held, the statute means what it says: Code of Civil Procedure section 170.3, subdivision (d) provides the exclusive means for seeking review of a ruling on a challenge to a judge, whether the challenge is for cause or peremptory. (*People v. Hull* (1991) 1 Cal.4th 266, 271–276 [2 Cal.Rptr.2d 526, 820 P.2d 1036]; *People v. Williams* (1997) 16 Cal.4th 635, 652 [66 Cal.Rptr.2d 573, 941 P.2d 752] [where defendant failed to seek review via writ of mandate, his "statutory judicial disqualification claim is not properly before us on this automatic appeal following a judgment of death"]; *People v. Superior Court (Jimenez)* (2002) 28 Cal.4th 798, 802 [123 Cal.Rptr.2d 31, 50 P.3d 743]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 50–51 [17 Cal.Rptr.3d 710, 96 P.3d 30].)

Here, defendant filed a writ petition in the Court of Appeal seeking review of the denial of the disqualification motion, which the Court of Appeal summarily denied. Defendant thus received the appellate review of his statutory claim to which he was entitled. Defendant suggests that Code of Civil Procedure section 170.3, subdivision (d) does not provide his exclusive appellate remedy but is merely a procedural step that must be followed before he can raise the disqualification issue on appeal. Not surprisingly, he cites no authority for this construction of the statute, and our cases are clearly to the contrary.[16]

Defendant's claim is also substantively without merit. Defense counsel's declaration in support of the disqualification motion made it clear that he was not asserting that the trial court was personally biased against him but, rather, that an institutional bias against him pervaded the Van Nuys courthouse because of the "unusual relationship between the Van Nuys court system and the family of the deceased in this case." The basis of this allegation was that the victim's mother, Lori Parker, a paralegal or legal secretary, and her fiancé, Martin Gladstein, a criminal defense lawyer, were known to court personnel at the Van Nuys courthouse and had personal relationships with some of them, and that Gladstein had recently tried a case before Judge Kriegler, to whom defendant's case was assigned, and had access to areas of the courthouse restricted to the general public.

The declaration also referred to four specific incidents to support the claim of institutional bias: (1) defense counsel had personally observed Mrs. Parker and two of her friends hold a "private conference" with Judge Ronald S. Coen in his courtroom, which was adjacent to Judge Kriegler's courtroom; (2) a lawyer named Larry Baker, who was a friend of both Gladstein's and Parker's, approached defense counsel outside of Judge Kriegler's courtroom and said "words to the effect of 'No offense, Bob, but I hope your guy dies' "; (3) graffiti had been carved on a wood railing outside Judge Kriegler's courtroom that read "anal sex kid must die"; and (4) a bailiff involved in transporting prisoners to Judge Kriegler's courtroom had told defendant, "Why don't you just kill yourself and save everybody time and money." The declaration noted that when defense counsel brought this information to Judge Kriegler, the bailiff was relieved of any duties with respect to defendant.

---

[16] We have observed that, notwithstanding the exclusive-remedy provision of Code of Civil Procedure section 170.3, "a defendant may assert on appeal a claim of denial of the due process right to an impartial judge." (*People v. Mayfield* (1997) 14 Cal.4th 668, 811 [60 Cal.Rptr.2d 1, 928 P.2d 485].) Although defendant alluded to the due process clause in his motion below and on appeal here, his argument here is focused on whether the trial court complied with the statute and he makes no separate due process argument. Even if we construed his argument to encompass a due process claim, however, we would reject it for the same reasons we find his argument substantively unavailing.

The declaration concluded that the perception of institutional bias, "local publicity," the "unusual relationship to the court system of the family of the deceased," and the "venom of court personnel and members of the legal community" created "an appearance of bias or prejudice."

As early as September 24, 1994, defense counsel informed Judge Kriegler that he was contemplating bringing the motion and Judge Kriegler urged him to file it. On October 14, defense counsel again stated he would be "filing a motion in the nature of a 170.1 challenging this entire building." On November 14, when the defense again raised the issue of filing the disqualification motion, the trial court pointed out that the statute required the motion be filed "at the earliest possible opportunity." The motion was not filed until November 16.

Upon receipt of the motion, Judge Kriegler filed a verified answer denying any bias or impartiality and stating that the motion was untimely. At the hearing on the motion, Judge Kriegler declined to refer the motion to another judge pursuant to Code of Civil Procedure section 170.3, subdivision (c)(5) but, instead, struck the motion on grounds it was untimely and without a legal basis. (Code Civ. Proc., § 170.4, subd. (b).)[17] Judge Kriegler's ruling was correct.

■■■ " 'The standard for disqualification provided for in subdivision (a)(6)(C) of section 170.1 is fundamentally an objective one.' If a reasonable member of the public at large, aware of all the facts, would fairly entertain doubts concerning the judge's impartiality, disqualification is mandated. The existence of actual bias is not required." (*Flier v. Superior Court* (1994) 23 Cal.App.4th 165, 170 [28 Cal.Rptr.2d 383], fn. omitted, quoting *United Farm Workers of America v. Superior Court* (1985) 170 Cal.App.3d 97, 104 [216 Cal.Rptr. 4]; *People v. Brown* (1993) 6 Cal.4th 322, 336–337 [24 Cal.Rptr.2d 710, 862 P.2d 710].) "The challenge must be to the effect that the judge would not be able to be impartial toward a particular party." (*Flier, supra,* at p. 171.)

Defendant asserts that an institutional bias on the part of other judges or courthouse personnel is sufficient to disqualify a judge as to whose impartiality no question exists. We are far from persuaded the allegations in defense

---

[17] Code of Civil Procedure section 170.3, subdivision (c)(5) states in pertinent part: "No judge who refuses to recuse himself or herself shall pass upon his or her own disqualification or upon the sufficiency in law, fact, or otherwise, of the statement of disqualification filed by a party. In every such case, the question of disqualification shall be heard and determined by another judge . . . ." Code of Civil Procedure section 170.4, subdivision (b) states: "Notwithstanding paragraph (5) of subdivision (c) of Section 170.3, if a statement of disqualification is untimely filed or if on its face it discloses no legal grounds for disqualification, the trial judge against whom it was filed may order it stricken."

counsel's declaration demonstrated a pervasive institutional bias against defendant but, in any event, nothing in the disqualification statute supports his argument. His motion really appears to have been simply an attempt to relitigate his unsuccessful motion for change of venue.

■■■ The motion was also untimely. While certain specific events may not have been known to defense counsel until shortly before he filed the motion in November, specific facts to support his underlying argument of institutional bias were known to him as early as September. Thus, his failure to file the motion until the very eve of trial rendered it untimely under the statute. (Code Civ. Proc., § 170.4, subd. (b); *Urias v. Harris Farms, Inc.* (1991) 234 Cal.App.3d 415, 424 [285 Cal.Rptr. 659] ["The matter of disqualification should be raised when the facts constituting the grounds for disqualification are first discovered . . . ."].)

### F. *Denial of Venue Motion*

Defendant contends the trial court erred when it denied his motions to change venue or transfer his case to another judicial district within Los Angeles County due to prejudicial pretrial publicity and courthouse bias.[18] We disagree.

■■■ "A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. 'Whether raised on petition for writ of mandate or on appeal from a judgment of conviction, "the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable." ' [Citation.] 'The de novo standard of review applies to our consideration of the five relevant factors: (1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim.' [Citation.]" (*People v. Welch, supra,* 20 Cal.4th at p. 744, quoting *People v. Sully* (1991) 53 Cal.3d 1195, 1236–1237 [283 Cal.Rptr. 144, 812 P.2d 163].)

Defendant brought three motions to change venue or transfer. Each was denied.

We perceive no error. Only the first factor weighs in favor of granting the motion, but the nature and the gravity of the offense, standing alone, is not

---

[18] The same standard and considerations for determining whether to grant a motion to change venue apply in ruling on a motion to transfer and, therefore, we do not analyze that motion separately. (*People v. Jenkins* (2000) 22 Cal.4th 900, 945 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1276, fn.17 [18 Cal.Rptr.2d 796, 850 P.2d 1].)

dispositive. (*People v. Weaver, supra,* 26 Cal.4th at p. 905.) Nor, contrary to defendant's claim, does the second factor weigh in favor of the motion because we conclude the publicity was neither extensive nor prejudicial.

In his pretrial motion, defendant cited 18 newspaper articles about his case that had appeared between November 22, 1993 and June 9, 1994.[19] Except for a letter to the editor, all the articles were news stories. Five reported the circumstances of defendant's arrest and the victim's death and two reported her funeral. The remaining articles reported developments in the case as it moved through the legal system. Defendant's trial did not commence until November 1994, more than a year after most of the articles had appeared, and about six months after publication of the last one. Any potential prejudice from the media coverage was attenuated by the passage of time. (*People v. Welch, supra,* 20 Cal.4th at p. 744.) Moreover, 18 articles over a 12-month period can hardly be characterized as "extensive" (cf. *People v. Cummings, supra,* 4 Cal.4th at p. 1275 [51 newspaper stories and 24 television stories in an 11-month period]), nor, contrary to defendant's claim, was the coverage biased or inflammatory simply because it recounted the inherently disturbing circumstances of this case and the victim's family's grief at her murder.

■■■ Moreover, the fact that prospective jurors may have been exposed to pretrial publicity about the case does not necessarily require a change of venue. (*People v. Proctor* (1992) 4 Cal.4th 499, 527 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) " 'It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " (*People v. Daniels* (1991) 52 Cal.3d 815, 853 [277 Cal.Rptr. 122, 802 P.2d 906], quoting *People v. Chadd* (1981) 28 Cal.3d 739, 750 [170 Cal.Rptr. 798, 621 P.2d 837].) Here, all of the jurors and alternate jurors who had any knowledge of the case stated they could set aside this knowledge and decide the case on the law and evidence received at trial. In this connection, it should be observed that defendant failed to use all his peremptory challenges when he accepted the jury, thus indicating that "the jurors were fair, and that the defense itself so concluded." (*People v. Balderas* (1985) 41 Cal.3d 144, 180 [222 Cal.Rptr. 184, 711 P.2d 480]; see *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 46.)

Defendant also cites three newspapers articles that appeared during his trial that were the basis of renewed motions for change of venue on December 5 and December 7, 1993. His December 5 motion was based on a newspaper article that had appeared four days earlier, while jury selection was still in process, titled *Child-Murder Case Inflames Emotions.* The trial court included questions about this article and determined that the prospective jurors had not been exposed to it. Defendant's December 7 motion was brought after two

---

[19] Defendant's renewed motions also referenced the pretrial publicity.

newspaper articles implicated defendant in a plot to kill prosecution witnesses. The trial court questioned the jurors about the article and again determined that none of them had been exposed to it. Under these circumstances, the trial court properly denied defendant's renewed motions.[20]

None of the remaining relevant factors support a change of venue in this case. As to community size, the San Fernando Valley, from which the jury pool was drawn, contains over a million inhabitants and is far more populous than many counties. Therefore, the size of the community does not support a change in venue. (*People v. Staten* (2000) 24 Cal.4th 434, 449 [101 Cal.Rptr.2d 213, 11 P.3d 968].) Defendant asserts that the victim and her family occupied positions of prominence and popularity, but the victim became known only because she was a murder victim, not because of any preexisting status. (See *People v. Daniels, supra,* 52 Cal.3d at p. 852.) Defendant also points out that the victim's mother was a legal secretary and her fiancé was a criminal defense lawyer who were known in the Van Nuys legal community, but nothing in the record suggests these factors had any effect on the jury pool. (*People v. Weaver, supra,* 26 Cal.4th at p. 906.) Finally, despite defendant's attempt to depict himself as an outsider because of his recent immigrant status, and the victim of ethnic bias because of his Iranian origin, "there was no evidence of unusual local hostility to such persons, such that a change of venue would likely produce a less biased panel. Nor was the pretrial publicity calculated to excite local prejudices in this regard." (*People v. Balderas, supra,* 41 Cal.3d at p. 179; cf. *People v. Williams* (1989) 48 Cal.3d 1112, 1129 [259 Cal.Rptr. 473, 774 P.2d 146] [pretrial publicity focused on defendant's race and his status as an outsider to the community in contrast to victim's ties to the community].)

To the extent, moreover, that defendant asserts some racial or ethnic animus was at work among the jurors, his claim is belied by his failure to have exercised all his peremptory challenges. "In the absence of some explanation for counsel's failure to utilize his remaining peremptory challenges, or any objection to the jury as finally composed, we conclude that counsel's inaction signifies his recognition that the jury as selected was fair and impartial." (*People v. Daniels, supra,* 52 Cal.3d at p. 854.)

We therefore conclude that the trial court did not err in denying defendant's motions for change of venue or transfer.

---

[20] Defendant contends there were over 60 newspaper articles related to his case, but he includes numerous articles that appeared during his trial, some of them duplicates. These stories, obviously, were not before the court when it ruled on his motions to change venue or transfer and we do not consider them for purposes of our analysis.

### G. *Claims of Judicial and Other Bias and Inflammatory Publicity*

#### 1. *Bias Rendering the Proceedings Unfair*

Defendant claims that bias pervaded the proceedings, rendering them unfair. He again cites the incidents that supported his venue and disqualification motions. Not only have we already concluded that none of these incidents justified either disqualification of the trial court or a change of venue, but also defendant fails to show that any juror or prospective juror witnessed or was aware of any of these incidents. Therefore, we reject his assertion that these events had any impact on his trial.

Next, defendant asserts the trial court's response to his allegation of mistreatment by jail staff evinced bias against his religious beliefs. Defendant claimed that, during the trial, jail staff entered his cell without his consent and defaced his copy of the Koran and his trial notes. When defense counsel brought this allegation to the trial court's attention, the court agreed to have its bailiff investigate and urged defendant to file a formal complaint with the sheriff. The trial court noted, in passing, that it had had the bailiff look into previous complaints made by defendant and determined they were unfounded but, nonetheless would "have my deputy check into" defendant's fresh complaints.

Defendant contends the trial court's response was inadequate or indicative of judicial bias against him, but the trial court's actions were reasonable and responsive to his request.

Defendant also asserts the trial court and prosecutor ridiculed his religion. This assertion is without merit. After the discussion of defendant's mistreatment in the jail, the prosecutor pointed out that, earlier in the trial, defense counsel expressed concern that jurors might be prejudiced against defendant because he is Muslim. He noted that the trial court had permitted defendant to bring a Koran into the court but in a place where the jurors could not see it. He observed, however, that "I think it's important to note for the record the Koran, when this case started, was about two inches by three inches in size, and now he's bringing one the size of a telephone book each day when he comes into court. [¶] I think it is important for the issue of bias and prejudice, that counsel has brought up on this record over and over, that this is a situation that is being created at this point by the defendant by bringing this book in." The court noted that defendant was also kissing the Koran while witnesses were testifying against him. "I told him I thought he should sit there and quietly [*sic*] not make any overt movements during the trial that might be interpreted one way or the other by the jury. [¶] The defendant instead is flaunting the Koran in front of the jury and has been seen by me to be kissing the Koran at various times during the trial. [¶] So that is of record. It doesn't require any further response. There's no issue to be litigated on this."

The jury was not present during this exchange and defendant made no objection to either the prosecutor's remarks or the court's response. He now argues that the trial court "stif[led] his use of a spiritual guide during the proceedings." The trial court, however, despite its concern that defendant's use of the Koran might be a distraction, apparently neither prevented him from continuing to bring the book into the courtroom nor otherwise interfered with his religious practice.

Defendant next complains about an incident in which the victim's mother kissed the trial judge's bailiff. The record shows that the bailiff was not a willing participant but attempted to move away from the victim's mother. It was also unclear whether any juror witnessed the incident.

Furthermore, the prosecutor admonished the victim's mother to have no further contact with anyone related to the case.

Defendant rejected the trial court's offer to replace the bailiff and moved for a mistrial. The trial court denied the motion but suggested polling the jurors to determine whether they saw the incident. Defense counsel responded by requesting that the penalty phase be moved to another courthouse. The trial court denied the request. Defense counsel then requested that the court instruct the jury that any interaction between the victim's mother and the bailiff was improper and to disregard it. The trial court replied, "She's not on trial. I'm not going to do that. [¶] I would be happy to tell them if they saw any interaction, obviously that should play no role whatever in their determination of what happened in the case." Defense counsel rejected the trial court's proposal and declined to make any "further requests."

 "Misconduct on the part of a spectator is a ground for mistrial if the misconduct is of such a character as to prejudice the defendant or influence the verdict. [Citation.] A trial court is afforded broad discretion in determining whether the conduct of a spectator is prejudicial." (*People v. Lucero* (1988) 44 Cal.3d 1006, 1022 [245 Cal.Rptr. 185, 750 P.2d 1342].) The incident appears to have been brief and it was not clear that any juror even witnessed it. We conclude that the trial court did not abuse its discretion in denying defendant's mistrial motion. In the absence of any indication on the record that any juror actually observed the incident, we reject defendant's further claim that the trial court erred by failing to admonish the jury to disregard the incident.

Defendant next claims that the trial court was biased against his family and supporters, as evidenced by three incidents involving his mother, and a fourth incident involving some of his supporters.

During the discussion of the kissing incident between the victim's mother and the bailiff, the trial court noted that defendant's mother was sitting in the

court "crying almost uncontrollably right now while my bailiff is trying to console her." As the hearing progressed, defendant's mother became more and more voluble until, according to the court, she was "out of control." It ordered her removed from the courtroom. No juror was present when this occurred.

■■■ Defendant argues the court's removal of his mother indicated its bias against her. We disagree. "Trial courts possess broad power to control their courtroom and maintain order and security." (*People v. Woodward* (1992) 4 Cal.4th 376, 385 [14 Cal.Rptr.2d 434, 841 P.2d 954]; see Code Civ. Proc., § 128, subd. (a)(1)–(5).) The trial court's removal of defendant's mother was a reasonable exercise of this power.

The second incident involving defendant's mother occurred when the trial court was informed that she had been seen in the vicinity of the parking structure reserved for court employees. In a closed session, the trial court briefly asked her whether she had been parking there and was satisfied by her explanation that, because it was rainy and wet, she had been dropped off at the parking structure. Defendant asserts this was evidence the trial court was biased against his mother and his supporters. We disagree. The trial court's concern that a witness was parking in an area reserved for court employees was reasonable, its inquiry was brief, and it was satisfied with the explanation given.

Defendant also asserts that the trial court showed its bias against his mother because it refused to order television cameras to be turned off during her testimony as requested by defendant. However, at the in camera proceeding to which he directs us, defendant did not make this request. He asked for special transportation for himself to the court because he had been spat at and taunted by other prisoners on the bus ride from the jail to the court. In passing he mentioned that some of them had said they had seen his mother on television and "they're going to have somebody from their friends do something to her." At no point did he request the cameras be turned off during her testimony.

Lastly, defendant claims the trial court evinced bias against his supporters because it conducted a hearing during which the bailiff charged with guarding the jury during its deliberations informed the judge that three men, apparently supporters of defendant, appeared to have been following or "shadowing" the jury. Out of the presence of the jury, the bailiff told the court he asked the men for identification and ran a warrant check; one of the men had three outstanding warrants. The court held him until he could be taken into custody. The court briefly addressed the other two men and admonished them not to follow the jury. Defense counsel objected to "the disparate treatment of our

witnesses" and said he had observed the victim's mother in the cafeteria while the jury was also there. The trial court replied, "The jury is deliberating, and I want to make sure the jury does its best to reach a verdict without the kind of outside influences you are concerned about." As to the presence of the victim's mother in the cafeteria, the court pointed out that there was no report that she had followed the jurors.

On this record, it is clear that the trial court's action, in response to the bailiff's allegation, was intended to prevent any impairment of or interference with the jury's deliberation. We therefore reject defendant's claim of judicial bias.

We further reject defendant's more global claim that not only judicial bias, but courthouse personnel bias and "community" bias so "created an emotional atmosphere" that the jury was unable to reach a fair verdict. Every incident cited by defendant either clearly or apparently occurred outside the presence of the jury and could have had no impact on its deliberations or its verdict.

### 2. *Denials of Mistrial Motions for Inflammatory Publicity*

Defendant contends the trial court abused its discretion and violated his constitutional rights when it denied mistrial motions based on claims of inflammatory publicity.

■ "As we have previously explained, a mistrial should be granted 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged.' " ' [Citation.] We review the trial court's ruling for abuse of discretion and find no such abuse here." (*People v. Burgener* (2003) 29 Cal.4th 833, 873 [129 Cal.Rptr.2d 747, 62 P.3d 1], quoting *People v. Ayala, supra,* 23 Cal.4th at p. 282.)

The first incident involved a newspaper article that alleged prosecutors had reported that defendant was involved in a plot to kill a prosecution witness, Rauni Campbell. When the article was brought to the trial court's attention, the trial court inquired of the jurors whether they had had any exposure to articles or television reports about the case. None had. At the end of its inquiry, the court, which had previously ordered the jurors not to read newspapers, watch any television reports, or listen to any radio reports about the case, directed them not to read the newspaper at all, except for the sports and classified sections. Defendant engages in the unsupported assertion that the trial court's admonition was either inadequate or ineffective, but we presume the jury followed the court's instructions. (*People v. Harris* (1994) 9 Cal.4th 407, 426 [37 Cal.Rptr.2d 200, 886 P.2d 1193].)

Defendant's second mistrial motion was made on January 9, 1995, after defense counsel learned that the victim's mother had given a television interview in which, according to defense counsel, she demanded the death penalty for defendant. The trial court reminded counsel he had admonished the jury not to watch television reports of the case and offered to poll them. Sometime later in the proceedings, the trial court returned to the subject. The trial court said it would order the Parker family not to discuss the case with anyone, including the press, during the remainder of trial. Regarding the television report, the court stated it was hopeful that the jurors had been abiding by its admonition not to watch television. Defense counsel characterized this as "wishful thinking" and moved for a mistrial. The trial court admonished the victim's family but did not rule on the motion, nor did defendant press for a ruling.

Again, we presume that the jury followed the trial court's admonition to avoid any publicity about the case. Accordingly, even assuming defendant has not forfeited this claim by failing to press for a ruling, we would find no abuse of discretion in the denial of the motion.

H. *Prosecutorial Misconduct Claims*

1. *Use of an Informant*

Defendant complains that the prosecution interfered with his attorney-client relationship because it used a jailhouse informant to investigate allegations that he was conspiring to kill a prosecution witness. The claim is without merit.

During a pretrial conference, an issue arose regarding the prosecutor's attempts to subpoena videotapes from three Iranian television stations that had broadcast stories in which defendant made statements about the case in phone calls to his mother, which were then aired. One of the stations had failed to comply with the subpoena and there was some discussion about how to enforce it. Defense counsel interjected, accusing the prosecution of "overreaching, [and] overzealous enforcement." In the course of his remarks, he claimed that the prosecutor had ordered defendant "transferred to various cells in the county jail so he can gather evidence." He asked that the subpoenas to the television stations not be enforced.

The trial court rejected his request, pointing out that he had no standing regarding the subpoenas because they were directed at third parties. Defense counsel cited *Barber v. Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818] for the proposition that when "the prosecution infiltrates the defense camp, the prosecution runs afoul of the Sixth Amendment, and

Mr. Panah does have standing to complain about Sixth Amendment violations, and I would submit it."

The trial court denied the motion to quash, observing there was not "even a hint that this has anything to do with the attorney-client relationship or privilege." Then, while recognizing "there's no motion before the court," it invited the prosecutor to respond to defense counsel's other allegations.

The prosecutor replied that his office had received information that defendant was involved in a conspiracy to murder two prosecution witnesses and had conducted an investigation that involved obtaining court orders to tape conversations between defendant and an informant. He pointed out that the defense had been fully informed of the investigation, which had not resulted in a filing against defendant. He invited the defense to file whatever motions it deemed appropriate with respect to the investigation.

Defense counsel responded, "When the day is appropriate, we will notice any appropriate motion and we will litigate it with appropriate testimony, Your Honor." There was no further discussion of the point.

Thus, defendant never made a motion on Sixth Amendment grounds to suppress any evidence obtained by the prosecutor's use of an informant to investigate the alleged conspiracy to kill witnesses. Indeed, no charges were ever filed against defendant arising out of the investigation, nor was any of the evidence gathered during the information used against him at trial. Moreover, defendant cites nothing in the record that controverts the prosecutor's statements either that the investigation was conducted lawfully or that all information regarding it was turned over to the defense. In fact, during the course of defendant's November 21 *Marsden* motion, defense counsel acknowledged having received and reviewed transcripts from the taped conversations between defendant and the informant. We therefore conclude that defendant forfeited any Sixth Amendment claim based on the prosecution's use of the informant and, in any event, has failed to show any violation of his Sixth Amendment right or that he suffered any conceivable prejudice. (See *United States v. Morrison* (1981) 449 U.S. 361, 365, 366 [66 L.Ed.2d 564, 101 S.Ct. 665]; *People v. Jenkins, supra,* 22 Cal.4th at pp. 1006–1008.)

Defendant contends that the prosecutor used conversations between him and the informant to prevent defendant from gaining access to Rauni Campbell, one of the alleged targets of the conspiracy to kill witnesses. As noted below, the prosecution made Campbell available to the defense, but she declined to be interviewed by the defense. Defendant cites nothing in the record to support his claim that Campbell's unwillingess to speak to the defense investigator was related to defendant's conversations with the informant.

## 2. *Denial of Access to Prosecution Witness*

Defendant contends the prosecution violated his Sixth Amendment and other constitutional rights by denying him access to a prosecution witness, Rauni Campbell. Specifically, he argues that the trial court erred when it refused to order Campbell to be brought before the court for a *Franks* hearing (*Franks v. Delaware, supra,* 438 U.S. 154); that the prosecutor prevented him from interviewing the witness before she testified; and that the trial court abused its discretion by withholding her out-of-state address from the defense out of concern for her safety. (§ 1054.7.)

■■■ Under *Franks v. Delaware, supra,* 438 U.S. 154, a defendant has a limited right to challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. When presented with such a challenge, the lower court must conduct an evidentiary hearing *if* a defendant makes a substantial showing that (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth, and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to support a finding of probable cause. The defendant must establish the statements are false or reckless by a preponderance of the evidence. (*Id.* at pp. 155–156; *People v. Bradford, supra,* 15 Cal.4th at p. 1297.) Innocent or negligent misrepresentations will not defeat a warrant. (*Franks, supra,* 438 U.S. at pp. 154–155.) ■■■ "Moreover, 'there is a presumption of validity with respect to the affidavit. To merit an evidentiary hearing[,] the defendant['s] attack on the affidavit must be more than conclusory and must be supported by more than a mere desire to cross-examine. . . . The motion for an evidentiary hearing must be "accompanied by an offer of proof . . . [and] should be accompanied by a statement of supporting reasons. Affidavits or otherwise reliable statements of witnesses should be furnished," or an explanation of their absence given.' " (*People v. Benjamin* (1999) 77 Cal.App.4th 264, 272 [91 Cal.Rptr.2d 520], quoting *People v. Sandlin* (1991) 230 Cal.App.3d 1310, 1316 [281 Cal.Rptr. 702].) Finally, "[a] defendant who challenges a search warrant based upon an affidavit containing omissions bears the burden of showing that the omissions were material to the determination of probable cause." (*People v. Bradford, supra,* 15 Cal.4th at p. 1297.)

During the suppression hearing, defense counsel asked that Ms. Campbell be ordered to testify regarding two statements made by Officer Kong in the affidavit supporting the search warrant for defendant's residence. Kong stated that as he approached the courtyard in Campbell's apartment complex, defendant "fled through the courtyard apartment." Defense counsel maintained that Campbell would testify defendant did not "flee" but "left the apartment in the normal fashion." Kong was also quoted as saying Campbell

told him defendant had told her "he had done something very bad." Defense counsel claimed that what Campbell actually told Kong was that defendant said "they had done something very bad." The trial court found that defendant failed to meet the foundational requirements set forth in *Franks* and denied the motion.

We review denial of a *Franks* hearing de novo. (*People v. Benjamin, supra,* 77 Cal.App.4th at p. 271.) We conclude the trial court acted properly. Defense counsel's motion was unaccompanied by any of the evidentiary material required of the moving party.[21] At most, he provided no more than " 'conclusory contradictions' " of the affiant's statements "insufficient for the 'substantial preliminary showing' " required by *Franks.* (*Benjamin, supra,* 77 Cal.App.4th at p. 272.) He also failed to demonstrate that, even if the statements were inaccurate, they were material to the determination of probable cause. (*People v. Bradford, supra,* 15 Cal.4th at p. 1297.)

Defendant claims that the prosecution also denied him access to Campbell prior to her trial testimony. In this connection, he challenges the trial court's order withholding her address from defendant because of concern that he had conspired to threaten her safety. His claims are without merit.

At some point, apparently early in the case, there was an in camera proceeding at which the trial court granted the prosecution's request that Ms. Campbell's out-of-state address not be disclosed to defendant based on allegations that he had conspired with others to kill her and another witness. While defendant complained about his lack of access to Campbell in connection with his *Franks* motion, he made no attempt to compel disclosure of her address.

On November 21, 1994, the prosecutor agreed to make Campbell available to the defense by phone. Two days later the prosecutor represented that Campbell had declined to speak to the defense. The defense made no response to the prosecutor's representation nor did it seek disclosure of her address or telephone number.

On December 5, the prosecutor informed the trial court that Ms. Campbell would testify the next day. The prosecutor agreed to make her available to the defense. The following day, the prosecutor reported that he had introduced the defense investigator to Ms. Campbell and she had declined to speak to

---

[21] Defendant argues that defense counsel's brief reference to Campbell's grand jury testimony supplies the required evidentiary showing; he is wrong. On the other hand, if Campbell's grand jury testimony contradicted statements made by Kong in the affidavit, and Kong was available for questioning, defendant fails to explain why he did not call Kong and impeach him with Campbell's grand jury testimony.

him. When defense counsel complained that he had been deprived of the ability to interview her, the trial court observed, "[j]ust to be clear, the prosecutor several times has indicated that Miss Campbell does not want to talk to the defense. And she apparently delivered that message herself to the defense investigator today."

The defense then requested her current address in order to gather information about her reputation in her current community. The prosecutor reminded the court that Campbell had been relocated to protect her based on information that defendant had been involved in a plan to jeopardize her life. He also noted that he was unaware of any efforts by the defense to have investigated Campbell's reputation in the community at the time of the offense. The trial court observed that information about Campbell's reputation in her new community, in which she had lived for only a brief time, was of minimal relevance, if any. It also observed that because she had been defendant's girlfriend, the defense had at its disposal some knowledge about her with which to investigate her reputation. Finally, it cited concerns about her security and denied the request for further discovery of her address.

█ A defendant has a "right to the names and addresses of prosecution witnesses and a right to have an opportunity to interview those witness *if they are willing to be interviewed.*" (*Reid v. Superior Court* (1997) 55 Cal.App.4th 1326, 1332 [64 Cal.Rptr.2d 714], italics added.) A defendant does not have a fundamental due process right to pretrial interviews or depositions of prosecution witnesses. (*People v. Municipal Court (Runyan)* (1978) 20 Cal.3d 523, 530–531 [143 Cal.Rptr. 609, 574 P.2d 425].) Discovery of a prosecution witness's address, moreover, may be limited out of concern for the witness's safety. (§ 1054.7; *In re Littlefield* (1993) 5 Cal.4th 122, 136 [19 Cal.Rptr.2d 248, 851 P.2d 42].) Orders under this section are subject to review for abuse of discretion. (See *Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1135–1136 [99 Cal.Rptr.2d 149, 5 P.3d 203].)

Here, the prosecution provided defendant access to the witness but she refused to speak to the defense. Her refusal does not constitute prosecutorial misconduct. Defendant also challenges the trial court's denial of his motion to disclose the witness's address. On the record before us, where there appears to have been a credible allegation of potential injury to the witness, we find no abuse of discretion. In any event, since he failed to make this request until the day before Campbell testified, we fail to see how he could have been prejudiced by the denial of his motion. Accordingly, we reject defendant's claim that his statutory discovery rights, his rights to counsel, or any other constitutional rights were violated.

### 3. *Failure to Provide Coroner's Report*

Defendant contends the prosecutor committed misconduct by withholding a vital coroner's report, thereby violating the discovery statute (§ 1054.1) and his constitutional rights. The record discloses, however, that the report was prepared during the trial and provided to defendant at the earliest possible opportunity.

On the morning of Monday, December 12, 1994, just prior to the testimony of Medical Examiner Eva Heuser, the prosecution provided the defense a report from Dr. Heuser, prepared on the preceding Friday, December 9, entitled "Microscopic Report." The report contained Dr. Heuser's analysis of slides of tissue taken from the victim's vaginal and anal walls as well as perineal tissue. The analysis showed evidence of trauma and supported Dr. Heuser's conclusion that the injuries occurred while the victim was still alive. The prosecutor explained that on the previous Friday, in preparation for Dr. Heuser's testimony, he had her pull the slides and take a look at them in light of specific questions he had for her, and prepare a report. The prosecutor stated the report was "confirmatory of the testimony" Dr. Heuser had previously given, presumably before the grand jury. Dr. Heuser later testified she had intended to prepare such a report when she had first examined the slides but had forgotten to do so.

The defense requested a continuance of an unspecified amount of time. The trial court denied the request, noting the defense had had access to the original coroner's report and to Dr. Heuser's grand jury testimony, and "the defense could have simply have called Dr. Heuser with any questions." Later that day, in connection with a mistrial motion based on defense counsel's allegation his cross-examination had been unfairly limited, counsel returned to the report. He asserted that Dr. Heuser's conclusion that the injuries occurred premortem was new material and asked either that the defense be granted a continuance or that the report be excluded.

The trial court denied defendant's motions. It reiterated its finding that the prosecution had timely disclosed the report. It also observed that, despite the court's urgings, the defense had not yet called in its expert to examine the report.

Section 1054.1, subdivision (f) requires the prosecutor to disclose to the defense "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of . . . scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence." Such disclosure must be

made at least 30 days before trial, but "[i]f the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately . . . ." (§ 1054.7.)

██ Here, the trial court found Dr. Heuser's report was a new report and that disclosure was timely under the statute. Although defendant concedes "it could be argued the report was turned over within a reasonable time after it was prepared," he asserts that the prosecutor intentionally delayed having Dr. Heuser prepare the report to avoid discovery. Nothing in the record supports this imputation of misconduct to the prosecution. It is settled, moreover, that the prosecution "has no *general duty* to seek out, obtain, and disclose all evidence that might be beneficial to the defense." (*In re Littlefield, supra,* 5 Cal.4th at p. 135.) Therefore, the prosecution did not commit misconduct simply because it failed to ask Dr. Heuser to prepare the report sooner.

Moreover, there was apparently no information in the report to which defendant did not already have access. He argues that "*regardless* of the content of the report" he was prejudiced because the prosecutor's "unexpected presentation of it to the defense hampered his ability to adequately prepare for his examination of the coroner." But defendant's failure to adequately prepare for cross-examination cannot be attributed to the belated production of a report containing information already in his possession.

We conclude that disclosure of the report was timely. Necessarily, then, we reject the edifice of constitutional error that defendant constructs upon his claim of discovery violation.

Defendant alternatively contends the trial court abused its discretion by denying his request for a continuance of unspecified length. Under the circumstances, we find no abuse of the trial court's discretion in its denial of the continuance request and, in any event, no prejudice. (*People v. Samayoa, supra,* 15 Cal.4th at p. 840.)

### 4. *Intimidation of a Defense Witness*

Defendant contends the prosecutor committed misconduct by intimidating a defense witness, Victoria Eckstone. He argues this misconduct violated his Sixth Amendment right to compulsory process, among other constitutional rights.

██ " 'Governmental interference violative of a defendant's compulsory-process right includes, of course, the intimidation of defense witnesses by the prosecution. [Citations.] [¶] The forms that such prosecutorial misconduct may take are many and varied. They include, for example, statements to

defense witnesses to the effect that they would be prosecuted for any crimes they reveal or commit in the course of their testimony. [Citations.]' " (*People v. Hill* (1998) 17 Cal.4th 800, 835 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

Ms. Eckstone testified that she believed defendant was the father of her child, had spent time with the child, and loved her. On recross-examination, she was confronted by the prosecutor with her statement to a detective that she would not allow defendant near her child. Therefore, on redirect, she testified that, during the investigation of this case, the prosecutor called her several times and, when she finally returned his call, threatened to arrest her unless she spoke to him. She testified further, "I told them pretty much anything they wanted to hear as long as I wasn't going to get arrested."

On further recross-examination, she acknowledged that what she was actually told by someone in the prosecutor's office was, " 'I guess we're going to have to come out and get you,' " which she considered "a threat for an arrest." She testified further that she had not intentionally lied to the prosecutor.

In a bench conference after her testimony, the trial court disclosed it had received a note from the bailiff that said sheriff's deputies in the courtroom believed Eckstone might be under the influence of a controlled substance. The court said she could either be arrested or examined by a drug recognition expert or simply kept on call. The prosecutor asked she be examined because "if she's under the influence of a substance, I think the jury needs to know that." The court agreed "her demeanor and behavior was highly unusual, to say the least." Over defense counsel's objection, the trial court ordered the examination in another part of the courthouse and outside the presence of the jury. Subsequently, the trial court reported on the record that the examination had taken place, and there was "some indication of substance usage" but not enough to make an arrest.

We find no supportable claim of prosecutorial intimidation. The record makes clear that the alleged threat of arrest was simply a matter of interpretation on Eckstone's part. Moreover, even if the prosecutor had overreached during the investigatory part of this case, he did not interfere with defendant's Sixth Amendment compulsory process rights because Eckstone appeared and testified on defendant's behalf, not only in the guilt phase, but in the penalty phase. Thus, this case is easily distinguishable from the cases defendant relies upon in support of his argument, in which prosecutorial threats to charge a defense witness with perjury (*People v. Hill, supra,* 17 Cal.4th at p. 835; *People v. Bryant* (1984) 157 Cal.App.3d 582, 590 [203 Cal.Rptr. 733]), or apprising a defense witness of his privilege against self-incrimination in an

intimidating fashion (*People v. Warren* (1984) 161 Cal.App.3d 961, 973–974 [207 Cal.Rptr. 912]), deprived the defendant of the testimony of that witness. Defendant suggests that the threat of arrest may have subtly influenced Eckstone's demeanor. This is mere speculation.

■ We also reject his claim that prosecutorial misconduct was involved in Eckstone's detention for possible drug use. The request came not from the prosecutor or the court, but from police present in the courtroom. The extent of the prosecutor's participation was his legitimate observation that whether a witness is testifying under the influence of drugs is relevant to credibility. (*People v. Viniegra* (1982) 130 Cal.App.3d 577, 581 [181 Cal.Rptr. 848] ["It is well established that a witness may be questioned as to whether he or she has recently used, or is under the influence of, drugs"].) Additionally, the detention did not prevent Eckstone from returning to testify for defendant at the penalty phase. There was no misconduct and no constitutional violation.

### 5. *Misconduct During Closing Argument*

Defendant contends the prosecutor committed misconduct during his closing and rebuttal arguments. Defendant objected to only one of the statements he argues was misconduct, thus forfeiting his claims as to the rest. (*People v. Brown* (2003) 31 Cal.4th 518, 533 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) In any event, we find there was no misconduct but, even if there was, no prejudice.

■ When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury. (*People v. Ayala, supra,* 23 Cal.4th at pp. 283–284.) "To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury." (*People v. Brown, supra,* 31 Cal.4th at p. 553.) There are two exceptions to this forfeiture: (1) the objection and/or the request for an admonition would have been futile, or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct. Forfeiture for failure to request an admonition will also not apply where the trial court immediately overruled the objection to the alleged misconduct, leaving defendant without an opportunity to request an admonition. A defendant claiming that one of these exceptions applies must find support for his or her claim in the record. (*People v. Boyette, supra,* 29 Cal.4th at p. 432.) The ritual incantation that an exception applies is not enough.

Defendant contends that the prosecutor improperly appealed to the prejudices and passions of the jury, and denigrated the presumption of innocence, when he argued that the prosecution's evidence had "stripped away" defendant's presumption of innocence. Additionally, he claims that the prosecutor's reference to the victim's age, height, and weight also constituted an appeal to the jury's prejudices and passions because it drew an implied contrast between her stature and defendant's.

We disagree. "[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper." (*People v. Lewis* (1990) 50 Cal.3d 262, 283 [266 Cal.Rptr. 834, 786 P.2d 892].) Here, the prosecutor's references to the presumption of innocence were made in connection with his general point that, in his view, the evidence, to which he had just referred at length, proved defendant's guilt beyond a reasonable doubt, i.e., the evidence overcame the presumption.

Defendant's further claim that the prosecutor's reference to the victim's age, weight, and height was intended to appeal to the jury's sympathies is also without merit. These were facts in evidence. The prosecutor cannot be faulted for misconduct because he referred to them, nor was he required to discuss his view of the case in clinical or detached detail. (*People v. Hill, supra,* 17 Cal.4th at p. 819 [" 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " ' "], quoting *People v. Williams* (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

Next, defendant cites three comments by the prosecution he claims improperly lowered the burden of proof: (1) that it was a "reasonable interpretation" from certain body fluid evidence that defendant and the victim were on the bed in defendant's bedroom; (2) that it was a "reasonable inference" from other evidence regarding defendant's habits, customs and statements to Rauni Campbell that he videotaped the crime; and, (3) the analysis of tissue paper found in the wastebasket in defendant's bathroom "indicate[d]" that the victim had orally copulated defendant.

Defendant failed to object to any of these comments, or to seek a curative admonition, thus the claim is forfeited. (*People v. Brown, supra,* 31 Cal.4th at p. 553.) He argues that his failure to object or seek an admonition should be excused under the futility exception, but cites nothing in the record to support its application. In any event, these isolated references did not constitute an argument that defendant could be convicted on a showing of less than guilt beyond a reasonable doubt but were reasonable inferences or deductions that the prosecutor could permissibly urge the jury to draw from the evidence. (*People v. Hill, supra,* 17 Cal.4th at p. 819.)

Finally, defendant argues that the prosecutor committed misconduct when, in response to defense counsel's claim that the prosecutor had failed to produce either fingerprint or DNA evidence, he pointed out that the defense could also have conducted these experiments. Defendant contends that the prosecutor's argument shifted the burden of proof from the prosecution to the defense.

Again, defendant's failure to object to this argument or seek a curative admonition forfeits the claim, and he points to nothing on the record that would excuse forfeiture. In any event, the claim is without merit. Defense counsel argued that the prosecution had neglected to collect vital evidence, such as any fingerprints on the suitcase in which the victim's body was found or DNA evidence, and suggested the reason was because it did not want to risk linking someone else to the crime. The prosecutor's argument was a proper rebuttal to these claims. (*People v. McDaniel* (1976) 16 Cal.3d 156, 177 [127 Cal.Rptr. 467, 545 P.2d 843]; see also *People v. Wash* (1993) 6 Cal.4th 215, 263 [24 Cal.Rptr.2d 421, 861 P.2d 1107], quoting *People v. Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213] ["prosecutorial comment upon a defendant's failure to 'introduce material evidence or to call logical witnesses' is not improper"].)

Our rejection of defendant's specific claims of misconduct necessarily forecloses his additional claim of cumulative error and cumulative prejudice.

## I. *Denial of Suppression Motion*

Defendant contends the trial court erroneously denied his motion to suppress evidence obtained in unjustified warrantless searches of his residence and vehicle, or pursuant to an invalid search warrant, or statements obtained in violation of *Miranda v. Arizona* (1964) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].[22]

### 1. *Warrantless Searches of Defendant's Residence and Vehicle*

Defendant contends the police engaged in four warrantless searches of his apartment between the late afternoon of Saturday, November 20, 1994 and Sunday, November 21.[23] He alleges further that, in this same time frame, the police engaged in two warrantless searches of his vehicle.

---

[22] The challenge to the statements was brought under Evidence Code section 402, not Penal Code section 1538.5, but some of the evidence adduced for purposes of the admissibility issue was taken at the suppression hearing for the convenience of the witnesses.

[23] Defendant asserts that there was a fifth warrantless search of his residence on Sunday morning, but the Attorney General points out that this assertion is based on the mistaken testimony of a police detective who initially testified the Sunday morning search had occurred at 11:50 a.m., but then on cross-examination corrected himself and stated entry had occurred at 10:40 a.m. Thus, there was only one search on Sunday morning, not two, and, in his suppression motion, defendant did not argue otherwise.

■ "When reviewing a ruling on an unsuccessful motion to exclude evidence, we defer to the trial court's factual findings, upholding them if they are supported by substantial evidence, but we then independently review the court's determination that the search did not violate the Fourth Amendment." (*People v. Memro, supra,* 11 Cal.4th at p. 846.)

The first entry into defendant's apartment, unit 122, occurred sometime after 5:30 p.m. on November 20. Around 4:30 or 5:00 p.m., as part of a door-to-door search of the apartment complex, Officer Ruth Barnes and her partner knocked at the door of defendant's apartment and received no response, but she observed the television was on. She went back a second time at roughly 5:30 p.m. and knocked again. There was no response but she observed the television set was now off. A neighbor told her that a woman and a young man in his 20's lived in the apartment. Barnes reported her information to Sergeant Patton. Patton had independently learned that Nicole had been observed speaking to a male occupant of unit 122. Based on this information, Patton obtained a key from the manager and he and Barnes and two other officers entered the apartment to look for Nicole. The search lasted between five and 15 minutes. The officers checked the rooms upstairs and downstairs. Officer Barnes testified she did not search closets or look under beds while Sergeant Patton testified he checked closets. When they did not find Nicole, they left and the manager of the complex locked the door.

■ The trial court concluded the search was justified by exigent circumstances. "A long-recognized exception to the warrant requirement exists when 'exigent circumstances' make necessary the conduct of a warrantless search. . . . ' "[E]xigent circumstances" means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.' " (*People v. Lucero, supra,* 44 Cal.3d at p. 1017, quoting *People v. Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333]; *People v. Duncan* (1986) 42 Cal.3d 91, 97–98 [227 Cal.Rptr. 654, 720 P.2d 2] [" 'As a general rule, the reasonableness of an officer's conduct is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate' "], quoting *People v. Block* (1971) 6 Cal.3d 239, 244 [103 Cal.Rptr. 281, 499 P.2d 961].)

■ Among the factors the trial court cited in applying the exigent circumstances exception was that Nicole had been missing for several hours, the only lead the police had was that she had been seen talking to a male occupant of defendant's apartment, and a neighbor told Barnes a young male lived in defendant's apartment. The trial court also cited Officer Barnes's observations about the television having been on and off, which indicated someone may have been in the apartment, the fact that the person missing was a child, which heightened the exigency because, aside from being a victim of a crime, she might have been injured or unable to extricate herself, and the fact that the search consisted of a cursory search of obvious places where a child might be found.

We agree that the first entry into defendant's residence fell within the exception to the warrant requirement for exigent circumstances. Defendant does no more than assert the trial court's ruling was in error. His cursory argument is not persuasive—as even he seems to recognize—because, elsewhere in his brief, he acknowledges the initial search was arguably justified by the exception.

He contends, however, that in addition to exigent circumstances, the police were required to have had probable cause to believe Nicole was in the apartment. We conclude that the circumstances known to Sergeant Patton sufficiently established probable cause for the brief entry into defendant's apartment.[24] Moreover, as defendant concedes in his reply brief, no evidence was collected by police during their first entry into his apartment and, therefore, even if the entry was unjustified, there was nothing to suppress. (See *People v. Mattson* (1990) 50 Cal.3d 826, 850–851 [268 Cal.Rptr. 802, 789 P.2d 983] [purpose of the suppression statute is to "exclude evidence obtained in violation of a defendant's state and/or federal (Fourth Amendment) right to be free of unreasonable search and seizure"].)

■ The trial court concluded that the second and third entries by police into defendant's residence were with the consent of his mother, Mehri Monfared. It is settled that when voluntary consent to search has been given by the individual whose property is searched, the requirement of a search warrant is excused. (*People v. Memro, supra,* 11 Cal.4th at pp. 846–847.) The evidence adduced at the suppression hearing supports application of this exception to the second and third entries.

When Ms. Monfared returned to the complex in the early evening of November 20, Officer Barnes approached her in the parking lot and asked her

---

[24] The Attorney General argues the first search was also justified by the community caretaker exception to the Fourth Amendment warrant requirement (see *People v. Ray* (1999) 21 Cal.4th 464 [88 Cal.Rptr.2d 1, 981 P.2d 928]), but, as we conclude the exigent circumstances doctrine applies, we need not reach this issue.

about defendant's whereabouts. She told Barnes defendant was at work. Barnes asked Ms. Monfared if she would phone him and allow Barnes to talk to him. Monfared agreed. She unlocked the door to her apartment and Barnes followed her in. Monfared called defendant, spoke to him, then gave the phone to Barnes, who also spoke to defendant. She then returned the phone to Monfared and left the apartment.

Later that evening, Ms. Monfared spoke to Ahmad Seihoon. Monfared told him police were looking for the man who had spoken to Nicole. Seihoon returned to defendant's apartment. In response to a call from Monfared, three or four police entered her apartment to speak to Seihoon. He was briefly interviewed in the dining room about his conversation with Nicole.

Defendant contends there was neither express nor implied consent from Ms. Monfared for the police to enter the apartment. Not so. The entry by Officer Barnes to speak to defendant on the phone was plainly with the implied consent of Ms. Monfared. (*People v. Martino* (1985) 166 Cal.App.3d 777, 791 [212 Cal.Rptr. 45] ["Consent to enter a residence may be given nonverbally"].) The second entry by police to interview Seihoon was at Monfared's express invitation. Defendant asserts Ms. Monfared's consent was the product of coercion but cites nothing in the record to support this assertion. He also claims that while one police officer interviewed Seihoon, other police officers searched defendant's room. Again, the record does not support this assertion. While Seihoon testified that other police were in the apartment while he was interviewed, there was no testimony that they searched defendant's room or any other part of the apartment.

The fourth search of defendant's residence took place on the morning of November 21, when a number of police officers, including Detectives Burris, Navarro and Peloquin, entered the apartment. Prior to the search, Burris and Navarro went to the police station where they learned that a police officer was at the apartment of defendant's former girlfriend, Rauni Campbell, that defendant had attempted to commit suicide but fled when police arrived, and that he was a resident of the apartment complex from which Nicole had disappeared. Burris learned that defendant might have been involved in Nicole's disappearance and obtained the unit number of defendant's apartment from Navarro. Burris led the search of defendant's apartment to find Nicole. He instructed the other officers involved to look in places where she might be hidden or hiding. He did not instruct his fellow officers to gather evidence of any kind. Burris terminated the search after 10 to 15 minutes.

The trial court found that this entry was also justified by the exigent circumstances exception. The court concluded the exigency had not dissipated between the first entry and this one but became "heightened" because it was

not until this point that police had their first concrete evidence that Nicole's disappearance involved a crime, rather than an accident, and that defendant was involved. We agree with the trial court's analysis. This search involved different officers than those who conducted the first search and it was based on different and even more detailed information clearly raising the possibility that Nicole may have been in the apartment.

Defendant argues the passage of time between the first entry and the fourth entry, the police presence at the apartment complex during that period, and indications that Nicole was dead terminated any exigency. Not so. Less than 24 hours had passed between the arrival of police at the apartment complex and the Sunday morning search. The police could still reasonably have believed Nicole was alive notwithstanding defendant's statement to Rauni Campbell that Nicole was not alive. Defendant did not tell Campbell why he believed Nicole was dead, nor provide any details of her death. Police, meanwhile, had found bloodstained knives and bloodstains in defendant's car. The police could reasonably have believed that defendant had stabbed Nicole or inflicted some other serious, but not yet fatal, injury despite his statement to Campbell. While they had no definitive evidence Nicole was dead, they did know, beyond doubt, that she was the victim of some kind of criminal activity. We therefore agree with the trial court that the information police received regarding defendant's possible involvement in Nicole's disappearance heightened the exigent circumstances and that the fourth entry was justified on this ground.[25]

Defendant argues that Burris waited an hour and a half after learning of the information about defendant's possible participation in Nicole's disappearance before going to defendant's apartment, thus undermining the claim of exigency. The record reveals, however, that Burris testified he arrived at the police station at 10:15 a.m. and was at defendant's apartment by 10:40 a.m.

Defendant also challenges two searches of his vehicle. Detective Burris testified that, after he terminated the search of defendant's apartment, he went to Campbell's apartment complex. There he learned that Campbell had identified a black BMW as belonging to defendant, and that the car was registered to defendant's mother. He and Sergeant Mascola examined the car. The outside of the car was dirty and muddy. They both observed what appeared to be blood on the front seat. Mascola also saw two knives inside the car, one of which was bloodstained, and a "cord-type wire" protruding

---

[25] Additionally, no evidence was collected during this search. Police did observe posters of scantily clad women on the walls of defendant's room, and a video camera, and these observations found their way into the affidavit for the search warrant. Even if we assume the search was unjustified and that these observations should have been suppressed, probable cause for the search warrant would still have existed. (See *post*, at p. 472, fn. 27.)

from the trunk. Based on these observations, Burris formed the belief that Nicole might be in the trunk and had it pried open. Nicole was not found. A bloodstained notebook was then removed from the front seat of the car and examined by Burris and Mascola, who thought there might be something in it pertaining to Nicole's whereabouts.

The vehicle was impounded and removed to a tow yard where it was examined by a criminalist, Robert Monson, accompanied by Detective Peloquin. After a visual inspection of the exterior of the vehicle, Monson collected evidence from the interior, including the bloodstained notebook, a bloodstained knife, and bloodstains from front and rear seats.

In rejecting defendant's challenge to the vehicle searches, the trial court concluded that the first search was justified by exigent circumstances and both searches were justified by probable cause. We agree. Based on the circumstances known to Detective Burris and Sergeant Mascola, and their observations of apparent bloodstains in the car, knives, and a cord protruding from the truck that could have been used for binding, their belief that Nicole might be found in the trunk justified their search of the trunk, and their belief that the notebook might contain information regarding her whereabouts justified their inspection of it.[26] Moreover, the automobile exception to the Fourth Amendment's warrant requirement also applies to the initial search. (*United States v. Ross* (1982) 456 U.S. 798 [72 L.Ed.2d 572, 102 S.Ct. 2157]; *People v. Chavers* (1983) 33 Cal.3d 462, 466 [189 Cal.Rptr. 169, 658 P.2d 96] [under *Ross*, "police officers who lawfully stop a vehicle, having probable cause to believe that contraband is located or concealed somewhere therein, may conduct a warrantless search of the vehicle that is as thorough (as to location and type of container searched) as that which a magistrate could authorize by warrant"].) The probable cause to search had not dissipated even after the vehicle had been impounded. (*Florida v. Meyers* (1984) 466 U.S. 380, 382 [80 L.Ed.2d 381, 104 S.Ct. 1852], quoting *Michigan v. Thomas* (1982) 458 U.S. 259, 261 [73 L.Ed.2d 750, 102 S.Ct. 3079] [" 'the justification to conduct such a warrantless search does not vanish once the car has been immobilized' "].) Furthermore, as defendant concedes, the second search of his car did not uncover evidence that connected him to Nicole's murder.

### 2. Miranda *Issues*

Defendant also challenged statements taken and physical evidence obtained from him, on grounds that they were obtained in violation of his rights under *Miranda v. Arizona, supra,* 384 U.S. 436 (*Miranda*).

---

[26] The notebook contained equivocal but somewhat incriminating statements by defendant but, as he concedes, it was not introduced at trial.

Defendant was arrested by Officer Gourman. Upon being arrested he said something about having driven around Mulholland, where there was a waterfall, with someone he worked with at Mervyn's. He declined to answer Officer Gourman's follow-up questions.

Detective Burris arrived at the scene of defendant's arrest around 11:50 a.m. Without advising him of his *Miranda* rights, Burris proceeded to question him about Nicole's whereabouts because he believed she might still be alive. He asked defendant, "Where's the little girl?" Defendant told Burris he and two others might have taken her and dumped her over the "side of a hillside where there's a waterfall." Defendant was also questioned at the scene by Officer Angelo, who asked him if the little girl was okay. Defendant responded that he did not know what Angelo was talking about. He said, "What little girl?"

Defendant was then taken to West Valley Hospital. At the hospital he was questioned by Officer Joe as to Nicole's whereabouts. Officer Joe did not advise defendant of his *Miranda* rights. Defendant listed various places she might be and said "he'd like to be with the girl so much, that he would even carry her skeleton remains around." He was later interviewed by Detective Peloquin after being advised of his *Miranda* rights and waiving them. Peloquin showed defendant a photograph of Nicole and asked him if he knew her because police were looking for her. Defendant said he had seen her the previous day at the apartment complex. When asked if he knew where she was, he said yes, and "something to the nature of it was Mulholland near a waterfall." When asked if she was still alive, he said no.

In response to a question by a nurse treating him about whether he knew Nicole, defendant said "he may have seen her by a waterfall or the men in black hoods made him do it." She asked him if he had taken little girls before and he said, "yes, dozens of times."

Later that afternoon criminalist Monson arrived and obtained from defendant fingernail scrapings and clippings, a blood sample, blood from the cuticles and pubic hair samples. Defendant's pubic area was partially shaved. When Monson asked why, he said, "to look good for the girls on Friday night." He also collected defendant's clothing from Detective Peloquin and an elastic hair band.

The trial court found that the questioning of defendant at the scene of his arrest by Detective Burris and Officers Gourman and Angelo, and at the hospital by Officer Joe, was permissible under the rescue exception to *Miranda, supra,* 384 U.S. 436.

 Under some narrow circumstances, sometimes called the "public safety" or "rescue" exceptions, compliance with *Miranda* is excused where the purpose of police questioning is to protect life or avoid serious injury and the statement is otherwise voluntary. (*New York v. Quarles* (1984) 467 U.S. 649, 657 [81 L.Ed.2d 550, 104 S.Ct. 2626] ["We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination"]; accord, *People v. Coffman and Marlow, supra,* 34 Cal.4th at pp. 56–57; see *People v. Riddle* (1978) 83 Cal.App.3d 563, 579 [148 Cal.Rptr. 170] [compliance with *Miranda* excused where exigent circumstances exist "in that the need for action was urgent, the possibility of saving human life was present, and the primary motive for police questioning was rescue"]; *People v. Stevenson* (1996) 51 Cal.App.4th 1234, 1238 [59 Cal.Rptr.2d 878].)

Defendant contends the trial court erred in applying this exception to the statements elicited from him at the scene of his arrest and by Officer Joe at the hospital because there was no exigency. He asserts the information available to the police by the time they questioned him indicated that Nicole was dead. We disagree. Some of the very evidence cited by defendant— Rauni Campbell's statement that defendant said he had done something bad, the discovery of the knives and bloodstains in defendant's car—could only have heightened the belief of the police that Nicole was injured but still alive, as her body had not yet been found when defendant was questioned. Furthermore, the officers' testimony establishes that the primary purpose of the questioning was rescue. Finally, notwithstanding defendant's perfunctory assertion that the statements were not a product of his free will, the record supports the conclusion the statements were voluntary. We conclude, therefore, that the trial court properly admitted these statements.

With respect to Detective Peloquin's questioning of defendant at the hospital after defendant waived his rights, the trial court concluded that defendant's medical and psychological condition did not render his waiver involuntary. It rejected any suggestion that the waiver was obtained by coercion. The trial court also found admissible statements made by defendant to the treating physician and nurse at the hospital, concluding they were not acting as agents for the police.

 Defendant renews his claim that his hospital waiver was involuntary because of his compromised physical and psychological condition. In reviewing this claim, "the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review." (*People v. Massie* (1998) 19 Cal.4th 550, 576 [79 Cal.Rptr.2d 816, 967 P.2d 29].)

Defendant argues that when he was admitted to the hospital, he was suffering from acute psychosis, was under the influence of drugs, and was suffering from the effects of his suicide attempt, thus precluding a voluntary waiver of his rights. He also claims he was heavily affected by intrusive medical procedures, including the use of a catheter to extract a urine sample, injection with a tranquilizer, and the injection of charcoal into his system to absorb the sleeping pills. Defendant also points out that Peloquin testified that defendant was alternately rational and irrational.

The procedures to which defendant refers took place after Peloquin interrogated him and could have had no effect on the voluntariness of his waiver. While Peloquin acknowledged defendant was sometimes irrational during the interrogation, he also testified that defendant was responsive to his questioning, and his testimony was corroborated by the nurse who attended defendant. The court observed further that there was no question of police coercion in obtaining defendant's statement. (*People v. Williams, supra,* 16 Cal.4th at p. 659 ["A confession or admission is involuntary, and thus subject to exclusion at trial, only if it is the product of coercive police activity"].) We conclude, therefore, that defendant's statements to Detective Peloquin were not involuntary.

Finally, defendant argues that the physical evidence obtained from his person must be suppressed as the fruit of the poisonous tree, by which presumably he means his various statements to police. As we have found these statements were not taken in violation of his *Miranda* rights, we necessarily reject this corollary argument.

### 3. *Challenge to Search Warrant*

Defendant contends the search warrant issued for his apartment should have been quashed because the affiant, Detective Price, omitted material information and included false information.[27] The trial court found that the

---

[27] Price's affidavit related the following information: that at 1:05 p.m. on November 20, police were notified of Nicole's disappearance by her parents; that she had last been seen playing ball outside the Parkers' apartment; that a command post was established at the complex and an extensive search had failed to locate her; that on Sunday morning, Rauni Campbell called police to report defendant's suicide attempt; that when Officer Kong responded to the call, defendant fled; that Campbell told Kong defendant had told her he had done something very bad and was involved in the disappearance of an eight-year-old girl; that defendant lived in the same apartment complex as the missing girl; that defendant said the police would find out about it because they would find the video and the photographs; that, shortly afterwards, Officer Gourman observed defendant running from Campbell's apartment complex and arrested him; that defendant had ingested a number of sleeping pills and was transported to West Valley Hospital; that Campbell was taken to the police station, where she made further statements about her conversation with defendant, including that "[t]hey" were

affiant had not included statements that were either false or made in reckless disregard of the truth and that none of the information defendant claimed had been omitted from the affidavit was material to probable cause. The information defendant claims was omitted included any mention of the prior entries into his apartment, that Officer Barnes had spoken to defendant and his mother, and that Mr. Seihoon was the last person seen talking to Nicole. Defendant contended further that the affiant erroneously stated that Nicole lived in the same apartment complex as defendant, inaccurately reported certain statements made by defendant to police, and failed to report defendant's "deplorable" condition at the hospital when the statements were made. We agree with the trial court that these omissions were immaterial to probable cause.

Defendant also argues the search warrant should have been quashed because it was based, in part, on the prior illegal warrantless searches of defendant's residence and vehicle and on statements obtained in violation of *Miranda*. We have, however, rejected his challenges to the warrantless entries into his residence and vehicle and his *Miranda* claims. Our conclusions in this respect eliminate the predicate of his challenge to the search warrant on this ground. To the extent that defendant is advancing a *Franks* claim (*Franks v. Delaware, supra,* 438 U.S. 154), he fails to make the required showings either that the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth or that, even had the allegedly false statements been excised, the remaining contents of the affidavit would have been insufficient to support a finding of probable cause. (*Id.* at pp. 155–156.) We conclude that the trial court properly denied his motion to quash the search warrant.

---

going to make it look like he did it and the police were going to find the video and photographs, and that the girl was dead; that defendant's car was located, the trunk was forced open in an effort to find Nicole, and then the vehicle was impounded; that a second car registered to defendant was found parked in the parking garage at his apartment complex; that Detectives Burris and Navarro entered defendant's apartment to look for the girl and observed a video camera and photographs of women in various states of dress; that the residence was secured pending a search warrant; that Burris spoke to defendant, who said he had dumped the girl's body somewhere off Mulholland Drive near a waterfall; that during this interview defendant was alternately rational and irrational; that defendant then retracted his statement about dumping the body; that physical evidence had been obtained from defendant's person; that defendant told criminalist Monson he had shaved his pubic hair; that Price believed defendant had kidnapped the victim, photographed and videotaped her and then murdered her; and that evidence showing the commission of these offenses would be found at defendant's residence and the two vehicles referred to in the affidavit.

## J. Guilt Phase Evidentiary Rulings

### 1. Testimony Regarding Videotapes

Defendant contends the trial court erred when it allowed Detective Price to testify about videotapes taken from defendant's bedroom that depicted him having sexual intercourse with consenting adult women. The actual videotapes were not admitted. Defendant objected that the testimony was irrelevant and, even if relevant, was more prejudicial than probative under Evidence Code section 352. He additionally objected that the evidence violated the best evidence rule.[28]

" 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "We apply the deferential abuse of discretion standard when reviewing a trial court's ruling on a relevance objection. [Citations.] We discern no abuse of discretion here." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1123 [113 Cal.Rptr.2d 27, 33 P.3d 450].) Rauni Campbell testified that defendant told her on the morning after the murder that what he had done was "so big" and she would "find out about it" because "they have a tape of me." Additionally, Detective Navarro testified that the search of defendant's apartment on Sunday morning was stopped when he saw a video camera facing the bed.

Thus, the testimony was relevant to explain defendant's statement to Campbell; that is, whether any tapes, in fact, existed and if they depicted defendant and Nicole. They were also relevant to rebut the defense's claim that the body fluids found in defendant's bedroom and bathroom, which were consistent with oral copulation, could have come from other sexual partners of defendant, because the videotapes did not show acts of oral copulation. On this point, the evidence need not have been definitive as long as it had some tendency to establish the identity of the source of the fluids. (*People v. Garceau* (1993) 6 Cal.4th 140, 177 [24 Cal.Rptr.2d 664, 862 P.2d 664].)

---

[28] For the first time on appeal, defendant contends that admission of this testimony violated the due process clauses of the Fifth and Fourteenth Amendments and undermined the reliability required for a conviction under the Eighth and Fourteenth Amendments to the United States Constitution. Assuming without deciding that defendant's trial objections preserved these federal claims (see *People v. Yeoman*, *supra*, 31 Cal.4th at pp. 117, 133), the constitutional claims fail. We apply the same analysis to defendant's assertion of constitutional violations in connection with the allegedly erroneous admission into evidence of (1) his ring, (2) crime scene photographs, (3) state of mind testimony, (4) the prosecution's allegedly improper cross-examination of Victoria Eckstone, (5) the denial of defendant's request to recall Ms. Eckstone to testify to her detention for drug use after her testimony, and (6) his claim of cumulative prejudice. (See discussion, *post*.)

We also find no abuse of the trial court's discretion conferred by Evidence Code section 352. (*People v. Brown, supra*, 31 Cal.4th at p. 576.) As the trial court observed, there was already testimony from Ms. Campbell that she and defendant had engaged in sexual intercourse in his bedroom. Furthermore, the testimony about the tapes was neither graphic nor extensive.

■■ Defendant also objected to the testimony under the best evidence rule. Former Evidence Code section 1500 provided: "Except as otherwise provided by statute, no evidence other than the original of a writing is admissible to prove the content of a writing."[29] For purposes of this section, a videotape is a writing. (*People v. Moran* (1974) 39 Cal.App.3d 398, 407–408 [114 Cal.Rptr. 413].) The purpose of the best evidence rule is "to minimize the possibilities of misinterpretation of writings by requiring the production of the original writings themselves, if available." (Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1500, p. 488.) Therefore, "[t]he best evidence rule applies only when the contents of a writing are at issue." (*Hewitt v. Superior Court* (1970) 5 Cal.App.3d 923, 930 [85 Cal.Rptr. 493].) Conversely, "[u]nless the content is in issue the best evidence rule does not come into play." (*People v. Marcus* (1973) 31 Cal.App.3d 367, 371 [107 Cal.Rptr. 264].) Where no dispute exists regarding the accuracy of the evidence received in lieu of the original writing, any error in admitting such evidence is harmless. (*People v. Bizieff* (1991) 226 Cal.App.3d 1689, 1697–1698 [277 Cal.Rptr. 678].)

In the instant case, defendant's best evidence objection was pro forma. Defendant neither challenged Detective Price's testimony regarding the contents of the videotapes nor requested that the tapes be played. Accordingly, even assuming defendant's perfunctory objection was sufficient to raise the issue, we conclude that any violation of the best evidence rule was harmless.

## 2. *Admission of Defendant's Ring*

Defendant contends that the trial court erroneously admitted into evidence his ring because there was insufficient foundation. The ring, which was apparently skull shaped, was relevant to Dr. Heuser's testimony about scratches on the inside of Nicole's thigh. Dr. Heuser testified the scratches were consistent with having been inflicted by the ring. Prior to her testimony, criminalist Robert Monson testified that the ring, along with a necklace and a pendant, was given to him by Detective Peloquin at the emergency room of

---

[29] In 1998, this section was replaced with the secondary evidence rule (Evid. Code, §§ 1520–1523), but because this proceeding occurred before January 1, 1999, the former rule applies. (Stats. 1998, ch. 100, § 9.)

West Valley Hospital. When asked whether Detective Peloquin indicated if he took these items from defendant, Monson answered, "Yes." There were no objections to his testimony on either hearsay or foundational grounds. Detective Peloquin did not testify at trial.

At the close of the prosecution's case, the prosecution moved for admission of the ring into evidence. The defense objected on grounds of lack of foundation and hearsay. Outside the presence of the jury, the trial court read into the record the prosecutor's examination of Monson regarding how he obtained the ring. The trial court noted this testimony came in without objection and concluded, "that's the foundation."

Defendant renews his claims that there was insufficient foundation and that Monson's testimony was hearsay. With respect to the hearsay claim, " '[i]t is settled law that incompetent testimony, such as hearsay or conclusion, if received without objection takes on the attributes of competent proof when considered upon the question of sufficiency of the evidence to support a finding.' " (*People v. Bailey* (1991) 1 Cal.App.4th 459, 463 [2 Cal.Rptr.2d 204], quoting *Berry v. Chrome Crankshaft Co.* (1958) 159 Cal.App.2d 549, 552 [324 P.2d 70]; *Estate of Fraysher* (1956) 47 Cal.2d 131, 135 [301 P.2d 848] ["evidence which is admitted . . . without objection, although incompetent, should be considered in support of that court's action"]; *People v. Pierce* (1979) 24 Cal.3d 199, 206, fn. 3 [155 Cal.Rptr. 657, 595 P.2d 91].) Here, applying these principles, the trial court reasonably concluded that defendant's failure to lodge a *timely* hearsay objection to Monson's testimony forfeited such objection.

By contrast, his foundational objection to the admission of the exhibit was timely. We conclude, however, that the trial court did not abuse its discretion in admitting the evidence because Monson's testimony sufficiently connected defendant to the ring. (*People v. Coddington* (2000) 23 Cal.4th 529, 587 [97 Cal.Rptr.2d 528, 2 P.3d 1081] ["A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse"].) In any event, even if the trial court erred in admitting the evidence, the overwhelming evidence of defendant's guilt renders any such error harmless. (*Id.* at p. 588.)

### 3. *Crime Scene Photographs*

Defendant contends that the trial court should have excluded crime scene photographs of the victim because they were gruesome, cumulative, and more prejudicial than probative. The eight photographs in question depict the victim's unclad body and show injuries inflicted on her face, chest, arms, and rectum. Over defendant's objections, the trial court admitted the photographs

as relevant to the nature and extent of the victim's injuries, whether the injuries were premortem or postmortem, and to assist the coroner in her testimony.

We have viewed the photographs, agree they are relevant for the reasons stated by the trial court, and conclude the trial court did not abuse its considerable discretion under Evidence Code section 352 in admitting them. (*People v. Stewart* (2004) 33 Cal.4th 425, 480–481 [15 Cal.Rptr.3d 656, 93 P.3d 271]; *People v. Scheid* (1997) 16 Cal.4th 1, 18 [65 Cal.Rptr.2d 348, 939 P.2d 748] [trial court's determination under section 352 will not be reversed "unless the probative value of the photographs clearly is outweighed by their prejudicial effect"].) Furthermore, while the photographs are disturbing because they depict a dead child, her body is intact and neither her injuries nor any other aspect of the photographs can accurately be characterized as gruesome.

### 4. *State of Mind Evidence*

Defendant contends that the trial court erroneously admitted testimony about an argument he had with Adele Bowen, his supervisor at Mervyn's, the day before the murder. The defense objected on grounds of "[r]elevance. 352." The trial court overruled the objection, concluding the testimony was relevant to defendant's state of mind.

While evidence about defendant's state of mind in the hours following the disappearance of Nicole was relevant, we agree with defendant that evidence he argued with his supervisor the night before was not relevant for this purpose. Nonetheless, Bowen's brief testimony, even if admitted in error, was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### 5. *Qualifications of Prosecution Expert*

Defendant contends the trial court erred by denying his request to conduct a hearing pursuant to Evidence Code section 402 on the qualifications of the prosecution's forensic serologist, William Moore. The record reveals, however, that defendant never made such a request. Rather, he objected to the prosecution's attempt to pose a hypothetical question to Moore to establish that the pattern of semen on defendant's bed sheet was consistent with semen having been expectorated by the victim. At the sidebar hearing on defendant's objection, defense counsel disparaged Moore's qualifications but the reason he sought a "402 hearing" was because he claimed the attempted hypothetical question amounted to a "new theory." The trial court denied the request. It remarked, "I'm satisfied he's an expert," and told defense counsel he was free to cross-examine Moore about any opinion that he had not previously included in his reports or prior testimony.

■ Defendant's failure to have challenged Moore's expert qualifications in the trial court forfeits his claim. (*People v. Farnam* (2002) 28 Cal.4th 107, 162 [121 Cal.Rptr.2d 106, 47 P.3d 988] [defendant forfeited claim that expert was not qualified to testify to blood splatter evidence and crime scene reconstruction where his objection was to expert's qualification to estimate the amount of time elapsing from the start to finish of the attack on the victim].) The claim is also without merit. The trial court specifically found that Moore was an expert. That determination is governed by the deferential abuse of discretion standard and "will not be disturbed absent a showing of manifest abuse." (*People v. Bolin* (1998) 18 Cal.4th 297, 322 [75 Cal.Rptr.2d 412, 956 P.2d 374].) "Error regarding a witness's qualifications as an expert will be found only if the evidence shows that the witness ' " '*clearly lacks* qualification as an expert.' " ' " (*People v. Farnam, supra,* 28 Cal.4th at p. 162, quoting *People v. Chavez* (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372].) Moore testified he had a bachelor's degree in biology and had worked in private industry as a chemist before joining the Los Angeles Police Department's Scientific Investigation Unit. He had spent seven years in the narcotics and alcohol analysis units before joining the serology unit in 1991. He had qualified as a serology expert on four previous occasions, but this was his first death penalty case. Defendant's complaints about those qualifications go to the weight of Moore's testimony, not its admissibility. (*Ibid.*)

### 6. *Limitation of Cross-examination of Rauni Campbell*

During his cross-examination of Rauni Campbell, defense counsel asked her whether she and defendant "had smoked marijuana." The prosecutor objected on relevance grounds and the objection was sustained.

■ Defendant argues the trial court's ruling improperly restricted cross-examination and violated his state and federal constitutional rights. Not so. Evidence of a witness's drug use is inadmissible unless the testimony "tends to show that the witness was under the influence thereof either (1) while testifying, or (2) when the facts to which he testified occurred, or (3) that his mental faculties were impaired by the use of such narcotics." (*People v. Hernandez* (1976) 63 Cal.App.3d 393, 405 [133 Cal.Rptr. 745].) Here, defense counsel's question was phrased in the past tense and referred to some unspecified time. It was, therefore, properly excluded as irrelevant. Because the trial court's ruling was proper, "there is thus no predicate error on which to base the constitutional claims." (*People v. Roybal, supra,* 19 Cal.4th at p. 506, fn. 2.)

### 7. *Improper Cross-examination of Victoria Eckstone*

Defendant contends the trial court allowed improper impeachment of Victoria Eckstone about whether she called Detective Price from jail and asked for his help in obtaining her release, after she had testified on direct examination that she had felt coerced by Price and the prosecutor into agreeing to talk to them about defendant. Defendant argues that evidence of her arrest on an unrelated matter constituted inadmissible character evidence.

Evidence that Ms. Eckstone asked Detective Price for help and did not get it was clearly relevant to her credibility because it could have provided a reason for her hostility to the prosecution. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1054 [90 Cal.Rptr.2d 607, 988 P.2d 531]; Evid. Code, § 780, subd. (b).) Moreover, evidence that she sought Price's assistance also tended to undercut her direct testimony that he threatened to arrest her to induce her cooperation in the investigation of the case against defendant. Nor was the brief reference to her having been arrested so prejudicial that the trial court abused its discretion by not excluding it pursuant to Evidence Code section 352.

### 8. *Exclusion of Evidence of Eckstone's Detention*

Defendant contends the trial court violated his constitutional rights to a fair trial and to present a defense when, pursuant to Evidence Code section 352, it refused his request to recall Ms. Eckstone to testify to her detention for drug use after her initial testimony. (See *ante*, at pp. 460–462.)

Notwithstanding defendant's insinuation that Eckstone's detention was engineered by the prosecution in retaliation for her testimony, the record is clear that neither the prosecutor nor the court had anything to do with it. Thus, the evidence was irrelevant to any issue in the case. Moreover, even if there was some tangential relevance to her testimony, its probative value would have been vastly outweighed by the probability that it would either have required an undue consumption of time or may have confused the issues and misled the jury. (Evid. Code, § 352.) We find no abuse of discretion in the trial court's exclusion of the evidence.

### 9. *Cumulative Error*

Defendant contends that the cumulative effect of evidentiary error requires reversal. "Defendant has demonstrated few errors, and we have found each error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not

warrant reversal of the judgment." (*People v. Bolden* (2002) 29 Cal.4th 515, 567–568 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

### K. *Juror Bias*

Defendant contends the trial court erred by failing to grant a mistrial motion based on bias by the jurors against defendant's family. His argument is wholly without merit, not the least because he failed to make a mistrial motion on this ground.

It appears from the record that some supporters of defendant were following or "shadowing" the jurors during breaks in their deliberations, while others, including his mother, were clustering near the jury while it was assembling on breaks. Against this backdrop, the trial court reported a juror had told the bailiff she felt intimidated by the presence of defendant's supporters, particularly his mother. The bailiff noted that he had also overheard a male juror express relief that the jury no longer had to assemble "on the sixth floor," presumably to avoid contact with defendant's supporters.

During the ensuing discussion of this problem, defense counsel did not move for a mistrial based on juror bias. Indeed, when the trial court asked counsel if he wanted the court to question the juror who had complained about defendant's mother to determine if she was being influenced by the presence of anyone in the hallway, he said, "No, Your Honor."

Thus, defendant's belated claim of juror bias is forfeited. It is also meritless. There is no evidence the jury was biased against defendant, his mother, or his supporters, much less that such bias infected its deliberations. What the record seems to indicate is spectator misconduct on the part of defendant's supporters who, intentionally or not, made themselves conspicuous to the jurors in a manner that some of the jurors interpreted as intimidating. The jurors' understandable concern does not amount to misconduct, and there is nothing on the record to support defendant's claim that he was denied an impartial jury.

### L. *Third Party Culpability Evidence*

#### 1. *Exclusion of Third Party Culpability Evidence*

Defendant contends the trial court erred by excluding third party culpability evidence, as well as evidence of defendant's 1988 suicide attempt, and by denying his subsequent mistrial motion. These arguments are without merit.

 "A criminal defendant has a right to present evidence of third party culpability if it is capable of raising a reasonable doubt about his own guilt. The rule does 'not require that any evidence, however remote, must be admitted to show a third party's possible culpability . . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' [Citation.]" (*People v. Sandoval, supra,* 4 Cal.4th at p. 176, quoting *People v. Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99].)

The third party culpability evidence defendant contends was erroneously excluded involved testimony defendant attempted to elicit from a police witness about three men in a moving van observed at the apartment complex the morning of Nicole's disappearance, evidence about Ahmad Seihoon and his two sons, one 12, the other 17, who defendant seems to imply were those three men, and a threatening telephone call made to defendant by a man named Sean.

Preliminarily, defendant did not offer the evidence of the three men in a van to show third party culpability but to show the inadequacy of the police investigation. Defense counsel acknowledged he was not attempting to elicit the evidence for the truth of the matter, i.e., that there were three men in a van, but to demonstrate the police failed to follow up on obvious leads. Since defendant did not seek admission of the testimony as third party culpability evidence, he forfeited any claim that it was improperly excluded for that purpose. (Evid. Code, § 354, subd. (a).) Besides, the mere presence of three men in the parking lot of defendant's apartment complex at the time Nicole disappeared, absent any evidence, direct or circumstantial, linking them to the crime, does not qualify as admissible third party culpability evidence.

Defendant's somewhat confusing argument as to Ahmad Seihoon seems to suggest he and his two sons may have been the three men in the van, or perhaps that this was what defendant hoped to establish by questioning the officer about the three men. Again, defendant did not argue this point below, thus forfeiting it, and, in any event, the mere fact that Seihoon was observed talking to Nicole shortly before her disappearance was insufficient to render admissible as third party culpability evidence any evidence about Seihoon and his sons. Even less persuasive is defendant's claim regarding the threatening phone call by "Sean." Defendant argued the phone call demonstrated someone was "out to get" him and could therefore have been involved

in Nicole's disappearance and death. The trial court properly excluded this evidence as irrelevant and inadmissible under Evidence Code section 352.[30]

Under Evidence Code section 352 the trial court also excluded evidence of defendant's 1988 suicide attempt. The defense sought to offer evidence of that attempt to negate any inference of consciousness of guilt from his suicide attempt at Ms. Campbell's apartment the morning after the crime. As the trial court noted, defendant's 1988 attempt at suicide was not a reaction to any allegation he had been involved in a crime; therefore it was, at best, minimally relevant. The trial court found any such relevance was outweighed by the potential of the issue to confuse the jury or involve the undue consumption of time. (Evid. Code, § 352.) We agree. The exclusion of evidence of a four-year-old suicide attempt under circumstances that were not remotely similar to those under which defendant attempted suicide in this case was not an abuse of the trial court's discretion.

As there was no error in the trial court's rulings, the court properly denied defendant's mistrial motion.[31]

## 2. *Limitations on Attack on Police Investigation*

Defendant contends the trial court improperly limited his cross-examination of certain witnesses with which he hoped to show that the police had failed to consider other suspects. Defendant first complains that the trial court erroneously sustained the prosecution's objections to his attempts to question Ahmad Seihoon at the suppression motion about what Seihoon said to police when they interviewed him the day after Nicole's disappearance. Seihoon was questioned in connection with defendant's *Franks* challenge to the search warrant. (*Franks v. Delaware, supra,* 438 U.S. 154.) The trial court sustained the prosecution's objection that the content of Seihoon's interview with police was irrelevant for purposes of his *Franks* challenge and constituted an improper attempt at discovery.

---

[30] Defendant's reply brief refers to another "suspicious incidence" [*sic*] allegedly contained in a report by Mr. Parker to 'police about a man sitting in a van who approached him and questioned him about Nicole's disappearance. There is no citation to the record regarding this report, no indication defendant ever brought it to the court's attention or sought its admission under any theory. We disregard the reference.

[31] For the first time on appeal, defendant asserts that the trial court's evidentiary rulings respecting third party culpability evidence and evidence of his 1988 suicide attempt violated his federal constitutional rights to a fair trial, reasonable access to the courts, effective assistance of counsel, reliable guilt and penalty determinations, and due process and equal protection of the laws as required by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Assuming, without deciding, that defendant's offers of proof preserved these claims (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), because we conclude the trial court's rulings were correct, the constitutional claims fail.

■ The trial court's ruling was correct in the context of defendant's *Franks* motion. Other than speculating Seihoon may have said something to the police that they omitted from the affidavit, defendant failed to establish the relevance of the content of Seihoon's interview vis-à-vis his *Franks* claim. (*People v. Bradford, supra,* 15 Cal.4th at p. 1297 ["A defendant who challenges a search warrant based upon an affidavit containing omissions bears the burden of showing that the omissions were material to the determination of probable cause"].) It was therefore properly excluded.

Next, defendant recycles his claim that the trial court erred in limiting his cross-examination of Detective Price regarding the three men in the van. Since, as we have concluded, there was insufficient evidence to connect these unknown men to the crime for third party culpability purposes, whether or not Detective Price ascertained their identities was irrelevant and the trial court properly sustained the prosecution's objection on both relevance and Evidence Code section 352 grounds.

For the same reason, we reject defendant's claim that the trial court improperly limited his cross-examination of Detective Price regarding two potential witnesses, Heather Williams and Harold Dachs, Jr. In his offer of proof, defense counsel claimed Williams and Dachs told police they had observed "individuals outside the [defendant's] apartment" who fit "some of the statements that Mr. Panah has said to have made about other individuals being involved in this . . . ." In response to the trial court's inquiry about whether they were going to appear as witnesses, defense counsel asserted that the police had failed to keep track of them, rendering them unavailable. The trial court sustained the prosecution's relevance objection. We perceive no error. As with the men in the van, the offer of proof as to Williams and Dachs was grossly inadequate to support the admission of the evidence as third party culpability evidence and was therefore properly excluded as irrelevant.

Finally, defendant claims the trial court improperly restricted his cross-examination of Detective Price regarding whether Price had examined for fingerprints the suitcase in which Nicole's body was found. Defense counsel first asked Price if he had had the suitcase fingerprinted, to which Price answered in the negative. He then asked whether he "cause[d] any part of it to be fingerprinted?" Again, Detective Price answered no. Defense counsel then asked, "[t]he outside?" At that point the prosecutor objected on the grounds the question had been asked and answered. The court sustained the objection. The trial court's ruling was proper; the question was clearly repetitive. (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 352 [234 Cal.Rptr. 442] ["The control of cross-examination is within the discretion of the trial court, permitting it to curtail cross-examination relating to matters already covered or irrelevant"].)

Because we reject defendant's claim that the trial court's restrictions on the cross-examination of these witnesses deprived him of the opportunity to present a defense by attacking the police investigation, we also conclude that the trial court did not abuse its discretion when it denied his motion for mistrial on this ground.[32]

### M. *Instructional Error*

#### 1. *CALJIC No. 3.32*

Defendant contends the trial court erred when it denied his request to instruct the jury with CALJIC No. 3.32.[33] We disagree.

██ A trial court is required to give a requested instruction on a defense only if substantial evidence supports the defense. (*In re Christian S.* (1994) 7 Cal.4th 768, 783 [30 Cal.Rptr.2d 33, 872 P.2d 574].) The sole evidence in support of defendant's request was the testimony of Dr. Palmer, the emergency physician who treated him the day after Nicole's disappearance. Palmer testified that defendant was psychotic, agitated, and delusional when he examined him and that a toxicological screen revealed the presence of tetrahydrocannabinol, the active ingredient of marijuana, and benzodiazepine, which belongs to a class of drugs used as a mild tranquilizer.[34] He testified further that defendant was having visual and auditory hallucinations, acting inappropriately, and had self-inflicted slashes on his wrists. But these observations were made more than 24 hours after Nicole's disappearance. In the interim, defendant had spoken to Nicole's father and offered to help him look for Nicole and had gone to work where he had interacted with two supervisors,

---

[32] For the first time on appeal, defendant asserts the trial court's exclusion of evidence regarding the police investigation violated various federal constitutional rights. Again, assuming, without deciding, that his offers of proof preserved these claims (*People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), because we conclude the trial court's rulings were correct, the constitutional claims fail.

[33] The 1995 version of the instruction stated: "Evidence has been received regarding a [mental disease] [mental defect] [or] [mental disorder] of the defendant [____(insert name of defendant if more than one)____] at the time of the commission of the crime charged [namely, _____] [in Count[s] _____][.] [or a lesser crime thereto, namely _____]. You may consider this evidence solely for the purpose of determining whether the defendant [____(insert name of defendant if more than one)____] actually formed [the required specific intent,] [premeditated, deliberated] [or] [harbored malice aforethought] which is an element of the crime charged [in Count[s] _____], to wit, _____[.] [or the lesser crime[s] of _____]."

[34] Defendant draws no distinction between Palmer's testimony regarding defendant's mental state and defendant's voluntary ingestion of drugs, but the latter would not have supported an instruction based on CALJIC No. 3.32 and defendant did not request a voluntary intoxication instruction. (See CALJIC No. 4.21.)

Adele Bowen and Bruce Cousins, both of whom testified that defendant did not appear to be under the influence of any substance.

At best, Palmer's equivocal testimony established that defendant may have suffered from long-standing latent psychosis and, at some point, his condition deteriorated. This does not constitute evidence of defendant's mental state at the time of the commission of the crime. We conclude that this evidence was not sufficient to require the instruction.

### 2. *Manslaughter Instructions*

Defendant contends the trial court erred by rejecting his request to instruct the jury regarding voluntary and involuntary manslaughter as lesser included offenses of murder. Defendant also based this request on Dr. Palmer's testimony, arguing, under *People v. Saille* (1991) 54 Cal.3d 1103 [2 Cal.Rptr.2d 364, 820 P.2d 588], that Palmer's testimony constituted evidence of voluntary intoxication and mental illness so as to negate specific intent. The trial court rejected the request, observing, "[t]here is no evidence whatever in this case of any form of intoxication at the time of the murder, and there is no evidence whatever of any form of mental illness or disease at the time of the murder."

Based on our analysis of Dr. Palmer's testimony in the preceding part, we agree with the trial court that there was no substantial evidence of mental disease or voluntary intoxication at the time of the commission of the offenses, and, therefore, conclude it properly rejected the request for an involuntary manslaughter instruction. (See, e.g., *People v. Ochoa* (1998) 19 Cal.4th 353, 423–424 [79 Cal.Rptr.2d 408, 966 P.2d 442].)[35] As for the instruction on voluntary manslaughter, defendant points to no evidence that would have supported such instruction based either on a theory of heat of passion or imperfect self-defense. (*People v. Barton* (1995) 12 Cal.4th 186, 199 [47 Cal.Rptr.2d 569, 906 P.2d 531].)

### 3. *Defense Pinpoint Instructions*

Defendant contends the trial court erred when it rejected two defense pinpoint instructions, denominated Defense Special Instruction No. 3 (Instruction No. 3) and Defense Special Instruction No. 4 (Instruction No. 4). Instruction No. 3 stated: "There is evidence from which you may infer that the decedent was not alive at the time of the sodomy. This evidence includes the testimony of Dr. Heuser concerning the failure of the anal sphincter to

---

[35] In his reply brief, defendant argues that if the evidence of intoxication was insufficient to support an involuntary manslaughter instruction, this was because the trial court prevented him from questioning Rauni Campbell about whether she and defendant had used marijuana. We have already concluded that the trial court's ruling was correct. (See *ante*, at pp. 477–478.)

constrict. [¶] If you find from the evidence that it was reasonably possible that decedent was dead at the time of the sodomy, you must find the special circumstance to be not true, even though there may be evidence that the deceased was alive. [¶] In order to find the special circumstance of sodomy to be true, you must find that the only reasonable interpretation of the evidence was that the deceased was alive, and this must be proved beyond a reasonable doubt."

The first paragraph of Instruction No. 4 stated: "In considering whether the prosecution has failed to meet its burden of proving sodomy beyond a reasonable doubt, you may consider the testimony of Mr. Moore that he could not conclude that any semen was present in the anal region." There was a second paragraph, not reproduced in the record but which the trial court described as being "about the testimony of Dr. Heuser, that the penetration could have been by another object."

 "A trial court must instruct on the *law* applicable to the facts of the case. [Citation.] In addition, a defendant has a right to an instruction that pinpoints the *theory* of the defense. [Citation.] The court must, however, refuse an argumentative instruction, that is, an instruction 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' " (*People v. Mincey* (1992) 2 Cal.4th 408, 437 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

The first paragraph of Instruction No. 3 is no more than an assertion that the victim was dead at the time of the act of sodomy, supported by a fragment of the coroner's testimony. Similarly, the first paragraph of Instruction No. 4 argues, in essence, that because the serologist testified semen was absent from the victim's "anal region," the prosecution failed to prove its case beyond a reasonable doubt. The trial court properly rejected these portions of the special instructions as argumentative.[36]

 A trial court is not required to give pinpoint instructions that merely duplicate other instructions. (*People v. Bolden, supra*, 29 Cal.4th at p. 558.) The second paragraph of Instruction No. 3 directed the jury to find the sodomy special circumstance not true if it found it was "reasonably possible"

---

[36] Furthermore, as the Attorney General points out, the instruction mischaracterized the testimony of both Dr. Heuser and serologist Moore. Dr. Heuser testified the anal opening was very relaxed and the circumference of the anus had a bruised appearance, and that there was tearing of the anus toward the vagina and there was bleeding. She testified these injuries were consistent with the insertion of a male penis, or a similar object, into the victim's anus. She also testified the bruising around the anus occurred before death and that sodomy was a possible cause of death. Moore testified that the anal swab produced a positive acid phosphatase result indicative of the presence of semen, but was inconclusive, not that there was no semen in the victim's anus.

the decedent was dead at the time the act of sodomy was committed, notwithstanding evidence she was alive. The third paragraph of Instruction No. 3, in essence, required the jury to find the victim was alive beyond a reasonable doubt before it found the sodomy special circumstance true. Both proposed instructions were duplicative of the other instructions given, including, among others, the reasonable doubt instruction (CALJIC No. 2.90) and defendant's Special Instruction No. 1 (Instruction No. 1). This instruction informed the jury that, to find the sodomy special circumstance true, it must find the victim was alive when sodomy was committed. Also apparently duplicative was the second paragraph of Instruction No. 4, the intention of which appears to have been to instruct the jury that penetration with a foreign object did not constitute sodomy, a subject already covered in defendant's Instruction No. 1, which stated, in part, "If you find that penetration of the anus in this case was with a foreign object, you may not find the sodomy special circumstance to be true," and in the reasonable doubt instruction.

We find, therefore, that the trial court correctly rejected defendant's proposed instructions.

### N. Sufficiency of Lewd-conduct Special Circumstance Evidence

Defendant contends there was insufficient evidence to support the lewd-conduct special circumstance finding.[37] We disagree.

"In considering a claim of insufficiency of evidence, a reviewing court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] Where, as here, the jury's findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, 'but our opinion that the circumstances also might reasonably be

---

[37] Defendant asserts he sought dismissal of the lewd conduct special circumstance in the trial court on grounds of insufficient evidence, but the portion of the record to which he directs us does not support this claim. Rather, the record reveals that he sought dismissal of the special circumstance because it included conduct, like penetration with a foreign object, that, unlike rape or sodomy, the Legislature had determined was not sufficiently egregious to warrant a special circumstance unto itself. To the extent his attack on the sufficiency of the evidence here is a renewal of this argument, we reject it. Defendant's criticism of the lewd conduct special circumstance fails to take into account the well-established purpose of section 288, "to provide children with 'special protection' from sexual exploitation. [Citation.] The statute recognizes that children are 'uniquely susceptible' to such abuse as a result of their dependence upon adults, smaller size, and relative naiveté. [Citation.] The statute also assumes that young victims suffer profound harm whenever they are perceived and used as objects of sexual desire. [Citation.] It seems clear that such concerns cannot be satisfied unless the kinds of sexual misconduct that result in criminal liability are greatly expanded where children are concerned." (*People v. Martinez* (1995) 11 Cal.4th 434, 443–444 [45 Cal.Rptr.2d 905, 903 P.2d 1037].)

reconciled with a contrary finding' does not render the evidence insubstantial." (*People v. Earp* (1999) 20 Cal.4th 826, 887–888 [85 Cal.Rptr.2d 857, 978 P.2d 15], quoting *People v. Proctor* (1992) 4 Cal.4th 499, 528–529 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) Additionally, "[a]n appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396 [133 Cal.Rptr.2d 561, 68 P.3d 1].) Moreover, an appellate court "resolve[s] neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*Id.* at p. 403.)

■ Section 288 "is violated by 'any touching' of an underage child committed with the intent to sexually- arouse either the defendant or the child." (*People v. Martinez, supra,* 11 Cal.4th at p. 442.) Defendant argues the evidence was insufficient (1) to establish that Nicole was alive during the commission of the lewd conduct and (2) to prove his intent.

Dr. Heuser testified, in essence, that the bruising she observed on Nicole's body indicated her heart was still pumping blood when she sustained those injuries. Thus she concluded the bruises to Nicole's face, neck, arms, and legs occurred while Nicole was alive, as did the bruising she observed around Nicole's vaginal area and rectum. Indeed, she concluded the penetration of Nicole's rectum was a possible cause of death. Accordingly, substantial evidence established that Nicole was alive during the commission of the offense.

Substantial evidence also establishes defendant's sexual intent, based on all the circumstances surrounding the commission of the offense. (*People v. Martinez, supra,* 11 Cal.4th at p. 445.) First, Nicole's body was found in the nude. Second, the evidence firmly established that her rectum had been penetrated. Third, her vaginal opening was "very widely" open and bruised, which suggested stretching consisting with the penetration of the area with a finger. Fourth, there was body fluid evidence from which the jury could have inferred that defendant ejaculated in Nicole's presence. The conclusions to be drawn from this evidence, and the reasonable inferences therefrom, viewed in the light most favorable to the judgment are plain: defendant disrobed Nicole, or caused her to disrobe, penetrated her vaginally and anally, and ejaculated. This clearly established lewd conduct.

Defendant attempts to parse the evidence as narrowly as possible, resisting all reasonable inferences that could be drawn from the testimony of the coroner and the serologist, and citing such portions of their testimony that support his argument. In doing so, defendant simply ignores the substantial evidence rule. Properly applied to the evidence in this case, the evidence is more than sufficient to support the lewd conduct special circumstance.

O. *Denial of New Trial Motion*

1. *Sufficiency of Evidence of Oral Copulation*

Defendant argues that his conviction of oral copulation was not supported by substantial evidence and the trial court erred when it denied his new trial motion on this ground. He asserts that the insufficiency of the evidence is demonstrated by the jury's failure to find true the oral copulation special circumstance.

Defendant was charged with violation of section 288, subdivision (c), oral copulation of a person under 14 and more than 10 years younger than the perpetrator. " 'Oral copulation' is the act of copulating the mouth of one person with the sexual organ or anus of another person. [¶] Any contact, however slight, between the mouth of one person and the sexual organ or anus of another person constitutes 'oral copulation.' Penetration of the mouth, sexual organ or anus is not required. Proof of ejaculation is not required. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person engaged in an act of oral copulation with an alleged victim; and [¶] 2. The alleged victim was under the age of 14 and more than 10 years younger than the other participant." (CALJIC No. 10.46, brackets omitted.)

Defendant does not dispute that the age differential element was proved but claims the evidence was insufficient to prove an act of oral copulation occurred.

Serologist Moore's analysis of a tissue paper found in the wastebasket of defendant's bathroom revealed semen stains consistent with defendant and high amylase activity indicative of saliva consistent with Nicole. Moore testified that the stains were consistent with the product of oral copulation. Semen and saliva stains found on defendant's bed sheet, which Moore testified could also have originated from defendant and Nicole, in a pattern that indicated spewing, also supported Moore's conclusion. This evidence was sufficient to support defendant's conviction. (*People v. Scott* (1978) 21 Cal.3d 284, 296 [145 Cal.Rptr. 876, 578 P.2d 123] ["The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable"].) His citation of conflicting evidence is of no avail. (*People v. Maury, supra,* 30 Cal.4th at p. 403 [on review of a sufficiency claim, the reviewing court "resolve[s] neither credibility issues nor evidentiary conflicts; we look for substantial evidence"].)

Regarding defendant's claim of inconsistent verdicts, first, as the trial court noted, the verdicts are not necessarily inconsistent. The jury could

have found that, while an act of oral copulation occurred, the murder was not committed during the commission of that act (§ 190.2, subd. (a)(17)(F)), and could have convicted him of the substantive oral copulation count while finding the oral copulation special circumstances not to be true. In any event, any inconsistency in the verdicts does not require reversal of the oral copulation conviction. "It is . . . settled that an inherently inconsistent verdict is allowed to stand; if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of a substantive offense, effect is given to both." (*People v. Santamaria* (1994) 8 Cal.4th 903, 911 [35 Cal.Rptr.2d 624, 884 P.2d 81].)

## 2. *Remaining Issues on Motion for New Trial*

Defendant contends the trial court abused its discretion by denying his motion for a new trial. Defendant's motion advanced 12 claims.[38] Here, he confines his argument to four grounds: (1) the removal of Shafi-Nia and appointment of William Chais violated his right to effective assistance of counsel; (2) the trial court erroneously denied his venue motions; (3) the trial court erroneously declined to give certain defense penalty instructions regarding defendant's offenses as a factor in aggravation and on the burden of proof on the grounds that the instructions it gave were adequate; and (4) a new trial was justified by erroneous trial court rulings including (a) denial to the defense of access to Rauni Campbell, (b) the trial court's refusal to give an advance ruling on the scope of cross-examination of defendant at the sanity phase, (c) the exclusion of the "Sean" tape, and (d) the trial court's refusal to exclude the coroner's report as a sanction for the prosecution's alleged violation of discovery. Defendant has presented most of these claims on appeal, independent of his new trial claim, and we have found them to be without merit and rejected them. We also reject his claim that the trial court abused its discretion in denying his new trial motion on these grounds. Defendant's remaining claims are merely enumerated without further argument or citation to authority and for this reason we reject them. (*People v. Ashmus* (1991) 54 Cal.3d 932, 985, fn. 15 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

---

[38] The complete grounds include (1) insufficiency of the evidence; (2) unlawful search and seizure; (3) improper removal of Shafi-Nia; (4) replacement of Shafi-Nia with unqualified counsel; (5) denial of motions for change of venue; (6) prejudicial trial atmosphere; (7) bias of the judge and bailiffs against defendant and his supporters; (8) confusing and erroneous instructions; (9) denial of access to Rauni Campbell; (10) coerced withdrawal of defendant's insanity plea; (11) exclusion of the "Sean" audiotape; and (12) discovery violation regarding Dr. Heuser's report.

### III. Discussion: Penalty Phase Issues

A. *Evidentiary Claims*

1. *Reference to a Menendez Brother*

Defendant contends that his right to counsel was violated because the defense expert, Dr. Vicary, revealed during recross-examination that defendant had spoken to one of the Menendez brothers prior to taking several psychological tests that Vicary testified defendant had answered in such a manner as to create the impression he was mentally ill. Defendant objected when the prosecutor asked if one of the people defendant might have spoken to prior to taking the tests was one of the Menendez brothers. Outside the presence of the jury, defense counsel moved for a mistrial on the grounds it was "improper" for the prosecutor to suggest defendant was "receiving advice from one of the Menendez brothers." In the course of the discussion, the prosecutor said that Vicary had mentioned defendant had talked to the Menendez brother "off the cuff." The trial court found the question was fair and denied the mistrial but told the prosecutor "there's going to be no additional questioning on that." There was no further reference to the subject.

Defendant contends that Dr. Vicary violated his Sixth Amendment right to counsel by revealing to the prosecutor that defendant told Vicary he had talked to one of the Menendez brothers.

Defendant failed to object on this ground in the trial court, where he only objected to defendant being associated with one of the Menendez brothers. His claim, therefore, is forfeited. (*People v. Williams, supra,* 16 Cal.4th at p. 250 [constitutional objection to admission of evidence forfeited if not raised below].)

In any event, admission of defendant's statement to Vicary was relevant to the latter's assessment of defendant's mental state, which defendant himself tendered as an issue at the penalty phase, and its admission did not violate either his Fifth or Sixth Amendment rights. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1190 [9 Cal.Rptr.2d 834, 832 P.2d 146].) The prosecutor had established from Dr. Vicary that defendant had answered questions on the psychological tests so as to suggest he was mentally ill; that he may have sought advice from other inmates on how to do so was clearly relevant to the assessment of his mental state, and any such information he provided to Vicary was not privileged.

Even if the prosecutor's bare reference to one of the Menendez brothers was improper, the trial court did not abuse its discretion in denying defendant's mistrial motion. (*People v. Burgener, supra,* 29 Cal.4th at p. 873

[mistrial should be granted only when a party's chances of receiving a fair trial have been irreparably damaged].) For the same reason, even assuming the reference was improper, there is no reasonable possibility the jury would have rendered a different verdict in the penalty phase absent the error. (*People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

### 2. *Admission of Evidence of Hit-and-run Conviction*

On direct examination, Dr. Vicary testified that defendant had no prior criminal record as a juvenile or an adult. On cross-examination, he acknowledged that defendant's criminal history included a hit-and-run arrest. Subsequently, at defendant's request, the jury was instructed that defendant's conviction of misdemeanor hit and run was received in connection with Dr. Vicary's opinion of defendant's mental state and could be only be considered "in assessing what weight you choose to give Dr. Vicary's opinion. [¶] This misdemeanor is not violent criminal activity which can constitute an aggravating factor."

Defendant contends that admission of this evidence amounted to improper impeachment. Alternatively, he contends the evidence should have been excluded pursuant to Evidence Code section 352. We do not agree.

The evidence was admitted to impeach Dr. Vicary's testimony that defendant had no juvenile or adult convictions, to the extent that this conclusion reflected upon Dr. Vicary's opinion of defendant's mental state. As such, it was properly admitted. (*People v. Hendricks* (1988) 44 Cal.3d 635, 642 [244 Cal.Rptr. 181, 749 P.2d 836] ["Other-crimes evidence may be used to impeach the testimony of an expert witness"].) Furthermore, any possibility the jury might have misunderstood the purpose of this evidence was obviated by the limiting instruction, which we presume the jury understood and followed. (*People v. Harris, supra*, 9 Cal.4th at p. 426.) Defendant's Evidence Code section 352 claim is forfeited by his failure to have made this objection, but even if he had, we would find no abuse of the trial court's considerable discretion in admitting the evidence. (See *People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d 456, 892 P.2d 1199].)

### 3. *Improper Impeachment of Victoria Eckstone*

Defendant's witness Victoria Eckstone testified that she believed defendant was the father of her child and she wanted her child to continue to have a relationship with defendant even if he was incarcerated. In rebuttal, a Burbank police detective, Kevin Krafft, testified that Eckstone had told him the father of her child was William Boorstin, whom she described as her

"common law husband" of 10 years. Detective Krafft also testified he had obtained a birth certificate for the child listing Boorstin as the father. Additionally, Deputy Sheriff Brent Rollins testified that Eckstone told him defendant was the father of her child but that the name of the father's child was not on the birth certificate, and that the child would never see her father again.

Defendant argues the testimony of Detective Krafft and Deputy Sheriff Rollins should have been excluded under Evidence Code section 352 because it was more prejudicial than probative and could have confused the jury and resulted in an undue consumption of time. Defendant also argues that, even if Detective Krafft's testimony was proper impeachment because it was inconsistent with Eckstone's testimony, Deputy Sheriff Rollins's testimony was not. Finally, he argued that the trial court erred in denying his request to order a blood test to determine the child's paternity.

The underlying issue presented to the trial court was Eckstone's credibility, not the actual paternity of her child. Thus, the fact that she told Detective Krafft another man was the father of her child and put his name on the birth certificate was not only inconsistent with her testimony that she believed defendant was the child's father, but even more deeply inconsistent with her assertion that a parental bond existed between defendant and her child that she wished to maintain and perpetuate. Similarly, her statement to Deputy Sheriff Rollins that defendant would never see the child also undercut this testimony. Thus, their testimony was proper impeachment testimony. (*People v. Price* (1991) 1 Cal.4th 324, 474 [3 Cal.Rptr.2d 106, 821 P.2d 610]; Evid. Code, § 780, subds. (g), (h).)

Nor did the trial court abuse its discretion in concluding the evidence was more probative than prejudicial. In light of the relatively brief testimony of Detective Krafft and Deputy Sheriff Rollins, defendant's concern that the evidence would have led to a minitrial on the issue of Eckstone's credibility, causing an undue consumption of time or confusion of the issues, obviously did not materialize.

Finally, because the actual paternity of the child was not at issue, the trial court did not abuse its discretion in denying defendant's request for a paternity test.[39]

---

[39] Defendant asserts on appeal that the trial court's denial of his request for a paternity test violated his federal constitutional rights to due process, a fair trial, and a reliable penalty determination as required by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Assuming, without deciding, that defendant's offer of proof preserved these claims (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), because we conclude the trial court's ruling was correct, the constitutional claims fail.

## 4. *Victim Impact Testimony*

Defendant contends the victim impact testimony by Nicole's parents and brothers was cumulative, unsubstantiated and prejudicial.[40] He asserts further that fleeting references by two of the witnesses to the victim's having been "abducted" and "kidnapped" were prejudicial because the trial court had previously dismissed kidnapping charges and kidnapping special circumstances for insufficient evidence. Finally, he contends that statements made by the victim's mother to the press urging that defendant be sentenced to death violated rules regulating victim impact evidence.

In *Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597], the United States Supreme Court overruled earlier cases finding a federal constitutional proscription against victim impact evidence and argument. The high court concluded: "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." (*Id.* at p. 827.) "Moreover, after *Payne* was decided, we concluded that the immediate injurious impact of a capital murder is a 'circumstance of the crime' (§ 190.3, factor (a)) which may be introduced and argued in aggravation under state law. [Citation.]" (*People v. Montiel* (1993) 5 Cal.4th 877, 935 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People v. Edwards* (1991) 54 Cal.3d 787, 835 [1 Cal.Rptr.2d 696, 819 P.2d 436] [factor (a) of section 190.3 "allows evidence and argument on the specific harm caused by the defendant, including the impact on the family of the victim"].)

In *Edwards*, we stated that our holding "only encompasses evidence that logically shows the harm caused by the defendant." (*People v. Edwards, supra,* 54 Cal.3d at p. 835.) We said the trial court should weigh the probative value of the victim impact evidence against the prejudicial effect. " 'On the one hand, it should allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction. On the other hand, irrelevant information or inflammatory rhetoric that diverts the jury's attention from its

[40] Defendant objected to the proposed testimony of the victim's father on Sixth and Fourteenth Amendment grounds. In response, the trial court ruled that the victim's family members could testify only to "new matters that haven't been covered as we get to other witnesses." Defendant asserts that the trial court failed to follow its own ruling, permitting cumulative testimony which, as a result, violated his federal constitutional rights to fair penalty trial, his confrontation rights, and rights to due process and equal protection as required by the Fifth, Sixth, Eighth and Fourteenth Amendments. Assuming, without deciding, that his initial objection below preserved these claims (*People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), because we find no error in the admission of the victim impact evidence, defendant's constitutional claims fail.

proper role or invites an irrational, purely subjective response should be curtailed.' " (*Id.* at p. 836, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 864 [180 Cal.Rptr. 640, 640 P.2d 776].)

Defendant contends that testimony the victim's 16-year-old brother, Chad, had faltered in school and began to use drugs following his sister's death was improper because there was no connection between her death and his drug use. He also complains that, because the family's members testified about the impact of Nicole's death on one another, that the evidence was cumulative and prejudicial.

The victim's father testified that, prior to Nicole's death, Chad was the family athlete, and was a "4.0 student," but, following her death, his grades deteriorated, "he is drinking a lot and doing drugs," and would not talk about his sister but "kept it all inside himself," and refused to go to counseling. Chad's brother, 18-year-old Travis, also testified that Chad was doing worse in school and was not playing sports and stated his belief that Chad "is into drugs and alcohol because of it." We conclude that these brief references to Chad's use of drugs and alcohol were neither irrelevant nor prejudicial but, in context, depicted the "residual and lasting impact" he "continued to experience" as a result of Nicole's murder. (*People v. Brown* (2004) 33 Cal.4th 382, 398 [15 Cal.Rptr.3d 624, 93 P.3d 244].) Furthermore, the jury was specifically instructed that in assessing victim impact evidence it could "consider only such harm as was directly caused by defendant's act." In these circumstances, we conclude there was no error in the admission of this evidence. Even if it was error, given the brevity of the testimony, we would find any such error harmless.

Defendant also contends the victim impact evidence was cumulative because "the jury heard three times that Travis Parker . . . considered suicide, twice that Chad Parker may have been involved in drugs and alcohol, three times that he was having trouble in school, and twice that Casey Parker, youngest brother of the deceased, was having nightmares." We disagree. There is no requirement that family members confine their testimony about the impact of the victim's death to themselves, omitting mention of other family members. Moreover, in this case the references were brief. Accordingly, we reject defendant's claim that the testimony was unduly repetitious or prejudicial.

Defendant next contends that Mr. Parker's reference to Nicole as having been "abducted" and Chad Parker's use of the term "kidnapped" were improper because the trial court had dismissed kidnapping counts and kidnapping special circumstances for insufficiency of the evidence. Defendant

failed to object to either reference, thus his claim is waived. (Evid. Code, § 353.) In any event his claim is without merit. The witnesses' use of these terms was clearly colloquial, not legal. Moreover, the references occurred only once. In light of these circumstances, we reject defendant's assertion that the terms could have had any prejudicial impact on the jury.

Finally, defendant contends that statements the victim's mother made in a television interview calling for defendant's death violated victim impact evidence rules. These statements were not part of her victim impact testimony; nor, as we have previously observed, is there anything in the record to support defendant's allegations that any of the jurors were exposed to her remarks. Therefore, we reject the claim.

### 5. *Cumulative Prejudice*

Defendant contends the cumulative effect of the trial court's erroneous evidentiary rulings during the penalty phase requires reversal. As we have rejected his claims of error, necessarily he suffered neither individual nor cumulative prejudice from them. (*People v. Bolden, supra,* 29 Cal.4th at pp. 567–568.)

### B. Davenport *Error*

■ A prosecutor may not argue that lack of evidence of a mitigating factor may be considered by the jury as a factor in aggravation. (*People v. Davenport* (1985) 41 Cal.3d 247, 289–290 [221 Cal.Rptr. 794, 710 P.2d 861].) While conceding "the prosecutor did not specifically state that a lack of mitigating circumstance was an aggravating factor," defendant nonetheless claims the prosecutor implied as much. He contends the trial court abused its discretion when it denied his motion for mistrial on this ground.

In the brief passage of the prosecutor's closing argument that defendant cites, the prosecutor observed there was no evidence of consent by the victim (§ 190.3, factor (e)), or that the offenses had been committed under circumstances defendant reasonably believed to be a moral justification or extenuation for his conduct (§ 190.3, factor (f)), or that he acted under extreme duress or under the substantial domination of another person (§ 190.3, factor (g)). The prosecutor concluded: "No evidence of that. What you have is one person solely involved in the crime. And that's Mr. Panah." The prosecutor then reviewed in some detail the circumstances of the crime (§ 190.3, factor (a)), at the end of which he stated, "[t]hese are all factors in aggravation."

Defendant claims this last statement implied to the jurors that the absence of any evidence to support the factors in mitigation to which the prosecutor

had earlier referred converted them into factors in aggravation. Our review of the prosecutor's argument belies this claim. In context, it is clear he was referring to evidence pertaining to section 190.3, factor (a) only, notwithstanding his reference to "factors." His discussion of the lack of evidentiary support for the factors in mitigation was entirely proper. (*People v. Dyer* (1988) 45 Cal.3d 26, 83 [246 Cal.Rptr. 209, 753 P.2d 1].) The trial court properly denied defendant's mistrial motion. Necessarily, then, we also reject defendant's claim that the prosecutor's conduct and the trial court's denial of defendant's mistrial motion violated his federal constitutional rights to due process, equal protection, a fair trial and a reliable penalty determination.

## C. *Instructional Error*

Defendant contends the trial court erred when it denied or modified his proposed instructions. We find no error.

Defendant contends the trial court erred when it declined to instruct the jury as follows: "A juror properly may reject death as a penalty solely to grant mercy to a defendant." Not so. (*People v. Lewis* (2001) 26 Cal.4th 334, 393 [110 Cal.Rptr.2d 272, 28 P.3d 34] [defendant is not entitled to a pure "mercy" instruction]; *People v. Bolin, supra,* 18 Cal.4th at p. 344.) In *Bolin,* "the trial court gave the standard instruction to take into account 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial.' The court also told the jury 'to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.' No additional instruction was required." (*Bolin,* at p. 344.) Substantially the same instructions were given here.

Next, defendant contends the trial court erred when it denied his request to instruct the jury it could reject the death penalty if it had a "lingering doubt" about his guilt, though the court allowed the defense to argue the point. We have previously rejected this argument on the grounds that such instruction is not necessary because there is no requirement for it under either state or federal law (*People v. Lawley* (2002) 27 Cal.4th 102, 166 [115 Cal.Rptr.2d 614, 38 P.3d 461]), and the lingering doubt concept is sufficiently encompassed in other instructions ordinarily given in capital cases. (*People v. Hines* (1997) 15 Cal.4th 997, 1068 [64 Cal.Rptr.2d 594, 938 P.2d 388].) On the same grounds, we reject defendant's claim.

Defendant argues that the trial court improperly modified the following instruction with the addition of the italicized words: "The permissible aggravating factors are limited to those circumstances in aggravation upon which

you have been specifically instructed. Therefore, evidence which has been presented regarding the defendant's background, *if proven*, may be considered by you only as mitigating evidence." The trial court justified the addition of the phrase "*if proven*," because it made the instruction less argumentative. Defendant contends that the phrase erroneously implied the jury was required to find the mitigating circumstance had to be proven beyond a reasonable doubt. We disagree. Nothing in the phrase itself implies that the reasonable doubt standard, or any particular standard, applies. Defendant's assertion that, because the reasonable doubt standard was used in the guilt phase, the jury likely applied it in the penalty phase is speculative. Furthermore, the jury was instructed, at defendant's request, that "[a] juror may find that a mitigating circumstance exists if there is *any* evidence to support it *no matter how weak the evidence may be*." (Italics added.) We conclude, therefore, that the jury was not misled by the trial court's modification of defendant's instruction.

Finally, defendant advances two arguments regarding the burden of proof. The trial court instructed the jury that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without the possibility of parole." In addition, the jury was instructed that the determination of the appropriate penalty was not a mechanical counting process, but required the evaluation of the moral weight of all the evidence, aggravating and mitigating; that, to impose the death penalty instead of life without possibility of parole, each juror must be personally persuaded that the balance of aggravation over mitigation justified the punishment; and that each "juror may find that a mitigating circumstance exists if there is any evidence to support it no matter how weak the evidence may be." Defendant nonetheless argues that the trial court's failure to instruct the jury it could not return a judgment of death unless it found that the aggravating factors "outweighed" the factors in mitigation requires reversal. He makes the further global claim that the trial court's failure to provide a burden of proof instruction failed to give the jury adequate guidance. We disagree. "[W]e have consistently held that instructions similar to those given in this case adequately explain the jury's sentencing responsibilities and are not impermissibly vague." (*People v. Anderson* (2001) 25 Cal.4th 543, 600 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

In light of our rejection of defendant's claims of instructional error, we necessarily reject his further assertion that the cumulative effect of instructional error violated his federal constitutional rights to due process, equal protection, a fair trial, and a reliable penalty determination.

### D. *Constitutional Challenges to the Death Penalty Statute*

 Defendant raises a number of challenges to the death penalty statute that we have considered and consistently rejected in previous decisions. He provides no persuasive reason for us to reexamine those conclusions. We again conclude therefore that: (1) the statute adequately narrows the class of death-eligible offenders (*People v. Griffin* (2004) 33 Cal.4th 536, 596 [15 Cal.Rptr.3d 743, 93 P.3d 344]; *People v. Prieto* (2003) 30 Cal.4th 226, 276 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Barnett, supra,* 17 Cal.4th at p. 1179); (2) section 190.3, factor (a) is not impermissibly overbroad facially or as applied (*People v. Brown, supra,* 33 Cal.4th at p. 401; see *Tuilaepa v. California* (1994) 512 U.S. 967, 987–988 [129 L.Ed.2d 750, 114 S.Ct. 2630]); (3) the statute is not unconstitutional because it does not contain a requirement that the jury be given burden of proof or standard of proof instructions for finding aggravating and mitigating circumstances in reaching a penalty determination, other than other crimes evidence, and specifically that all aggravating factors must be proved beyond a reasonable doubt, or that such factors must outweigh factors in mitigation beyond a reasonable doubt, or that death must be found to be an appropriate penalty beyond a reasonable doubt (*People v. Welch, supra,* 20 Cal.4th at pp. 767–768); (4) neither the federal nor state Constitution requires the jury to unanimously agree as to aggravating factors, nor have our conclusions in this respect been altered by recent United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] (*People v. Ochoa, supra,* 26 Cal.4th at pp. 452–454); (5) the jury need not make written findings disclosing the reasons for its penalty determination (*People v. Jenkins, supra,* 22 Cal.4th at p. 1053); (6) the jury may properly consider evidence of unadjudicated criminal activity involving violence or force under factor (b) of section 190.3 (*People v. Brown, supra,* 33 Cal.4th at p. 402), although, we note, in this case no such evidence was introduced; (7) because the statute does not allocate the burden of proof (*People v. Medina* (1995) 11 Cal.4th 694, 782 [47 Cal.Rptr.2d 165, 906 P.2d 2]) and a burden of proof instruction need not, and should not, be given (*People v. Welch, supra,* 20 Cal.4th at pp. 767–768), neither the failure of the trial court to instruct the jury that the reasonable doubt standard does not apply to mitigating factors, nor its failure to instruct the jury it need not unanimously agree on such factors, violated defendant's constitutional rights, nor was it likely the jury would have imported the reasonable doubt standard from the guilt phase into its penalty phase deliberations; (8) the trial court is not required to omit inapplicable sentencing factors when instructing the jury (*People v. Kipp, supra,* 26 Cal.4th at p. 1138); (9) nor is the trial court constitutionally required to instruct the jury that certain sentencing factors are relevant only to mitigation

(*People v. Kraft* (2000) 23 Cal.4th 978, 1078–1079 [99 Cal.Rptr.2d 1, 5 P.3d 68]), although in this case the trial court did instruct the jury that defendant's age could only be considered for mitigation; (10) the use of certain adjectives in the list of mitigating factors, here, "substantial," "reasonably believed," and "moral," are not so vague as to erect a barrier to the jury's consideration of mitigating facts and render the statute unconstitutional (see *People v. Prieto, supra,* 30 Cal.4th at p. 276 ["extreme," "substantial"]); (11) CALJIC No. 8.88, with which the jury was instructed, adequately defines "mitigation" (*People v. Ochoa, supra,* 26 Cal.4th at p. 452) notwithstanding defendant's resort to empirical evidence which was not part of the record below (*People v. Taylor* (2001) 26 Cal.4th 1155, 1180 [113 Cal.Rptr.2d 827, 34 P.3d 937]); (12) neither the federal nor state Constitution requires intercase proportionality review (*People v. Brown, supra,* 33 Cal.4th at p. 402); (13) the statute does not deny equal protection because the statutory scheme does not contain disparate sentence review (*People v. Allen* (1986) 42 Cal.3d 1222, 1286–1288 [232 Cal.Rptr. 849, 729 P.2d 115]), nor does it deny equal protection on any other ground (*People v. Boyette, supra,* 29 Cal.4th at pp. 465–467); and (14) the statute is not constitutionally deficient because prosecutors retain discretion whether to seek the death penalty (*People v. Ochoa, supra,* 26 Cal.4th at p. 461).

### E. *Preexecution Delay*

▪ Defendant contends the delay in carrying out his execution is violative of his constitutional rights, including federal and state proscriptions against cruel and unusual punishment. We have previously considered and rejected this argument because, as we explained in *People v. Ochoa* (1998) 19 Cal.4th 353, 477–478 [79 Cal.Rptr.2d 408, 966 P.2d 442] "[a]s long as it is reasonable, the time required for our statutorily mandated review is not a violation of a criminal defendant's constitutional rights; it is essential to ensuring that those rights are and have been respected. . . . [¶] As we stated in [*People v.*] *Hill* [(1992) 3 Cal.4th 959 [13 Cal.Rptr.2d 475, 839 P.2d 984]], defendant's claim is in reality a facial challenge to the 1978 death penalty law. We have repeatedly held that the 1978 death penalty law is facially constitutional as a general matter [citation], and we adhere to our holding in *Hill* with regard to defendant's claim."

### F. *International Norms*

▪ Defendant argues that California's use of the death penalty violates international norms of humanity and decency. We have, as he acknowledges, repeatedly rejected this claim. "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. [Citations.]" (*People v. Hillhouse* (2002) 27 Cal.4th

469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Ghent* (1987) 43 Cal.3d 739, 778–779 [239 Cal.Rptr. 82, 739 P.2d 1250].)

G. *Disproportionality of Sentence*

Defendant contends his sentence is disproportionate to his culpability and violates the state's constitutional proscription against cruel or unusual punishment. Defendant cites his lack of a previous criminal history and asserts his " 'personal characteristics' and background were most impressive. [Citation.] His community activities were extremely impressive." Additionally, defendant argues he was "improperly convicted of the charged crimes."

"To determine whether a sentence is cruel or unusual under the California Constitution as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including his or her age, prior criminality, and mental capabilities. [Citation.] If the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], so that the punishment " ' "shocks the conscience and offends fundamental notions of human dignity' " ' (*People v. Cox* [(1991)] 53 Cal.3d [618,] 690 [280 Cal.Rptr. 692, 809 P.2d 351]), the court must invalidate the sentence as unconstitutional." (*People v. Lucero, supra,* 23 Cal.4th at pp. 739–740.)

It is true that defendant was a youth who, before this crime, had no prior record of any serious offenses, and it is also true that his journey from his native land to this country was an arduous and perhaps traumatic one. His personal characteristics, however, pale in comparison to the gravity and circumstances of his current offense. Defendant sexually assaulted and brutally murdered an eight-year-old child. We are unable to conclude that the penalty imposed in this case is disproportionate to his culpability.

H. *Cumulative Error*

Defendant contends the cumulative effect of error during the proceedings in his case, from pretrial rulings through the penalty phase, requires reversal. We have either rejected his claims of error or found any errors to be individually harmless. We also conclude their cumulative effect does not require reversal of the judgment. (*People v. Bolden, supra,* 29 Cal.4th at pp. 567–568.)

## IV. Disposition

For the reasons stated, we affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied May 18, 2005.